# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**MAIN OFFICE**

Wheeling, WV
75 Twelfth St.
Wheeling, WV
26003
(304) 232-9292


**OTHER LOCATIONS**

Morgantown, WV
WesMon Center IV
829 Fairmont Rd.
Suite 101
Morgantown, WV
26501
(304) 598-9292


Martinsburg, WV
300 Foxcroft Ave.
Suite 300
Martinsburg, WV
25401
(304) 263-6690


Charleston, WV
222 Capitol Street
Suite 203
Charleston, WV
25301
(304) 720-9292


Pittsburgh, PA
Mellon Center
500 Grant Street
Suite 2900
Pittsburgh, PA
15219
(412) 566-2249


Steubenville, OH
The Chase Building
401 Market St.
Suite 719
Steubenville, OH
43952
(740) 284-9292

U.S. EQUAL EMPLOYMENT          :

OPPORTUNITY COMMISSION,        :

      Plaintiff,          :   CIVIL ACTION NO.

    v                       :     2:17-cv-00073

BIG LOTS STORES, INC.,         :

      Defendant.          :


                      *   *   *

Deposition of Christena Johnson

Tuesday, April 17, 2018

                  *   *   *

a witness herein, taken on behalf of the defendant in

the above-entitled cause of action, pursuant to notice

and the Federal Rules of Civil Procedure, by and before

Connie M. Nichols, Registered Professional Reporter and

Notary Public within and for the State of West Virginia,

at the Isaac Jackson Hotel, 830 Harrison Avenue, Elkins,

West Virginia 26241, commencing at 10:25 a.m.



Register for
FREE Transcript
Repository

**Main Office**
Wheeling, WV
Toll Free: (800) 659-2249
Phone: (304) 232-9292
Fax: (304) 232-9375



**SRS**
STRESKI REPORTING
*& Video Service*
A Division of MDStreski, LLC

www.Streski.com
schedule@Streski.com
Toll Free: (800) 659-2249

```
                                                          Page 2
  1    APPEARANCES:

  2         .

  3                    On behalf of the Plaintiff:

  4              LISA H. HERNANDEZ, Esquire

  5              GREGORY MURRAY, Esquire

  6    U.S. Equal Employment Opportunity Commission, William S.

  7    Moorhead Federal Building,  1000 Liberty Avenue, Suite

  8    1112, Pittsburgh, Pennsylvania 15222

  9                  Telephone:  (412) 395-5852

 10                    Fax: (412) 395-5949

 11              E-mail:  lisa.hernandez@eeoc.gov

 12                      gregory.murray@eeoc.gov

 13

 14                       and

 15

 16              HELEN CAMPBELL ALTMEYER, Esquire

 17    U.S. Department of Justice, United States Attorney's

 18    Office, Northern District of West Virginia,

 19    1125 Chapline Street, Suite 3000, Wheeling,

 20    West Virginia 26003

 21                  Telephone:  (304) 234-0100

 22                  Fax:  (304) 234-0112

 23              E-mail:  helen.altmeyer@usdoj.gov

 24
```

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 3

```
 1   APPEARANCES (Continued):

 2

 3                    On behalf of the Defendant:

 4              DANIEL J. CLARK, Esquire

 5   Vorys, Sater, Seymour and Pease, LLP, 52 East Gay

 6   Street, Columbus, Ohio 43215

 7              Telephone:  (614) 464-6400

 8                Fax:  (614) 464-6350

 9              E-mail:  djclark@vorys.com

10

11                         and

12

13              DAVID R. STONE, Esquire

14   Jackson Kelly, PLLC, 150 Clay Street, Suite 500,

15   Morgantown, West Virginia 26501

16              Telephone:  (304) 340-1000

17                Fax:  (304) 340-1130

18              E-mail:  drstone@jacksonkelly.com

19

20

21

22

23

24
```

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 13

```
 1      Q.    What was Rich's last name?

 2      A.    I do not know, sir.

 3      Q.    Okay.

 4            And what was Rich's job title?

 5      A.    He was the manager.

 6      Q.    Okay.

 7            And do you know why Rich left?

 8      A.    No, I do not.

 9      Q.    How did you hear that Rich had left?

10      A.    Vickie Hamrick told me.

11      Q.    Okay.

12            What is Vickie Hamrick's job?

13      A.    She's underneath Rich.  So she would be like

14      the associate manager type thing.  Because he was the

15      manager.

16      Q.    So is Vickie the most-senior manager in the

17      store now that Rich is gone?

18      A.    As I was told by her, yes.  She's the one

19      that's doing all of the stuff right now until they hire

20      someone.

21      Q.    Okay.

22            How long have you been employed with Big Lots?

23      A.    Seven years.

24      Q.    What was the first position that you held?
```

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 14

1      A.    I was a cashier.

2      Q.    Okay.

3            And when you started, did you -- were you

4      limited to just doing the cashier duties?

5      A.    Yes.

6      Q.    Okay.

7            Who was the store manager at the time you were

8      hired?

9      A.    Donna -- but I can't think of her last name.

10     Donna Long is what her last name was.

11     Q.    Okay.

12           And who was the manager that replaced Donna?

13     A.    Dave Perry.

14     Q.    Okay.

15           And who was the manager that replaced Dave

16     Perry?

17     A.    Rich.

18     Q.    Okay.

19           And you said Rich was there until about two

20     weeks ago.

21     A.    Yes.

22     Q.    Okay.

23           How long had -- you said the last two weeks

24     Vickie Hamrick has been filling in for Rich --

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 16

1          **What were the stock duties?**

2      A.    That's whenever you unload the truck and then

3  you would put the truck out.  And then after you do all

4  that, then you throw the boxes in the thing, and then

5  you crush the boxes and straighten up the stockroom, and

6  plus I also did cashier too.

7      Q.    **Okay.**

8            **So after about six months at Big Lots, you**

9  **had -- you continued to work the cashier -- as a cashier**

10 **but also did the stock duties.**

11     A.    Uh-huh.

12     Q.    **Yes?**

13     A.    Yes.

14     Q.    **Did -- the stock duties, do they involve**

15 **taking the merchandize from the stockroom to the shelves**

16 **or --**

17     A.    Yes.

18     Q.    **Okay.**

19            **And how long did you do the cashier and stock**

20 **duties together?**

21     A.    For years.

22     Q.    **Did there come a time where you acquired**

23 **additional duties in addition to the cashier and stock?**

24     A.    Yeah, I went straight from stock to furniture.

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 17

1    And, of course, I did stocking, too, and cashier.

2         Q.    **Okay.**

3         A.    I did it all.

4         Q.    **You earlier described your current role,**

5    **saying you're doing a combination of cashier, stock,**

6    **recovery and furniture.**

7         A.    Uh-huh.

8         Q.    **Okay.**

9              **Yes?**

10        A.    Yes.

11        Q.    **Okay.**

12             **The -- what duties did you perform in**

13   **furniture?**

14        A.    I would take furniture we unloaded from the

15   truck and we'd put it back in the stockroom where it

16   goes.  We used to make tags, which I did that, I would

17   take make the tags of what the furniture was.  And then

18   I'd take it back there and I would put it on like the

19   couches that they belong to, or the chairs, or whatever

20   went back in the back, to locate what they was.  So

21   whenever any employees would go back there to look for a

22   specific couch, you would have that little orange tag on

23   there to see what it was so you could make sure you get

24   the right couch out and stuff.

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 18

1           I didn't put furniture together.  I did one

2   piece and it fell apart, so they told me not to do that

3   no more.

4       **Q.    My wife told me the same thing.**

5           **The recovery duties, is that cleaning up the**

6   **shelves, returning items to the shelves?**

7       A.   It was returning items to the shelves that was

8   in the buggy.  And also it was to take the stuff -- like

9   if like the shampoo's like in the back and you can't --

10  it ain't in the front, you just pull every items up so

11  people -- or so customers can get to them easier so they

12  don't have to climb up on the shelves and pull from

13  clear back in the back if they needed it or whatever.

14      **Q.    Okay.**

15      A.   And then, of course, we always had stock stuff

16  on top, and if we needed to bring them down, we can

17  always bring them down.  That would be also recovery.

18      **Q.    Did you ever perform the role of a support**

19  **manager at Big Lots?**

20      A.   I was a fourth key holder at Christmastime.

21      **Q.    Okay.**

22          **What -- is that the same as a support manager**

23  **or is that something different?**

24      A.   No, that was just -- I have a fourth key -- I

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 20

1          As of the holiday season of 2014, did you have

2    any management experience?

3    A.    I would say no.  I want to say no on that.

4    Q.    Okay.

5          Well, it's a good time for me to ask:  Before

6    you started with Big Lots, where were you working?

7    A.    Nowhere, I was a home mom.

8    Q.    Okay.

9    A.    Stay home.

10   Q.    Why did you first seek employment at Big Lots?

11   A.    I got a divorce from my ex-husband and I

12   needed to support my children.

13   Q.    Did Dave or Douglas tell you why they wanted

14   to get you manager experience?

15   A.    Because I was trying for manager's -- I was

16   trying for manager's positions and Dave Perry told me I

17   didn't qualify for anything.  So Douglas said -- they

18   told me that if I did this, that I'd be able to go

19   further along and see how I do on this.

20   Q.    Okay.

21         What were the duties of this fourth key

22   position?

23   A.    It was coming in, like, middle shifts.  Well,

24   I would come in the middle shifts between the morning's

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 25

1    Q.    In 2013 you're -- the position you held.

2    A.    Yes.  I'm just part-time person still.

3    Q.    Okay.

4          When -- do you recall when you told Mr. Perry

5    that you wanted more hours?

6    A.    I don't remember when.  I just talked to him

7    about it beforehand.  I told him that I'd like to have

8    more hours.

9    Q.    Had you told him more than once that you

10   wanted more hours?

11   A.    Yes.

12   Q.    Okay.

13         Did you volunteer to actually work at other

14   Big Lots locations in an effort to get more hours?

15   A.    Yes.  And I have done that.

16   Q.    And did Mr. Perry take you with him to other

17   stores on occasions?

18   A.    Yes.

19   Q.    And did he do that because he wanted to get

20   you more hours?

21   A.    Yes.

22   Q.    And had you told him that you were interested

23   in getting as many hours as he could give you?

24   A.    Yes.

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page  26

1      Q.    You tell him that was because you wanted to

2  make as much money as possible for your children?

3      A.    Yes.

4      Q.    Do you recall what other Big Lots store

5  locations you worked at, other than the Elkins store?

6      A.    Bridgeport, Fairmont, Morgantown.

7      Q.    How often would you -- let's just focus on the

8  time where Mr. Perry was the store manager at the Elkins

9  store.

10          How often would Mr. Perry assign you or offer

11  you an opportunity to work at another Big Lots store

12  location?

13     A.    Every time that they would call and tell him

14  that they needed help.

15     Q.    How often did that come up?  Is that every

16  month or a couple times a year?

17     A.    Mainly right around Thanksgiving and

18  Christmastime.  So that's when mainly they needed more

19  help than anything.  And I would go up and put stock

20  out.

21     Q.    And do you recall when Mr. Perry left his

22  employment at Big Lots?

23     A.    No.

24     Q.    Do you still on occasion get assigned to work

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 34

1    computer."  He said, "I'll let you know."

2            And then that morning I came in -- one morning

3    I came in and he told me that it was going in the

4    computer.  I went over to furniture and I put my

5    application in.  And then afterwards I told him that I

6    put my application in.

7        Q.    Okay.

8              **After that, did he say anything else to you?**

9        A.    He just took me in the office and he says

10   that, "I know that you put your application in and you

11   went to training and all that up there in Morgantown."

12   But he says, "I'm going to let you know something,

13   Bobbi's getting that position."

14       Q.    **Did he say why Bobbi was getting that**

15   **position?**

16       A.    He said that she's been there longer and that

17   she's more qualified for it.

18       Q.    **Do you know who made the decision on who got**

19   **that furniture position?**

20              MS. HERNANDEZ:  Objection.  Foundation.

21            Go ahead.

22              THE WITNESS:  I'm so sorry.

23              MS. HERNANDEZ:  It's okay.  Just wait.

24   Just wait until, you know, until I object and then --

756b3c98-aff2-47e7-8915-106e23ebdfa1

U. S. EQUAL EMPLOYMENT OPPTY. COMMISSION v. BIG LOT STORES, INC. 4/17/2018 CHRISTENA JOHNSON

Page 35

1          THE WITNESS:  Okay.

2          MS. HERNANDEZ:  But go ahead.

3     A.   No.

4  BY MR. CLARK:

5     Q.   You don't know who made the decision?

6     A.   Huh-uh.

7     Q.   Do you know if Dave made the decision?

8     A.   No.  I do not know.

9     Q.   Did Dave tell you whether or not he was going

10  to be involved in filling that furniture position?

11    A.   He just said that he's the manager.  Only

12  thing he told me.

13    Q.   Okay.

14         Did -- were you ever interviewed for the

15  furniture position?

16    A.   Yes.

17    Q.   Who interviewed you?

18    A.   Not Douglas, the other guy.  I can't think of

19  the name now.  It's not Tanner, it's not Douglas, it's

20  the one in-between them.  Yeah, it is Douglas, because

21  Donovan left.  I met with Douglas, that interviewed me.

22    Q.   Where did that interview take place?

23    A.   In the office at the Elkins Big Lots.

24    Q.   Was anyone else present for the interview?

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 57

1      Q.    Okay.

2            And after that conversation with Mr. Perry,

3  did you start to do that?

4      A.    Yeah.

5      Q.    And did he ever raise this issue with you

6  again, after the evaluation?

7      A.    No.

8      Q.    Okay.

9            MR. CLARK:  We've been going about an hour.

10  Are you doing all right?  Want to take a break?

11           THE WITNESS:  No, I'm good.

12                    *   *   *

13           (Whereupon, Johnson Deposition Exhibit

14  No. 6 was marked for purposes of identification.)

15                    *   *   *

16  BY MR. CLARK:

17     Q.    Ms. Johnson, we've just placed in front of you

18  a document marked as Exhibit 6.  It's titled

19  Acknowledgement of Receipt of Harassment Free Policy.

20           Do you recognize Exhibit 6?

21     A.    Yes.

22     Q.    What is it?

23     A.    It's a harassment that -- it's a policy that's

24  saying that I understand that I agree that nothing would

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 58

1    happen.  You know, like you can't harass anybody, you

2    can't make fun of people, you can't do any of that stuff

3    to this.

4        Q.    And there's a signature line for associate

5    signature.  Is that your signature on Exhibit 6?

6        A.    Yes.

7        Q.    Okay.

8              And below your signature is a line, associate

9    ID number.  There's a number printed there.  Is that the

10   associate number that you were issued by Big Lots?

11       A.    Yes.

12       Q.    Okay.

13             And the store number, 458, is that the Elkins

14   Big Lots store location?

15       A.    Yes.

16       Q.    The form is dated August 3 of 2011.  Do you

17   recall signing Exhibit 6 on that date?

18       A.    Yes.

19       Q.    Okay.

20             Do you recall where you were when you signed

21   Exhibit 6?

22       A.    I was in the office at Big Lots.

23       Q.    Okay.

24             And at the time you received and signed

Page 62

1      A.     No.

2      Q.     Did you have any problems with any other

3   associates in the store while Ms. Long was the manager

4   at the Elkins store?

5      A.     Yes, and she took care of it.

6      Q.     Okay.

7      A.     And they stopped.  Well, I should say she

8   stopped.  Because it was just one person.

9      Q.     Who was the one person you had an issue with?

10     A.     Shelia.

11     Q.     Okay.

12            What's Shelia's last name?

13     A.     Berbera? (sic)  I can't say it.

14     Q.     What's your best guess?

15     A.     Berbera.  Starts with a B.

16     Q.     And what problems did you have with Shelia

17   while Ms. Long was the manager at the Elkins store?

18     A.     She got on the phone -- or I should say the

19   intercom, and she said the same thing that I said, but

20   it was like mocking me, trying to mock me.  And Donna

21   heard it from the office, and she came out there and she

22   said for her to go home.  She told her to clock out and

23   go home.  She said, "I won't tolerate that."

24     Q.     Just that one occasion?

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 68

 1      A.    That, I can't recall if I did, if I didn't.

 2      Q.    Okay.

 3            But you know that's your signature on Page 1

 4  and Page 2.

 5      A.    Yes.

 6      Q.    Okay.

 7            The charge references disability

 8  discrimination.  Are you disabled?

 9      A.    Yes.

10      Q.    How so?

11      A.    I'm deaf in my right ear.

12      Q.    Do you have any other impairments that you

13  believe constitute a disability other than your right

14  ear?

15      A.    No.

16      Q.    Okay.

17            How long have you had the impairment of the

18  hearing of your right ear?

19      A.    All my life.

20      Q.    From birth?

21      A.    Yes.

22      Q.    Does the -- during your employment with

23  Big Lots, did you have any work restrictions or

24  limitations as a result of your hearing impairment?

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 69

1    A.    No.

2    Q.    Has your hearing impairment impacted your

3    performance of any other jobs that you've held?

4    A.    No.

5    Q.    Okay.

6          Does your hearing impairment impact your -- or

7    impose any limitations on your life outside of work?

8    A.    No.

9    Q.    Are you under -- I guess let's focus on the

10   2015 time period, were you receiving any medical

11   treatment or therapy for or related to your hearing

12   impairment?

13   A.    No.

14   Q.    And looking back at the first page of

15   Exhibit 7, it says -- where the box says "the

16   particulars are," it says:  On August 1, 2010, I started

17   my employment with Big Lots.

18   A.    Yes.

19         That's wrong.

20   Q.    Okay.

21   A.    Supposed to be August 30 of 2011.

22   Q.    Okay.

23         Do you know how that error got on there?

24   A.    No, I do not.

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 72

1    wrong.

2         Q.    Okay.

3               So, but do you still believe you read it

4    before you signed Exhibit 7?

5         A.    I think I did.

6         Q.    Okay.

7         A.    But it's all wrong.

8         Q.    Okay.

9               Let's just focus on the statement it says:

10   During the course of my employment the staff made fun of

11   me because of my disability.

12              Do you see that statement?

13        A.    Yes.

14        Q.    Who on the staff made fun of you because of

15   your disability?

16        A.    Shelia, there's Bobbi, there's Kellie, there's

17   Pam.

18        Q.    And what did Shelia do to make fun of you

19   because of your disability?

20        A.    Shelia.  Okay.  Well, first of all, she mocked

21   me.  If I come in and if I didn't say her name

22   correctly, she would -- if I said "Shelia," she would

23   said, "Shelia!  Shelia!  Why don't you get my name

24   correctly?  Why don't you just go home, you retard."

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 74

1     Q.     Okay.

2            So when you talked earlier about the fourth

3     key-holder position --

4     A.     I was --

5     Q.     -- you were in that line, it's just the

6     numbers.

7     A.     I was in there way low, yeah.  I was just -- I

8     was just a key -- what they did with me and what they do

9     with everybody else is like at Christmastime, they would

10    give you a key, they would have an extra manager, which

11    would be the lower one, which I would be four or five

12    key holder.  Because they would want that extra manager

13    there just in case in the evenings or in-between the

14    first and third manager would come in.  So you would

15    just come in in-between and take care of stuff.

16           I mean you don't do as much as, you know, the

17    regular manager does or the night-shift manager does.

18    But you do, you know, that's to help you train yourself

19    to get you prepared to be what a manager is at Big Lots.

20    Q.     Okay.

21           So you said that -- that Kellie actually saw

22    Shelia mock you?

23    A.     Oh, yeah.  She would do the same thing.

24    Q.     Anybody else witness Shelia mocking you?

756b3c98-aff2-47e7-8915-106e23ebdfa1

U. S. EQUAL EMPLOYMENT OPPTY. COMMISSION v. BIG LOT STORES, INC. 4/17/2018 CHRISTENA JOHNSON

Page 77

1      Q.      -- how often?

2      A.      She did it with Donna that one time, and then

3   when Donna sent her home, that was it for -- until Dave

4   started.  And then whenever Dave became the manager

5   there, then that's when she really started.  Just

6   picking on me, calling me names.  Saying that she's the

7   CSS and that I better listen to her or she's going to

8   send me home.  Changing my schedule around.

9           I would think my schedule is this day, and

10  then I would come in -- because I would check it, and

11  I'd write down my schedule.  And then the next day I'll

12  come in at such a time, and Dave would jump me and tell

13  me, "Christena, you're supposed to be in at this

14  such-and-such a time."

15          And I would say, "Dave, let's see what the

16  schedule says here in this book."

17          And he then he would go up there and he would

18  see that someone erased my schedule and put Shelia on

19  there.  And then he would ask Shelia, and she said,

20  "Yeah, I'm the CSS, I can do what I want."

21     Q.      Is that true?  Is the CSS allowed to change

22  the schedule?

23     A.      I do not know, sir.  I couldn't tell you.

24     Q.      Of the associates in the Elkins store, did you

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 79

1     Q.    Did you ever talk to other associates about

2     the number of hours they were being scheduled for?

3     A.    Yes.  And everybody didn't have a problem with

4     it.

5     Q.    Nobody told you they thought you were -- it

6     was unfair that you were getting more hours than they

7     were?

8     A.    No.  Except for Shelia.

9     Q.    Okay.

10          So Shelia did have a problem with the number

11    of hours.

12    A.    Yes.

13    Q.    And how do you know that?

14    A.    She would tell me.

15    Q.    And when did she tell you that?

16    A.    Whenever I -- if I got an hour -- if, like,

17    say if I got 35 hours and she only got 34-1/2, she would

18    take five of my hours from me and she would put it on

19    herself.  And she would tell me, "Well, you don't

20    deserve no hours."

21    Q.    Was she hostile to you when she told you that?

22    A.    Oh, yes.

23    Q.    Okay.

24          When did she first start to demonstrate some

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 81

1    That's all the freight in the back.  They expect that

2    stuff to be out on the shelves, not sitting back there

3    in the stockroom.

4         So whenever -- if Dave would ask me if I would

5    do that, that's where I got my extra hours, because I

6    would do stuff like that.

7    **Q.    Did Shelia ever make any comments to you about**

8    **your hearing impairment?**

9    A.    She called me deaf, stupid, retarded.

10   **Q.    Is that all at one time or are those**

11   **separate --**

12   A.    Those are all just separate times.

13   **Q.    Okay.**

14   **Do you recall when she called you deaf?**

15   A.    Yeah, she called deaf.

16   **Q.    Do you recall when?**

17   A.    Just in the evenings, whenever her and Kellie

18   would be working together.

19   **Q.    Was it every time they worked together she --**

20   A.    Almost every time that they worked together.

21   **Q.    What -- in what context?**

22   A.    Well, she -- if I would say, "Shelia, can you

23   answer the phone?"

24        She'd say, "Can't you answer it, you deaf

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 82

1  person?"

2           And then I'd say, "Okay."  So I'd answer it.

3           And then her and Kellie would stand there, and

4  while I'm trying to talk to -- when you're deaf, when

5  you're trying to talk to someone on the phone, you only

6  have the one ear.  And whenever someone's in -- right

7  behind you, right in your ear, laughing at you and

8  you're trying to hear your customers, that's pretty

9  hard.

10           And you turn around and you go, "Shh, I'm

11  trying to listen."

12           "Oh, you deaf person!"

13           And that's whenever Kellie would start.

14      Q.    **What would Kellie --**

15      A.    That's when she would say, "You deaf person,

16  get off the phone if you can't hear anybody."

17      Q.    **Kellie would say the same thing --**

18      A.    Yes.

19      Q.    **-- call you deaf.**

20      A.    (The witness nodded her head.)

21      Q.    **Okay.**

22           **When did Shelia call you retarded?**

23      A.    Whenever she had a chance.  In the evenings,

24  during the day, whenever I would be working.  If I asked

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 83

1   her something and if she was mad, she'd call -- she

2   would just say, "Go away, retard."

3       Q.    **What was -- do you know what she was mad**

4   **about?**

5       A.    No.

6       Q.    **Was she mad at you or just mad in general?**

7       A.    Just mad in general.  Throwing things,

8   throwing the register around, you know, picking up the

9   register and banging it because it wouldn't close right

10  or something or -- and then if someone was to say,

11  "Christena, can you go get her to stop because, you

12  know, we're busy."

13          And I would say, "Shelia, we got customers in

14  the store, you got to calm down."

15          "Go away, you retard."

16      Q.    **Did she call other people retard?**

17      A.    No.  As I heard, no.

18      Q.    **Okay.**

19          **Did other people hear Shelia call you retard?**

20      A.    If they did, they never said anything to me.

21      Q.    **You also said that Shelia called you stupid?**

22      A.    Yes.

23      Q.    **Okay.**

24          **In what context did she call you stupid?**

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 84

1    A.    If I asked for help or anything.  Like if I

2  asked for help over there in furniture or something, if

3  her and Bobbi standing there, and I would say, "Bobbi,

4  can you come and help me in furniture?"

5        Shelia would look at me and say, "Well,

6  Christena, can't you do it?  Or are you stupid or what?"

7        Or I would say, "Bobbi, can you go over here

8  and look for this type of furniture because I can't -- I

9  don't see it over here."

10        "What are you?  Stupid?"

11    Q.    **Would you say anything in response to her?**

12    A.    Only thing I said is, "No, I'm not stupid.

13  Shelia, please stop calling me names."

14    Q.    **Did -- you said earlier that Bobbi also made**

15  **fun of you because of your disability.**

16    A.    Yes.

17    Q.    **How so?  What did Bobbi do?**

18    A.    The same stuff.

19    Q.    **What specifically did Bobbi do?**

20    A.    And then -- specifically?

21    Q.    **Yes.**

22    A.    Bobbi would -- if I would ask her to help me

23  over there in furniture and stuff, she would do the same

24  stuff.  "What are you?  Stupid?  Retarded?  Can't you do

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 86

1     A.    If I asked Bobbi to ask -- to help me, she

2  would call me stupid and retarded and the same thing.

3  And then they would all sit around and laugh at me.

4     **Q.    Okay.**

5     A.    One night I asked for Bobbi to help me with

6  furniture.  I had a kitchen cart, and the guy wanted to

7  take it with him, and I had one.  And I came over and I

8  asked Bobbi, I said, "Bobbi," I said, "Can you help?"

9         And the guy was standing there, and he stood

10  right there beside me and he said, "I'll help you lift

11  it up."

12         And I said, "No, you can't go back there,

13  sir."  I said, "But I appreciate it."

14         And she said, "Well, I'm not lifting that

15  furniture."

16         Well, I lifted the kitchen cart up on the -- I

17  want to call it -- we call it like a mattress cart.  And

18  I lifted it up on there and I carried it out.  He paid

19  for it; I took it up to the register; I signed my paper

20  saying that, you know, that he's taking it.  I took it

21  out to his truck.  And I asked Bobbi and Kellie, because

22  they both was up front, I asked them to hold the doors

23  open so I can, you know, to get it out.

24         And Kellie said, "I'm eating dinner, get it

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 87

1    yourself, you retard."

2            And the guy looked at her and said, "She's not

3    a retard.  She's doing the best that she can by herself

4    because none of you want to help her."

5            So he held one door, and I opened up the other

6    and I pushed the cart out.  And I was trying to lift the

7    kitchen cart on top of his truck, and I couldn't get it

8    up on top.  And he looked inside -- he went inside and

9    he asked them, he says, "Can you not help this poor

10   woman?"

11           And they laughed at him.

12           Because he came back out and says, "Whenever

13   you get done," he says, "I'm going to help you."  He

14   says, "Whenever you get done, I want the number," he

15   says, "because I'm calling."  He said, "This is" -- and

16   this is the word that he used -- "this is bullshit,

17   because you're out here struggling and they're in there

18   laughing at you, eating."

19           And I said, "I'm sorry, sir."

20      Q.    Do you recall when this was?

21      A.    2015.  I think it was back in August or

22   October.  It was like almost wintertime, so it would

23   have been in October.

24      Q.    October of what year?

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 88

1      A.    2015.

2      Q.    And you mentioned that the customer had asked

3  for a number.

4      A.    Yes.  I --

5      Q.    Whose number?

6      A.    He wanted the corporate's number.  He wanted

7  to call.  And I had came back in, I got the paper, I

8  looked it up, I got me a piece of paper, I wrote down

9  the number, he came in and he looked at all three of

10  them.

11         And he says, "I'm calling in all three of

12  you."

13         He says, "This is bull."

14         He says, "There is no sense in this, when the

15  woman's asked you several times to help her."

16      Q.    And what position did Bobbi hold at this time?

17      A.    She was just a cashier.  But she was over

18  there in furniture working with me that night.

19      Q.    So if Bobbi ultimately took the furniture

20  manager position in early 2015, would this have been --

21      A.    October 2015, yeah, then she was furniture

22  manager.  And she didn't do it.

23      Q.    It was -- well, was she furniture manager or

24  she was --

756b3c98-aff2-47e7-8915-106e23ebdfa1

U. S. EQUAL EMPLOYMENT OPPTY. COMMISSION v. BIG LOT STORES, INC. 4/17/2018 CHRISTENA JOHNSON

Page 89

1     A.    She was doing both.

2     Q.    -- or it was a different time?

3     A.    She was doing both that time.  So it might

4  have been 2014, 2013 then.

5     Q.    Do you know?

6     A.    No.

7     Q.    Okay.

8           How do you recall it being in October?

9     A.    Because it was -- it was two weeks after

10  Forest Festival.

11    Q.    What's that?

12    A.    It's a thing that we have down here in Elkins,

13  it's a carnival with rides.

14    Q.    Okay.

15          How do you recall that this incident was after

16  that festival?

17    A.    Because I have that written down on my

18  paperwork.

19    Q.    What paperwork are you referring to?

20    A.    The ones that I was told to keep track of when

21  things happens to me.

22    Q.    Who told you to keep track of things happening

23  to you?

24    A.    Sheria Blackburn and Jane, the one that we was

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 92

1      Q.      Why not?

2      A.      Because it was mine.

3              I talked to Dave about it.  I told Dave, and

4      Dave was supposed to do something, and then he never

5      done anything.  Until one day, I just went in there and

6      I just -- I was mad.  I came into the store and I told

7      him --

8              I said, "We need to talk."

9              I took him into the office.

10             I said, "Dave -- "

11             I said, "I'm very upset with you."

12             I said, "I have gave you chances after chances

13     after chances."

14             I said, "I have asked you to do something with

15     Bobbi.  I've asked you to do something with Shelia.

16     I've asked you to do something with Pam.  I've asked you

17     to do something with Kellie."

18             And I said, "You refused to do anything with

19     them."

20             So I said, "I think what we need to do is go

21     to higher up."

22             And that's whenever he said, "Don't do that."

23             He says, "Give me another chance.  I'll take

24     care of it, because we do not want anyone to come down

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 101

1    A.    I just told them, I said, "You all need to

2    stop."

3          And then I tried to ignore it.  And some

4    nights it was harder than others, but I tried my best to

5    ignore, because I have to have a job.  So I just try to

6    focus on my job and focus on doing other things and

7    staying away from them as much as possible.

8    Q.    **Why did you not call Mr. Bond when the**

9    **harassment resumed?**

10   A.    Because I went back to Dave and I told Dave,

11   and he said that he would take care of it.  He said that

12   he was going to call him and talk to him and see what

13   needs to be done.   And I let it go and go and go.

14         I just kept asking them stop.  When I would be

15   around, if they said anything, called me stupid and

16   retarded, fuzzy bunny, whatever they wanted to call me

17   at that time.

18         I'd say, "Please stop.  Please stop doing

19   this.  I'm not a person, you know, to make fun of

20   but" --

21   Q.    **What -- fuzzy bunny, do you know what that's a**

22   **reference to?**

23   A.    I had some hair on my black shirt, and Bobbi

24   called me fuzzy bunny.

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 103

1    dogs and cats has got hairs, so it's all over your

2    shirt.

3        Q.    Okay.

4              So I had previously asked you about the ways

5    in which Bobbi had mistreated you or made fun of you.

6    You had -- she called you stupid.

7        A.    She called me stupid.

8        Q.    A retard?

9        A.    Retard.

10       Q.    And fuzzy bunny?

11       A.    Fuzzy bunny.

12       Q.    Any other ways in which Bobbi made fun of you?

13       A.    No, I don't think so.

14       Q.    Okay.

15       A.    Not at this time, I can't think of anything

16   right now.

17       Q.    You still work with Bobbi?

18       A.    No, she -- they fired her.

19       Q.    Do you know why they fired her?

20       A.    No, I do not.

21       Q.    When was the last time you saw Bobbi?

22       A.    I want to say two weeks ago when she came into

23   the store to buy some stuff.

24       Q.    Did you talk to her?

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 105

1    A.    Mistreating me, Shelia?

2    **Q.    Yeah.**

3    A.    I know it was last year that's -- she ain't

4  been saying anything to me this year.  She been talking

5  to me nicely this year.  She ain't been saying any mean

6  things this year at all.

7    **Q.    Do you know why she's changed this behavior?**

8    A.    No, I do not.

9    **Q.    I had asked you previously about who had made**

10  **fun of you at Big Lots, you also identified Pam.**

11   A.    Pam Kelly, yeah.

12   **Q.    What's Pam's last name?**

13   A.    Kelly, I think that's her last name.  No --

14  yeah, I want to say Pam Kelly.  I might be wrong.

15   **Q.    Okay.**

16   A.    She don't work there no more either.

17   **Q.    When's the last time you worked with Pam, that**

18  **you recall?**

19   A.    That, I don't remember.  It's been years --

20  it's been a couple years.

21   **Q.    And do you know why Pam's no longer at**

22  **Big Lots?**

23   A.    No, I do not.

24   **Q.    What was Pam's job at Big Lots when she was**

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 106

1    **there?**

2        A.    That, I do not recall.

3        **Q.    Did she work at a cash register with you?**

4        A.    I think so.  I think she used to do that.

5        **Q.    Did -- what did Pam do to make fun of you?**

6        A.    She would -- only thing that she would do is

7    she would mock me.  And other than that, that's about

8    the only thing that she did.  And she didn't do as much

9    as Kellie and Bobbi and Shelia did.

10       **Q.    What did she do to mock you?**

11       A.    If I would say something, she would go and

12   say -- try to say the same thing, but slur her words.

13       **Q.    Do you recall how many times she did that?**

14       A.    I wouldn't hear her but, say, maybe a few

15   times.

16       **Q.    Was she -- she was repeating --**

17       A.    What I would say.

18       **Q.    -- what you would say?**

19       A.    Yeah.

20       **Q.    Was she doing the repeating to you or to**

21   **someone else?**

22       A.    She would just say it just to say it.  Even

23   though --

24                And I would say, "Pam, that's not nice."

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 109

1          And how about you mentioned Kellie -- Kellie's

2    last name?

3        A.    Kellie Graham.

4        Q.    When's the last time you worked with Kellie

5    Graham?

6        A.    Couple years ago.

7        Q.    Is she employed at Big Lots?

8        A.    No.

9        Q.    Do you know when the last time she was -- a

10   couple years ago was the last time she worked there.

11       A.    Yes.

12       Q.    Do you know why her employment at Big Lots

13   ended?

14       A.    No.

15       Q.    What position did she hold at the time she

16   left?

17       A.    She was a key holder.

18       Q.    Do you know what she did as a key holder?

19       A.    She did everything as a manager.  She opened,

20   closed.  Ran the store just like the managers do.

21       Q.    And how did Kellie Graham make fun of you?

22       A.    By calling me names.  "Retarded," "stupid,"

23   "dumb".

24       Q.    More than once?

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 113

1           And I just looked at her and said, "You know

2    what, I can't read."

3           And I threw the box at her.

4           And when I threw the box at her, she picked it

5    up.

6           And she says, "We're going to have a

7    discussion after this."

8           I said, "That's fine."

9           And whenever we got done, I looked at her and

10   I told her, I said -- when we got done with the truck

11   and stuff --

12          I looked at her and I said, "Don't you ever

13   call me stupid again," I said, "or you can do the truck

14   yourself."

15     Q.    Do you recall when this incident was?

16     A.    No, I do not.  And ever since then, we've been

17   friends.

18     Q.    Were you and Ms. Eddleman and Ms. Blackburn

19   kind of considered a clique in the store?

20     A.     No.  We was friends, yeah.  Whenever they went

21   for breaks or something, they would always come and get

22   me and take me.  Because I would never take breaks or

23   lunch or anything.  I would always keep busy, keep doing

24   what I was supposed to be doing.  Stock or furniture,

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 114

1    whatever.

2          So one of them always came and got me.  And we

3    would go out and smoke -- well, they would smoke

4    cigarettes and I would just stand there and talk to them

5    for a little bit.

6       **Q.    So the three of you would take breaks**

7    **together.**

8       A.    Sometimes, yes.

9       **Q.    Okay.**

10         **Would Pam and Bobbi and Kellie take breaks**

11   **together?**

12      A.    Yes.  They'd go back to the office.

13      **Q.    They took their breaks in the office.**

14      A.    Yes.

15      **Q.    And you and Ms. Eddleman and Ms. Blackburn**

16   **would take breaks outside.**

17      A.    We go out outside like we was supposed to.

18   And that's not always, because there were times that

19   Tisha and Sheria would go out, and there's times that me

20   and Sheria would go out, and then there's times that

21   we'd all take separate breaks.  It wasn't an everyday

22   thing that we did, you know, 24 hours a day or anything.

23   Because some of us had to work.

24         Whenever I started working with Sheria over

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 115

1    there in furniture, that's whenever me and Sheria took a

2    lot of breaks together.  Because we'd lift all that

3    furniture and stuff together and everything.

4          And she would say, "Come out and have a -- you

5    know, get some air."

6          Q.    Did -- was Ms. Eddleman ever present when

7    Kellie, Bobbi, Pam or Shelia made fun of you?

8          A.    Sometimes she was present.  She was working.

9    I don't know if she ever heard them call me anything or

10   anything.

11         Q.    When you say "present" -- that she was just in

12   the store?

13         A.    She was just at the store, working.

14         Q.    She wasn't with you when it was going on.

15         A.    No.

16         Q.    Okay.

17               Did you ever tell Ms. Eddleman about being

18   made fun of?

19         A.    Yes.

20         Q.    At the same time it happened?

21         A.    Yes.

22         Q.    Do you recall any specific conversations with

23   her about that?

24         A.    The only thing I would tell her -- because she

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 121

1    A.    Yes.

2    Q.    And you have not looked for work during that

3   time.

4    A.    No.

5    Q.    Do you have any plans to look for work in the

6   near future?

7    A.    In the future?  Probably, maybe, if I can make

8   more money somewhere, yeah.

9    Q.    If an opportunity came up, you would explore

10  it?

11   A.    Yeah, I'd do it, yeah.  Who wouldn't?

12   Q.    I guess my question -- are you actively doing

13  anything to look for such an opportunity?

14   A.    No.

15   Q.    Okay.

16         So your plan for now is to stay with The Lunch

17  Box 40 hours a week and part time at Big Lots.

18   A.    As of right now, yes.

19   Q.    Okay.

20         And that could change if you found an

21  opportunity that was better.

22   A.    Well, Vickie said that the opportunity of the

23  furniture manager position might come back open --

24   Q.    Okay.

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 122

1    A.    -- at the Elkins Big Lots.  So I was thinking

2    about taking -- applying for it, if it does, and see

3    where it goes from there.

4         Q.    Okay.

5    A.    Because they're always talking about leaving.

6    So I was thinking about applying for it.  And like I

7    told Vickie, that's something I might do.  So --

8         Q.    Okay.

9    A.    And then if that happens, then I'm going to

10   leave The Lunch Box, because I'll get benefits and

11   everything at the Big Lots.

12        Q.    Okay.

13        Who was talking about leaving?

14   A.    Daryl -- I don't know what his last name is.

15   Vickie Hamrick, the manager there now, she was telling

16   me about it.

17        Q.    Okay.

18   A.    That he was talking to her about quitting.

19        Q.    Daryl's currently the furniture --

20   A.    And Daryl's the furniture manager right now.

21        Q.    Okay.

22   A.    And like I told Vickie, I might have to redo

23   everything, restudy everything, because I'm not -- we

24   got new furniture and stuff.  I'm not familiar with

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 128

1    she is.  She was some -- she's no longer with the

2    company, but she was somebody that came down to -- had

3    some interviews with some people.

4        Q.    Okay.

5              And how do you know Billie Jo's no longer with

6    the company?

7        A.    That's what everyone told me, she was no

8    longer with the company.

9        Q.    So take a step back to the conversation with

10   Ms. Blackburn in the bathroom.  And she calls --

11       A.    She didn't say --

12       Q.    -- she called Dave.

13       A.    No, when we was in the bathroom, she was just

14   trying to take care of me.

15       Q.    Okay.

16       A.    Getting me calmed down.  And then she asked me

17   what happened, and I told her.  And then when I told her

18   that the girls was, you know, picking on me and making

19   fun of me up there -- well, she knew what the girls

20   names was, was Shelia and Bobbi and Kellie.  She went

21   over to -- she said okay.

22             Once we got done with that, she went up to the

23   register -- to the furniture register, and that's

24   whenever she called Dave and then that's when she called

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 133

1    Ms. Blackburn left the store --

2        A.    Do not know for sure.

3        Q.    -- that Billie Jo came down?

4              Was it a couple days, couple weeks?

5        A.    I think it was a couple weeks.

6        Q.    Did you take any notes about your -- the --

7    Billie Jo's investigation?

8        A.    No.

9        Q.    Why not?

10       A.    Because I was just telling her what happened,

11   and then that was it.

12       Q.    Did you give Billie Jo the notes that you had

13   been keeping at home?

14       A.    No.

15       Q.    Why not?

16       A.    Because those were, like I said, that was my

17   diary, and I didn't give them to her.  That was back in

18   2013, I didn't have nothing back then.

19       Q.    You think the conversation -- the --

20   Billie Jo's investigation was in 2013.

21       A.    Yeah, I think so.

22       Q.    Did you start keeping the notes in your diary

23   at home before or after --

24       A.    After.

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 134

1     Q.     -- your conversation with Billie Jo?

2     A.     After.  It was late 2014.

3     Q.     Was when you started keeping them.

4     A.     Uh-huh.

5     Q.     Are you still taking notes about any

6  mistreatment that happens at work?

7     A.     No.

8     Q.     When did you stop taking notes about your --

9     A.     2016.  Beginning of 2016.

10    Q.     So you kept notes from late 2014 to early

11  2016.

12    A.     Something like that.  But it's not, like,

13  constantly.  It was just like a couple here and there.

14    Q.     Okay.

15    A.     Stuff really, you know, hurt my feelings.

16    Q.     What happened in early 2016 that --

17    A.     Nothing happened in 2016.

18    Q.     So did you stop taking notes because nothing

19  was happening at work?

20    A.     Right.

21    Q.     Okay.

22           Did you speak with Billie Jo in person?

23    A.     Yes, I did.

24    Q.     Where did you meet with her?

Page 136

 1       Q.    Did she ask you to tell her all the ways in

 2   which she felt you'd been mistreated?

 3       A.    That, I don't recall.

 4       Q.    Do you recall telling her about the ways you

 5   felt you had been made fun of?

 6       A.    Yes.  And I gave her the names too.

 7       Q.    Okay.

 8             Did you feel like you got to -- that you told

 9   her everything that you could remember at that time?

10       A.    Yes.  That was happening to me at that time,

11   yes.

12       Q.    Do you recall anything that she told you?

13       A.    No.

14       Q.    Did she tell you what -- she tell you to do

15   anything after the interview?

16       A.    During the -- I do remember her saying that if

17   I have any problems or anything, I can give her a call.

18   And she gave me her card.

19       Q.    Like a business card?

20       A.    Yeah.

21       Q.    Okay.

22             Did you ever call her?

23       A.    No.

24       Q.    Did you understand that Billie Jo came from

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 137

1   the Big Lots HR department, human resources?

2       A.    No.

3       Q.    Did you see her in the store after this

4   interview?

5       A.    No.

6       Q.    You never saw her again, just the one time.

7       A.    Just the one time.  I've heard she'd been in

8   the store, but I wasn't present when she was in the

9   store.

10      Q.    Are you certain of that, or you just don't

11  recall?

12      A.    No, that's what I remember.

13      Q.    You're certain that you didn't -- you had

14  never seen her since the interview?

15      A.    Right.

16      Q.    Okay.

17            After your -- the interview with Billie Jo,

18  did the mistreatment stop?

19      A.    For a while.  About two, three months.

20      Q.    And in two or three months it started.

21      A.    Yeah.

22      Q.    Same people?

23      A.    Same people.

24      Q.    Same kind of conduct?

Page 138

1    A.    Same kind.

2    **Q.    Did you call Billie Jo?**

3    A.    No.

4    **Q.    Why not?**

5    A.    I told David Perry about it, try and give it

6    back to him.  Because he just kept telling me that he

7    didn't want anyone to come to the store and stuff, that

8    he would take care of it, he'd take care of it.  And so

9    I'd try to leave it up to him.  But he never did.

10   **Q.    So did you think that at this point that Dave**

11   **Perry was going to put a stop to things, when you told**

12   **him about it?**

13   A.    I was hoping that he would.

14   **Q.    But he hadn't in the past.**

15   A.    But he didn't do it in the past and he didn't

16   do it in the future.

17   **Q.    So why didn't you call Billie Jo then?**

18   A.    Because, like I said, he told me that he

19   didn't want no one to come down to the store, he wanted

20   me to try to keep -- he would take care of it and he

21   would solve the problem.  And Tisha -- Sheria Blackburn,

22   she got tired of it one night and she put a stop to it.

23   **Q.    But Billie Jo came after the call from --**

24   **right, from after Mrs. Blackburn's call?**

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 140

1    fun of by four different associates.  Is it -- just to

2    get the basic timeline -- under Donna, your first

3    manager, there was one incident with Shelia, that Donna

4    spoke to her about.  And under Dave Perry, there were a

5    number of incidents that you spoke with him about.  And

6    then after Dave left, the mistreatment stopped.

7         A.    Yes.

8         Q.    Okay.

9         A.    Yes.

10        Q.    So except for the one instance with Donna, all

11   of the mistreatment took place while Dave Perry was the

12   store manager.

13        A.    Yes.

14        Q.    Other than your interview with Douglas

15   Browning, did you have any interactions with him?

16        A.    No.

17        Q.    Did you notice any changes that he brought to

18   the store or policies or procedures?

19        A.    No.

20        Q.    Do you believe that Mr. Browning treated you

21   unfairly in any way?

22        A.    Yes.  He didn't take care of anything.

23        Q.    What did he not take care of?

24        A.    What everybody said that he was supposed to

756b3c98-aff2-47e7-8915-106e23ebdfa1

U. S. EQUAL EMPLOYMENT OPPTY. COMMISSION v. BIG LOT STORES, INC. 4/17/2018 CHRISTENA JOHNSON

```
                                                      Page 146
 1    under oath.  Do you understand that?

 2        A.    Yes.

 3        Q.    Okay.

 4              I want to go over a couple documents with you

 5    not in much detail, but just to see if you have seen

 6    them before.

 7                    MR. CLARK:  We'll mark them all at once.

 8                         *   *   *

 9                    (Whereupon, Johnson Deposition

10    Exhibit Nos. 8, 9, 10 and 11 were marked for purposes of

11    identification.)

12                         *   *   *

13    BY MR. CLARK:

14        Q.    I'll hand you Exhibit 8 and 9.  This one is

15    10, and that's 11.

16              If we could start just with Exhibit 8.  I

17    marked four exhibits and handed them to you, marked 8,

18    9, 10 and 11.  Just looking at Exhibit 8, do you

19    recognize Exhibit 8 as Big Lots' Equal Employment

20    Opportunity Policy?

21        A.    Yes.

22        Q.    And did you see this document as a Big Lots

23    employee?

24        A.    Do what now?
```

STRESKI REPORTING & VIDEO SERVICE  1-800-659-2249
Wheeling, WV  Morgantown, WV  Martinsburg, WV  Charleston, WV  Steubenville, OH  Pittsburgh, PA

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 147

1    Q.    Did you see or receive a copy of this policy

2    as part of your employment at Big Lots?

3    A.    Yes.

4    Q.    Do you recall how you accessed, whether --

5    A.    I got this from Donna.

6    Q.    Okay.

7          That was your original store manager.

8    A.    Yes.

9    Q.    Okay.

10         Turning to Exhibit 9.

11   A.    (Witness complies.)

12   Q.    Do you recognize this as Big Lots'

13   Harassment-Free Environment Policy?

14   A.    Yes.

15   Q.    Did you also receive this policy from Donna?

16   A.    Yes.

17   Q.    Okay.

18         Let's look at Exhibit 10.

19   A.    (Witness complies.)

20   Q.    Do you recognize Exhibit 10 as a Standard of

21   Conduct policy at Big Lots?

22   A.    Yes.

23   Q.    And did you receive this policy from Donna

24   around the time you were hired at Big Lots?

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 148

```
 1      A.    Yes.

 2      Q.    And the last one, Exhibit 11, do you recognize

 3  Exhibit 11 as Big Lots' Open-Door Policy?

 4      A.    Yes.  I got this from Donna too.

 5      Q.    Okay.

 6            Do you have -- currently as a Big Lots

 7  associate, do you have access to employment policies?

 8      A.    What do you mean?

 9      Q.    Do you have -- you're currently a Big Lots

10  associate, correct?

11      A.    Yes.

12      Q.    Do you have current copies of Big Lots

13  employment policies?

14      A.    Do I have copies?

15      Q.    Yes.

16      A.    Yes.  In my files at the house.

17      Q.    Okay.

18            Do you -- are those the current policies or

19  are those --

20      A.    When I first started.

21      Q.    Okay.

22      A.    Nothing new.

23      Q.    Okay.

24            You testified earlier, if you recall, about
```

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 149

1    the furniture manager position that you sought in early

2    2015.

3        A.    Yes.

4        Q.    And that was the position that was opened up

5    when Ms. Blackburn left Big Lots employment?

6        A.    Yes.

7        Q.    And I believe you testified you applied for

8    that position.

9        A.    Yes.

10       Q.    Right.

11             On the computer.

12       A.    Yes.

13       Q.    Do you know why Ms. Blackburn left Big Lots?

14       A.    She was -- she gave an -- what's that word --

15    ultimatum -- she either had to quit one job or quit Big

16    Lots --

17       Q.    Okay.

18       A.    -- might as well say.  That's what Dave told

19    her.

20       Q.    Dave told you that or --

21       A.    Dave told Sheria that, and I was right in

22    front of Sheria whenever he told her that.

23       Q.    Okay.

24             And did he also say that she couldn't stay on

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 161

1    A.    Yes.

2    Q.    -- what you said.  I want to show you these.

3              MR. CLARK:  I marked this as Exhibit 12.

4              MR. MURRAY:  Yes.

5    BY MR. CLARK:

6    Q.    Have you seen these notes before?

7    A.    No.

8    Q.    Okay.

9          If you could take a look at -- just the --

10   focus on the first page.

11         It says:  Not good here.  When Keith, Kellie

12   work together, Keith is mean.  When Keith is not here,

13   Kellie stays up-front and won't put away freight.

14         It's the first paragraph.  Do you see that?

15   A.    Uh-huh.

16   Q.    Do you recall telling Billie Jo Bishop that

17   things were not good at the store when Keith and Kellie

18   worked together?

19   A.    Yes.

20   Q.    Okay.

21         Does this -- just looking at this paragraph,

22   is this -- does that refresh your recollection as to

23   something that you told Ms. Bishop?

24   A.    Yes.

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 168

1         You know, she doesn't specifically say, you

2    know, my name or their names.  She specifically said,

3    like, stockers or managers or -- she wouldn't say names

4    to me.

5         Q.    Okay.

6               **Were there people in the store that liked**

7    **Kellie?**

8         A.    That, I could not tell you.

9         Q.    **Were there other people in the store that did**

10   **not like Kellie?**

11        A.    That, I could not tell you either.

12        Q.    **Next line says:  "Kellie sabotages Tisha."**

13        A.    Yes.  She did do that a lot.

14        Q.    **How do you know that?**

15        A.    Because that's when -- because Tisha would be

16   back there working on freight and stuff, then she would

17   go back there and she would just criticize her when she

18   was working on freight.  She would criticize her if she

19   didn't work on freight.

20        Q.    Okay.

21        A.    So she was always doing -- sabotaging,

22   teasing, you know, always picking on her for one thing

23   or the other, for the freight.

24        Q.    **Okay.**

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 191

1   You got the manager, and then you got the assistant

2   manager, and then you got the two stock managers, and

3   then you got the furniture manager.

4        Q.    Okay.

5              So you did not apply for the position that

6   Vickie got?

7        A.    No.

8        Q.    Okay.

9              And you recall, in regards to this position,

10  Mr. Perry telling you that you didn't have the

11  management experience.

12       A.    Yes.

13       Q.    Did you agree with him that you were not

14  qualified for that position?

15       A.    Yeah, because I know I don't have that much

16  experience on that, yes.

17       Q.    Okay.

18       A.    But the other two positions that I tried for,

19  well, I was going to try for, he told me I didn't

20  qualify for those ones.  And then the furniture manager,

21  I did apply for it.

22       Q.    Okay.

23                        *   *   *

24              (Whereupon, Johnson Deposition Exhibit

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 198

1          You said earlier that the -- you haven't been

2     mistreated since Dave Perry left.

3     A.    Yes.

4     Q.    Under Vickie and Rich, things are okay.

5     A.    Yes.

6     Q.    Are you feeling better now than then?

7     A.    Yes.

8     Q.    Okay.

9          When did you -- the symptoms you described,

10    when did you start experiencing those; do you recall?

11    A.    I do not know.

12    Q.    Okay.

13         Did you ever experience those symptoms while

14    Donna was your manager?

15    A.    No.

16    Q.    Okay.

17         Did you ever see a doctor for --

18    A.    No.

19    Q.    -- any treatment?

20    A.    I never had time.

21    Q.    See a counselor?

22    A.    No.

23    Q.    Was there ever a time where you didn't come to

24    work because of the symptoms?

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 206

1    you were going to apply for the job, he told you that

2    the position had already been given to Bobbi.

3        A.    Yes, that he's giving it to Bobbi.

4        Q.    Okay.

5              If you could look down at the next -- the line

6    that says October 2015:  "CP states in October of 2015,

7    a full-time assistant team leader position was open.

8    And CP states she applied online and in November CP was

9    interviewed by Douglas Browning."

10       A.    No, I was applied by -- with the furniture and

11   not that, because I knew I couldn't do that one.

12       Q.    Okay.

13             Do you know why Ms. Robertson's notes reflect

14   something different?

15       A.    No, I don't know why that's like that.  But it

16   shouldn't have been like that.  Because I didn't apply

17   for that job, because I knew I couldn't handle that job.

18   That's why I didn't apply for that job.

19       Q.    For the one that Vickie Hamrick --

20       A.    Right.

21       Q.    -- got.  Okay.

22             Do you specifically recall your conversation

23   with Ms. Robertson regarding the furniture position in

24   January of 2015?

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 207

1      A.    Yeah.   I told her about how I was wanting the

2   position of the furniture since Sheria -- since Sheria

3   left, I was -- I'm applying for the job in furniture.

4   And so then I told her that when I told Dave that I was

5   going to apply, he told me not to bother with it because

6   he was going to give it to Bobbi.  But I went ahead and

7   applied for it.  Because I wanted to take -- I wanted to

8   have an opportunity to get that position, because I knew

9   furniture very, very well.  And that's why I applied for

10  that position.

11     **Q.    Okay.**

12     **So Exhibit 14 does not accurately reflect your**

13  **statement to Ms. Robertson.**

14     A.    No, no.

15     **Q.    Okay.**

16     A.    None of that.

17     **Q.    And at the top it said -- that same section**

18  **says:  "Promotion; CP states she's qualified for the**

19  **following position and helped train the person**

20  **selected."**

21     **Would you agree with me that you were not**

22  **qualified for the assistant team leader position**

23  **described in October of 2015?**

24     A.    Yeah, I didn't qualify for that job.

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 208

1      Q.     Okay.

2             And you didn't help train Vickie Hamrick.

3      A.     No, I just -- I showed her a couple things.

4   But, no, not like I done everything for Tisha, no.

5      Q.     And you've not seen those notes before today.

6      A.     No.

7             MR. CLARK:  We may be receiving some

8   additional documents.  If that requires further

9   testimony from you, we'll be in touch.  But those are

10  all the questions I have for you for today.

11            THE WITNESS:  Okay.

12            MS. HERNANDEZ:  I just have a couple

13  questions for you, Christena.

14            THE WITNESS:  Okay.

15                    *   *   *

16            E X A M I N A T I O N

17  BY MS. HERNANDEZ:

18     Q.     You testified earlier that you earned $8.75 an

19  hour at The Lunch Box; is that right?

20     A.     Yes.

21     Q.     Okay.

22            When did you start earning $8.75 an hour?

23     A.     Last year.

24     Q.     Do you know when?

756b3c98-aff2-47e7-8915-106e23ebdfa1

Page 215

```
 1    THE STATE OF    :
      WEST VIRGINIA   :
 2                    :  SS:  C E R T I F I C A T E
      COUNTY OF OHIO  :
 3

 4           I, CONNIE M. NICHOLS, Registered Professional
      Reporter, CLR and Notary Public within and for the State
 5    of West Virginia, duly commissioned and qualified, do
      hereby certify that the within-named witness,
 6    CHRISTENA JOHNSON, was by me first duly sworn to testify
      to the truth, the whole truth and nothing but the truth
 7    in the cause aforesaid.

 8           I do further certify that the testimony was by
      me reduced to stenotype in the presence of the witness;
 9    afterwards reduced to Computer Aided Transcription under
      my direction and control; that the foregoing is a true
10    and correct transcription of the testimony given by said
      witness.
11
             I do further certify that I am not a relative,
12    counsel or attorney of either party, or otherwise
      interested in the event of this action.
13
             I, to the best of my ability, do hereby
14    certify that the attached transcript meets the
      requirements set forth within Article 27, Chapter 47 of
15    the West Virginia Code.

16
             IN WITNESS THEREOF, I have hereunto set my
17    hand and affixed my seal of office at Wheeling,
      West Virginia, on the 14th  day of May 2018.
18

19           Connie M. Nichols

20           _____
             CONNIE M. NICHOLS, RPR
21           Notary Public within and for
             the State of West Virginia

22    My Commission expires:
      October 16, 2021
23

24
```

756b3c98-aff2-47e7-8915-106e23ebdfa1

10/1/13                                   Big Lots! HR PolicyWeb

EXHIBIT      8
WIT: _Johnson_
DATE: _4/17/18_
C. M. NICHOLS, REPORTER

[ Print Policy ]

## Equal Employment Opportunity                    Last update: April 2012

No person shall be discriminated against in employment because of race, religious creed, color, age, sex, sexual orientation, gender identity, national origin, religion, marital status, medical condition, genetic information, disability, military service, pregnancy, childbirth and related medical conditions, or any other classification protected by federal, state, and local laws and ordinances.

This policy applies to all terms and conditions of employment including, but not limited to hiring, training, promotion, transfer, demotion, compensation, benefits, and termination.

The Executive Vice President is responsible for formulating, implementing, coordinating, and monitoring all efforts in the area of equal employment opportunity.

Each manager is responsible for initiating and administering this policy within his/her store/department.

Every associate is expected to adhere to the guidelines set forth in this policy in both practice and spirit.

Any formal or informal allegation that this policy has been violated should be referred immediately to Human Resources.

### Employing Persons with Disabilities

Qualified individuals with disabilities are to be treated in a nondiscriminatory manner in the pre-employment process and in all terms, conditions, and privileges of employment.

All medical-related information is to be maintained in a confidential manner in separate, confidential files.

Applicants and associates with disabilities are to be provided reasonable accommodation, except where making an accommodation would create an undue hardship on the Company or would pose a direct threat to the health or safety of employees or others.

All requests for reasonable accommodation from qualified applicants and associates with disabilities are to be referred to the appropriate Human Resources manager. The Company will make a good faith effort to assist individuals seeking accommodations.

In determining the feasibility of the requested accommodation, the Company will consider the preference of the individual to be accommodated and, if there are two or more effective accommodations, will choose the least expensive or most practical accommodation.

Accommodation is generally initiated by a request from an applicant or associate. Situations may arise where an associate, who is known to have a disability, may be having difficulty performing the essential functions of his/her job and therefore, may need accommodation. The associate's supervisor should discuss the matter with the appropriate Human Resources manager. The Human Resources manager will advise the associate's supervisor on how to initiate a discussion with the associate.

### Religious Accommodation

The Company will also reasonably accommodate otherwise qualified job applicants and associates with religious beliefs or practices, unless doing so would impose an undue hardship.

Violations of this policy may result in disciplinary action, up to and including termination of employment. (See Confidential Information, Harrassment-Free Environment, Open Door)

10/1/13                                    Big Lots! HR Policy Web

EXHIBIT ___9___
WIT: _Johnson_
DATE: _4/17/18_
C. M. NICHOLS, REPORTER

Print Policy

## Harassment-Free Environment                Last update: April 2012

Big Lots strictly prohibits harassment and/or discrimination based on race, religious creed, color, age, sex, sexual orientation, gender identity, national origin, religion, marital status, medical condition, genetic information, disability, military service, pregnancy, childbirth and related medical conditions, or any other classification protected by federal, state and/or local laws and ordinances.

Each supervisor or manager is responsible for maintaining a work environment that is free of harassment both sexual and otherwise. This includes communication of this policy to all associates and assuring that they are not subjected to insulting, degrading or exploitative behavior as defined below.

The Company does not tolerate harassment of our job applicants, contractors or associates by another associate, supervisor, vendor, customer, or any third party. Any form of harassment on the basis of race, religious creed, color, age, sex, sexual orientation, gender identity, national origin, religion, marital status, medical condition, genetic information, disability, military service, pregnancy, childbirth and related medical conditions, or any other classification protected by federal, state and local laws and ordinances is a violation of this policy and will be treated as a disciplinary matter. The Company has zero tolerance for harassment and is committed to a workplace free of any harassment.

**Harassment Defined.** Harassment as defined in this policy is unwelcome verbal, visual or physical conduct creating an intimidating, offensive, or hostile work environment that interferes with work performance. Harassment can be verbal (including slurs, jokes, insults, epithets, gestures or teasing), graphic (including offensive posters, symbols, cartoons, drawings, computer displays, or e-mails) or physical conduct (including physically threatening another, blocking someone's way, etc.) that denigrates or shows hostility or aversion towards an individual because of any protected characteristic. Such conduct violates this policy, even if it is not unlawful. Because it is difficult to define unlawful harassment, associates are expected to behave at all times in a professional and respectful manner.

**Sexual Harassment Defined.** Sexual harassment can include all of the above actions, as well as other unwelcome conduct, such as unwelcome or unsolicited sexual advances, requests for sexual favors, conversations regarding sexual activities and other verbal or physical conduct of a sexual nature. Examples of conduct that violates this policy include: unwelcome sexual advances, flirtations, advances, leering, whistling, touching, pinching, assault, blocking normal movement; requests for sexual favors or demands for sexual favors in exchange for favorable treatment; obscene or vulgar gestures, posters, or comments; sexual jokes or comments about a person's body, sexual prowess, or sexual deficiencies; propositions, or suggestive or insulting comments of a sexual nature; derogatory cartoons, posters, and drawings; sexually-explicit e-mails or voicemails; uninvited touching of a sexual nature; unwelcome sexually-related comments; conversation about one's own or someone else's sex life; conduct or comments consistently targeted at only one gender, even if the content is not sexual; and teasing or other conduct directed toward a person because of the person's gender.

**All such conduct is unacceptable in the workplace and in any work-related settings such as business trips and business-related social functions, regardless of whether the conduct is engaged in by a supervisor, co-worker, client, customer, vendor or other third party.**

**Reporting Procedures.** The following steps have been put into place to ensure the work environment at Big Lots is respectful, professional, and free of harassment. If an associate believes someone has violated this policy, the associate should promptly bring the matter to the immediate attention of his or her manager or the appropriate Human Resources Manager.

**Investigation Procedures.** The Company will promptly investigate the facts and circumstances of any claim of harassment. To the extent possible, the Company will endeavor to keep the reporting associate's concerns confidential. During the investigation, the Company generally will:

·       Interview the complainant and the alleged harasser

EEOC000057

- conduct further interviews as necessary

- document the Company's findings regarding the complaint

- document recommended follow-up actions and remedies, if warranted

- inform the complainant of the Company's findings.

Every manager or supervisor who learns of any associate's concerns about conduct in violation of this policy, whether in a formal complaint or informally, must immediately report the issues raised to the appropriate Human Resources Manager.

All associates are expected to fully cooperate with internal investigations that may be initiated by the Company to examine any perceived violation of Company policy or procedure or any other matter. This includes, but is not limited to, maintaining an appropriate level of discretion regarding the investigation and disclosing any and all information that may be pertinent to the investigation.

Upon completion of the investigation, the Company will take corrective measures against any person who has engaged in conduct in violation of this policy, if the Company determines such measures are necessary. These measures may include but are not limited to, counseling, suspension, or immediate termination. Anyone, regardless of position or title, whom the Company determines has engaged in conduct that violates this policy will be subject to discipline, up to and including termination.

**No Retaliation.** No associate will be subject to, and the Company prohibits, any form of discipline or retaliation for reporting perceived violations of this policy, pursuing any such claim, or cooperating in any way in the investigation of such claims. If an associate believes someone has violated this no-retaliation policy, the associate should bring the matter to the immediate attention of his or her manager or the appropriate Human Resources Manager. Anyone, regardless of position or title, whom the Company determines has engaged in conduct that violates this policy against retaliation will be subject to discipline, up to and including termination.

We cannot remedy claimed harassment or retaliation unless the associate brings these claims to the attention of management. Failure to report claims of harassment and/or retaliation prevents us from taking steps to remedy the problem.

This policy is intended to be in compliance with all Federal laws, specifically Title VII of the Civil Rights Act of 1964, and all State and Local laws dealing with unlawful discrimination and/or harassment. (See Equal Employment Opportunity, Open Door, Standards of Conduct)

EEOC000058

10/2/13                                    Big Lots! HR Policy Web

EXHIBIT _____ /D
WIT: __Johnson__
DATE: ___4/17/18___
C. M. NICHOLS, REPORTER

[ Print Policy ]

## Standards of Conduct                    **Last update: February 2012**

Associates are expected to conduct themselves in a way that is conducive to an ethical business environment. Violations of company policy, public policy, or local, state, and federal laws will not be tolerated. Conduct is expected to reflect our Company's values at all times.

The following behaviors are unacceptable deviations from the Company Standards of Conduct:

1. Violation of the Harassment-Free Environment Policy.
2. Physical assault or attempted assault on another associate, customer or vendor.
3. Engaging in conversation, gestures or behaviors that are considered lewd, offensive, abusive, and profane or threatening to associates, customers and/or vendors.
4. Inappropriate fraternization, including having an intimate relationship with another associate whom you supervise, either directly or indirectly, or over whom you exert some influence or control by nature of your responsibility.
5. Violation of the Drug-Free Workplace Policy, including but not limited to consuming intoxicating beverages or use of illegal drugs during scheduled work time; or reporting to work under the influence of intoxicating beverages or illegal drugs.
6. Smoking or use of tobacco products in an unauthorized manner or area (See Smoke Free Policy).
7. Conduct which results in a substantial risk of harm to a customer or another associate, or damage to Company property.
8. Possession of weapons, including but not limited to, knives, firearms, explosives, or other instruments that may cause harm to others, opened intoxicating beverages, or illegal drugs on Company property, including parking lots, or while conducting Company business.
9. Conviction of a criminal offense for a crime against the Company or related to the type of responsibilities performed for the Company.
10. Dishonest activities such as, theft, selling merchandise at a price lower than that which is marked on the goods without authorization, consumption or use of merchandise that has not been previously purchased by the associate or approved by management.
11. Violation of minor labor laws for those associates under eighteen (18) years of age. *NOTE: Associates less than eighteen (18) years of age are not permitted to load, unload or otherwise operate the cardboard baler. These associates are also not permitted to operate any type of power equipment.* (See Employment of Minors Policy).
12. Violation of the No Solicitation Policy.
13. Unauthorized use of Company property, facilities or resources (See Systems and Information Security Policy).
14. Unauthorized divulgence of personnel records or Company business (See Confidential Information Policy).

EEOC000062

15. Insubordination by refusing to complete lawful work as assigned by a manager. In the event of conflicting instructions, the associate should follow the directions of the manager-on-duty and later request clarification.

16. Unsatisfactory work performance including disregard of established safety practices and rules.

17. Failure to cooperate with Company investigations or inspections.

18. Excessive absenteeism or tardiness (See Attendance Policy).

19. Working before or after scheduled time without authorization from management.

20. Job abandonment, which includes two (2) consecutive days absence from scheduled work without calling into management (See Call-In Procedure Policy) or walking off the job without notifying management. These occurrences are considered voluntary terminations (See Termination of Employment Policy).

21. Falsification of documents or records including but not limited to, employment application, expense reports, price change documents, timecards, permitting another associate to clock in or out for you, production reports, payroll management documents, etc.

22. Misuse of the associate discount privilege by permitting someone not eligible to purchase items with the associate discount or by returning merchandise for a full refund when purchased with the associate discount (See Associate Discount Policy).

23. Associates are not permitted to hold or hide merchandise for purchase at a later time. Associates may not purchase merchandise unless it is available for sale to the general public.

24. The writing of bad checks to the Company of failing to repay funds owed to the Company.

25. The following violations are store specific:

    a. Any violation of established shopping regulations including processing unauthorized markdowns and/or ringing sales or handling any other transaction (i.e., returns, cashing checks, etc.) of your own or any immediate relative.

    b. Improper use of "paid outs".

    c. Cashing checks.

    d. Use or unauthorized removal of store funds, or other Company resources, for personal use.

    e. Unexplained single incident till variance of $50 or greater where till integrity has been maintained.

    f. Single till variance of $5 or more, and/or variances of $15 or more in a 30-day period.

    g. Failure of store associates to perform established procedures, including but not limited to, the following:

        i. Completing daily bank deposits.
        ii. Securing funds properly.
        iii. Maintaining accountability for all funds transactions.

EEOC000063



    iv. Conducting "cash pickups" when cash totals in excess of $1500 in drop box and till.

    v. Ensuring that Register operator "till drops" are made when cash exceeds $100 of paper currency in till.

    vi. Ensuring all doors are locked and alarms set as required.

    vii. Ensuring all safety exits are accessible.

    viii. Securing safe, as required including maintaining confidential safe combination.

    ix. Maintaining key control and confidential manager codes.

    x. Ensuring that store security cameras are operating daily and tapes maintained as required.

    xi. Allowing only authorized associates in controlled areas (i.e., stock room, cash office, etc.).

**26.** Violation of the Insider Trading Policy or the Insider Trading Policy for Directors and Section 16 Officers.

**27.** Violation of the Information Disclosure Policy.

**28.** Violation of the Code of Business Conduct and Ethics or the Code of Ethics for Financial Professionals.

**29.** Violation of any other Company rules/regulations or any other action/activity that is deemed to be detrimental to the orderly operation of our Company.

Associates are expected to comply with this Policy and report violations immediately. In all of the above instances, the severity of an individual violation may warrant immediate termination. However, only those persons with the approval to terminate can make this determination (See Termination of Employment Policy).

EEOC000064

Big Lots! HR Policy Web

Print Policy

EXHIBIT __/ \__
WIT: _Johnson_
DATE: _4/17/18_
C. M. NICHOLS, REPORTER

## Open Door

## Last update: August 2005

Big Lots believes in dealing directly with all associates and further believes that all associates have a right to express their opinions, concerns, and to ask any questions they may have relating to their job or the Company. Any associate with a question or problem is entitled to use the Open Door Policy and may contact anyone in the organization.

Take the question or concern to your immediate supervisor or manager.

OR

If you have a question and do not wish to discuss the matter with your direct manager or supervisor, go to the next level manager.

OR

If you have a question or you just feel uncomfortable discussing the issue with one of the managers listed above, contact the appropriate member of the Human Resources Department:

- Store Associates: Contact the Regional Human Resources Manager.
- Distribution Associates: Contact the Distribution and Transportation Services Human Resources Manager.
- General Office Associates: Contact the General Office Human Resources Manager.

Associates wishing to make anonymous complaints or ask a question may call the Get Real Hotline at 1-866-834-REAL (1-866-834-7325).

All members of management are expected to maintain the integrity and communicate the spirit of the Open Door Policy.

Any attempt to thwart or retaliate against an associate for exercising his/her Open Door rights will be considered a serious violation of Company policy and may result in disciplinary action, up to and including termination of employment. (See Harrassment-Free Environment, No Solicitation, Standards of Conduct, Union-Free Environment)

EEOC000060

EXHIBIT 12
WIT: Johnson
DATE: 4/17/18
C. M. NICHOLS, REPORTER

Christena.

L0143

Not good here. when Keith + Kellie
work together. Keith is mean. When
Keith is not here, Kellie stays up
front + won't put away freight.
Sherria is training me to be an
Assistant Store mgr.
Bobby, Kellie + Pam- all eating
food at front of store. Christena
asked for help w/ a cx. They laughed
at her + wouldn't help her... the
cx. helped her.
They laugh at me when I
call over the speaker for help. Kellie
likes to talk about everybody.
Kellie sabotages Tisha.
Dave tells everyone that he knows
who is sabotaging Tisha but he can't
do anything about it b/c he can't
prove it.
Last Tuesday Keith allegedly 'cussed'
Tisha when she was a cx.
Christena didn't observe it, Tisha
told her what happened.
Christena also goes to help in Morgantown
and Fairmont.
Has wanted to quit → they set

BLSI000641

up front + point at me and laugh.
      Kellie, Pam, Bobby
      Has asked Dave to watch the
cameras so he can see what they
do.
      Kellie is supposed to do HBC.
She puts it in buggies and hides it.
      Couple weeks ago, Dave approached
Christena + asked her to put out
several carts of freight and
told her that Kellie was hiding
the freight.
      Kellie follows Keith like a
puppy and just talks to him.

Tisha
Kellie      all worked at Dollar Store?
Christena

      Last night Randy called Kellie for
help at register. She (Kellie) stood for
10 minutes w/ Keith talking before
she went to help... just talking.
      If someone wants to buy furn.
after the furn person goes home,
Kellie tells them to come back the

BLSI000642

next day. She told Dave about
it. Dave said he talked to her
about it.
    Told Gina last week about the
bullying + Gina said not to quit +
Gina would see what she could do
about it.

Is aware of open door. Feels comfortable
talking to Dave.
    Feels treated fairly w/ Dave
but not w/ Kellie.
    Morale is good, even w/ the
issues. My mom used to work here
doing recovery.
    Dave asked Christena last
Tuesday if Kellie is still bullying
her.
    Last night Kellie messed up all
the money so that Tisha would be
late getting out of cash office.

    Feels bullied by Kellie so bad
that sometimes she doesn't want to
come to work.
    Tina tries to make everyone happy.

BLSI000643