# EXHIBIT C

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

- - - - -

U.S. Equal Employment         :
Opportunity
Commission,                   :

    Plaintiff,            :

    vs.                   :      Civil Action No.
                                        2:17-CV-00073
Big Lots Stores, Inc.,        :

    Defendant.            :

- - - - -

DEPOSITION OF DOUGLAS BROWNING

- - - - -

Taken at Ohio Civil Rights Commission
30 East Broad Street, 5th Fl.
Columbus, OH 43215
March 27, 2018, 1:37 p.m.

- - - - -

Spectrum Reporting LLC
333 Stewart Avenue, Columbus, Ohio 43206
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

2

1                    A P P E A R A N C E S

2

    ON BEHALF OF PLAINTIFF:
3
         U.S. Equal Employment Opportunity
4        Commission
         1000 Liberty Avenue, Ste. 1112
5        Pittsburgh, PA 15222
         By Lisa Hernandez, Esq.
6

7   ON BEHALF OF DEFENDANT:

8        Vorys, Sater, Seymour and Pease LLP
         52 East Gay Street
9        Columbus, OH 43216
         By Daniel J. Clark, Esq.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

1                    Tuesday Afternoon Session
2                    March 27, 2018, 1:37 p.m.
3                              - - - - -
4                        S T I P U L A T I O N S
5                              - - - - -
6         It is stipulated by counsel in attendance that
7     the deposition of Douglas Browning, a witness
8     herein, called by the Plaintiff for
9     cross-examination, may be taken at this time by
10    the notary pursuant to subpoena; that said
11    deposition may be reduced to writing in stenotypy
12    by the notary, whose notes may thereafter be
13    transcribed out of the presence of the witness;
14    that proof of the official character and
15    qualification of the notary is waived; that the
16    signature of the witness to the transcript of said
17    deposition is expressly waived by counsel and the
18    witness; said deposition to have the same force
19    and effect as though signed by the said Douglas
20    Browning.
21                             - - - - -
22
23
24

1  Q.     Okay.  And did you make the decision on
2  who to hire for that?
3  A.     We discussed it as a management team.
4  Q.     Okay.  So Dave Perry had some input
5  into that decision?
6  A.     Dave Perry had input on it and I play
7  devil's advocate.  So regardless of who you
8  brought up, I'm going to push him to truly sell me
9  on why they wanted that position.
10 Q.     Since we're talking about that
11 position, did -- how did you come to know who had
12 applied for that position?
13 A.     Just from what David had told me.
14 Q.     Okay.  Did you ever see any written
15 applications?
16 A.     Yes.  You mean for the internals?
17 Q.     Yes.
18 A.     Yes.
19 Q.     Okay.  And do you recall who applied
20 for that position?
21 A.     Internally?
22 Q.     Um-hmm.
23 A.     I'm not going to remember last names.
24 I believe there was three internals.  Bobbi, who

1   we gave the position to.  I think the girl's name
2   was Christena.  And then there was a gentleman who
3   they had -- who had applied external that they had
4   already hired as a stock clerk that was also
5   interested in it, and I can't recall what his
6   name is.  I do know he came from Lowe's in the
7   town just right there.  I can't remember the town
8   now.
9   Q.          And do you recall interviewing all
10  three of those candidates?
11  A.          Yes.
12  Q.          And just to clarify the timeline here,
13  would this have been in January 2015?
14  A.          No.  Probably not.  I don't recall when
15  it actually happened.  I did not take full control
16  of the district until mid January.
17  Q.          Okay.
18  A.          And we had inventories right behind the
19  other.
20  Q.          Okay.  But just to be clear, this was
21  the position that Bobbi Curtis I believe is her
22  last name --
23  A.          Bobbi Curtis, yes.
24  Q.          -- was hired for?

1    productivity issues in the past.
2    Q.       Okay. And you can't recall what any of
3    those were?
4    A.       I honestly don't recall.
5    Q.       Okay. But you did interview her
6    nevertheless?
7    A.       Yes, I interviewed her and talked to
8    her.
9    Q.       And what were your impressions of her?
10   A.       My impressions, I mean, I liked her --
11   I like everybody, but just -- I wanted to see more
12   of the leadership out of her. I think she was --
13   I don't recall at the time if she was a head
14   cashier or not. I forget what we even called
15   them.
16   Q.       CSS?
17   A.       I think it was CSS. CSM is where I'm
18   at now. I can't recall if she was a CSS at the
19   time or not. But I wanted to see the leadership
20   up front as far as -- at that point in time,
21   rewards cards in that district was real low, and
22   that was one of the pushes with the CSSs in all my
23   stores, let's see what we can do to drive that,
24   drive that program. So looking at that leadership

1   and what she could do with that.
2   Q.      Okay.  So in terms of the final
3   selection in that -- for that particular job, how
4   did you all decide upon Curtis?
5   A.      How did we all decide --
6   Q.      You and Perry decide that Curtis would
7   get the job offer?
8   A.      I think it came down, like I said, to
9   her and an external.  And they weighed out about
10  the same as far as looking at what the overall
11  leadership and growth would be, but Bobbi already
12  had the knowledge of Big Lots, which in my opinion
13  carries a lot of weight if you're an internal and
14  you already have the working knowledge of the
15  company.
16  Q.      Okay.
17  A.      And I know there was some other
18  details, and I just can't recall.
19  Q.      Okay.  Do you recall if you were the
20  one who -- did somebody recommend that Bobbi be
21  the selectee?  Did either you or David Perry make
22  that recommendation to the other?
23  A.      I don't recall.
24  Q.      Okay.  Do you recall having any

45

1 conversations with him about it?
2 A.         We discussed all the applicants and
3 went through all of them and looked at the pros
4 and cons of all of them.
5 Q.         Okay.  But it was your testimony that
6 David Perry had not even wanted to interview
7 Christena?
8 A.         At the beginning, correct.
9 Q.         Okay.  Thank you.
10            What was your relationship like with
11 David Perry?
12 A.         It was business.  You mean was it a
13 good or bad, or rough?  It would have been rough.
14 Q.         Okay.  How so?
15 A.         David was very weak on wanting to hold
16 people accountable for policies.
17 Q.         How so?
18 A.         We'll take the simple basics.  He would
19 not give -- hold anybody accountable for
20 attendance.  Name the policy, he would not --
21 unless I was holding his feet to the fire, which
22 in turn causes a lot of the issues we're sitting
23 here today talking about.
24 Q.         Okay.  So what kind of manager was he?

48

1 held a store meeting, and I don't recall what
2 month it was, it was early in, so it was January
3 or early February, with the entire staff, myself,
4 Billie Jo Bishop, I believe it was on a Sunday, to
5 go through basically the entire handbook as far as
6 policies go with just the basic operations of the
7 store. So that would have been -- that would have
8 been to that statement there. And the fact that
9 in some of -- when we talk about conflicts, it's
10 the fact that David did not address conflicts. If
11 someone came and told him, he would just sort of
12 ignore and hope they went away.
13 Q. And how did you know that, that that
14 was how he handled conflicts?
15 A. I would stop in the store, associates
16 would tell me they talked to David about this or
17 that and nothing had been brought up about it.
18 Q. Okay. So he hadn't taken action?
19 A. He hadn't taken action.
20 Q. Okay. And this would have only been
21 like, you know, a few -- a couple of months after
22 he took over, is that right, as DTL?
23 A. Yes. So this was created on February
24 4th, so it goes through a process where I created

62

1 following through as far as if they don't have a
2 rewards card, how to handle that.
3 Q.          Okay.  Because the goal was to sign
4 people up?
5 A.          The goal was to sign people up.
6 Q.          Okay.
7 A.          We're in the computer age, so the more
8 people we get signed up, the more we can reach out
9 to, and paper ads are pretty much a thing of the
10 past.  So that's how companies advertise.
11 Q.          Did you have occasion to observe
12 whether she was a hard worker?
13 A.          Overall -- if we just look at the
14 course of the two years, overall, she tried.  I
15 mean, she worked to the point that at one point in
16 time, I know prior to -- prior to the company and
17 I splitting, that David came and talked to me and
18 we did make her what was considered a support
19 manager, put in the support manager role.  Which
20 the support manager role, what that role was, it
21 was a non-key carrying role, but it was a role to
22 help develop them into leadership.  And it would
23 be when we go to extended hours during the
24 holidays, and the member of the management team

63

1    needed to take their lunch and there was not
2    another member of management there, that support
3    manager was able to help cover lunches when the --
4    when the member of management was out of the
5    building.
6    Q.      Okay.  So that person could be left in
7    the building when there were no other managers?
8    A.      Yes, they could be left in the
9    building.  They would -- if, for instance -- and
10   we'll just use David.  If David was there and no
11   other member of management was there, no other key
12   carrying member of management was there, he could
13   leave the keys that were required for her, which
14   would be the receiving key.  There really would be
15   no other reason to have any other keys at that
16   point in time, as far as getting into the cash
17   office or anything.  So just what she needed as
18   far as probably to receive.  He would be able to
19   leave the building, go take his half-hour lunch
20   and come back, and the support manager would cover
21   the building.
22   Q.      Okay.  And do you recall when that was
23   that he came to you about that?
24   A.      That would have been -- the company

90

1    Revolta. I don't know how much higher up it went
2    from there.
3    Q.      Okay. Were you aware that this former
4    furniture manager, Sheria Blackburn, had a job
5    with the U.S. Postal Service while she was working
6    at Big Lots?
7    A.      I might have been told. I don't
8    recall.
9    Q.      Okay. Do you know what Big Lots'
10   policy is, if at all, if there is one, about
11   department managers having employment elsewhere, a
12   second job?
13   A.      A second job? All full-time associates
14   have to have open availability.
15   Q.      What does that mean, open availability?
16   A.      I can schedule anything I want within
17   your 40 hours, or whatever time frame you're
18   given.
19   Q.      Okay.
20   A.      But a department head -- a department
21   head, you're not going to work around a second job
22   basically.
23   Q.      Okay.
24   A.      They are required to give you full,

115

```
 1   State of Ohio      :      C E R T I F I C A T E
     County of Franklin: SS
 2
         I, Kathryn E. Cathell, RMR, CRR, a Notary
 3   Public in and for the State of Ohio, certify that
     Douglas Browning was by me duly sworn to testify to
 4   the whole truth in the cause aforesaid; testimony
     then given was reduced to stenotype in the presence
 5   of said witness, afterwards transcribed by me; the
     foregoing is a true record of the testimony so
 6   given; and this deposition was taken at the time
     and place specified on the title page.
 7
         Pursuant to Rule 30(e) of the Federal Rules of
 8   Civil Procedure, the witness and/or the parties
     have waived review of the deposition transcript.
 9
         I certify I am not a relative, employee,
10   attorney or counsel of any of the parties hereto,
     and further I am not a relative or employee of any
11   attorney or counsel employed by the parties hereto,
     or financially interested in the action.
12
         IN WITNESS WHEREOF, I have hereunto set my hand
13   and affixed my seal of office at Columbus, Ohio, on
     April 6, 2018.
14

15

16

17

18                  [signature: Kathy Cathell]

19

20   _____
     Kathryn E. Cathell, Notary Public - State of Ohio
21   My commission expires December 11, 2019.

22

23

24
```