IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS DIVISION

**U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION**,

        Plaintiff,

    v.

**BIG LOTS STORES, INC.**,

        Defendant.

Civil Action No. 2:17-cv-00073

Hon. John Preston Bailey

**PLAINTIFF EEOC'S RESPONSE IN OPPOSITION TO
DEFENDANT BIG LOTS STORES, INC.'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................................................. ii

**TABLE OF AUTHORITIES** ......................................................................................... iv

**INTRODUCTION** .......................................................................................................... 1

**RESPONSIVE STATEMENT OF FACTS** ................................................................. 1

    1.  Christena Johnson's bilateral deafness and speech impairment. ......................................... 1

    2.  Christena Johnson's employment with Big Lots. .............................................................. 2

    3.  Big Lots employees ridiculing Christena Johnson because of her disabilities. .................. 3

    4.  Other Big Lots employees witnessed the harassment Christena Johnson suffered. ........... 6

    5.  David Perry's refusal to confront the disability-based harassment against Johnson. ......... 9

    6.  Sheria Blackburn's report of the harassment to District Manager Donovan Bond. ......... 11

    7.  Billie Jo Bishop's negligent, reckless harassment investigation. ..................................... 12

    8.  Billie Jo Bishop's investigation produces no corrective action against the harassers. ..... 14

    9.  Big Lots subjects Sheria Blackburn to retaliation and associational discrimination. ....... 16

    10. Big Lots subjects Christena Johnson to unlawful denial of promotion. ........................... 18

**ARGUMENT** ................................................................................................................ 20

    I.  Big Lots is not entitled to summary judgment on the disability-harassment claim. .......... 20

        A.  Big Lots has failed to challenge EEOC's claims that Johnson was "regarded as" disabled or that her speech impairment is a disability. ................................................. 21

        B.  Johnson has an actual disability because her significant deafness substantially limits her hearing, speaking, and communicating. .................................................................. 23

        C.  Johnson was harassed because of her hearing and speech impairments. .................... 26

        D.  The harassment Johnson suffered was not merely unpleasant; it was severe and pervasive because it was targeted, persistent, and humiliating. .................................. 29

        E.  Big Lots is liable for the harassment Johnson suffered. ............................................. 31

    II.  Big Lots is not entitled to summary judgment on EEOC's retaliation claims. ................. 35

A.  There are genuine issues of material fact concerning Big Lots' retaliatory motive for the Blackburn ultimatum and resulting constructive discharge. .................................. 35

B.  Summary judgment is inappropriate regarding EEOC's claims that Johnson was denied promotion because of disability and retaliation. .............................................. 39

III.  Summary judgment on EEOC's punitive-damages claim is unwarranted ................... 42

IV.  Summary judgment on EEOC's injunctive-relief claim is unwarranted. .................... 44

**CONCLUSION** ........................................................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006) ...................................... 35

*Alexander v. Alcatel NA Cable Sys., Inc.*, No. 01-2077, 2002 WL 31302227 (4th Cir. Oct. 15, 2002) ...................................................................................................................................... 32

*Bosket v. Long Island R.R.*, No. CV 00-7352-RJDJMA, 2004 WL 1305746 (E.D.N.Y. June 4, 2004) ...................................................................................................................................... 25

*Brodrick v. City of New York*, 942 F. Supp. 196 (S.D.N.Y. 1996) ............................................... 26

*Brown v. CVS Pharmacy, Inc.*, No. 6:12-CV-1193-ORL-31, 2013 WL 3353323 (M.D. Fla. July 2, 2013) ...................................................................................................................................... 25

*Connolly v. Bidermann Indus. U.S.A., Inc.*, No. 95 CIV. 1791 (RPP), 1998 WL 305643 (S.D.N.Y. June 9, 1998) ........................................................................................................... 25

*Dorsey v. CHS, Inc.*, No. 15-CV-02735-RBJ, 2017 WL 1356093 (D. Colo. Apr. 13, 2017) ...... 26

*EEOC v. AutoZone, Inc.*, 707 F.3d 824 (7th Cir. 2013).................................................................. 44

*EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167 (4th Cir. 2009).................................................... 32

*EEOC v. CONSOL Energy, Inc.*, 151 F. Supp. 3d 699 (N.D.W. Va. 2015), *aff'd*, 860 F.3d 131 (4th Cir. 2017)........................................................................................................................... 44

*EEOC v. Fed. Express Corp.*, 513 F.3d 360 (4th Cir. 2008 ........................................................... 42

*EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539 (9th Cir. 1987) .......................................... 44

*EEOC v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244 (11th Cir. 1997) .................. 44

*EEOC v. Serv. Temps Inc.*, 679 F.3d 323 (5th Cir. 2012).............................................................. 44

*EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306 (4th Cir. 2008) ................................................ 31, 35

*Fitzgerald v. Boone Cty. Pub. Safety Commc'ns Ctr.*, No. CIV.A. 04-149-DLB, 2006 WL 2714870 (E.D. Ky. Sept. 22, 2006)........................................................................................... 26

*Fox v. Gen. Motors Corp.*, 247 F.3d 169 (4th Cir. 2001) ................................................ 20, 27, 29

*Garcia v. Potter*, Civil Action No. SA–09–CV–973–XR, 2010 WL 2025068 (W.D. Tex. May 18, 2010) ...................................................................................................................................... 31

*Harris v. L & L Wings, Inc.*, 132 F.3d 978 (4th Cir. 1997) .......................................................... 31

iv

*Haugerud v. Amery School Dist.*, 259 F.3d 678 (7th Cir. 2001) ................................... 32

*Hawkins v. Hennepin Technical Ctr.*, 900 F.2d 153 (8th Cir. 1990) ............................ 37

*Jones v. Chandrasuwan*, 820 F.3d 685 (4th Cir. 2016) .................................................... 20

*King v. Rumsfeld*, 328 F.3d 145 (4th Cir. 2003) ........................................................... 40

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999) ....................................................... 42

*Lauer v. Schewel Furniture Co.*, 84 F. App'x 323 (4th Cir. 2004)................................. 40

*Long v. Hoffman Enclosures, Inc.*, No. CIV.A. 5:08-100-KKC, 2008 WL 2548640 (E.D. Ky. June 23, 2008)........................................................................................................... 28

*Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431 (4th Cir. 2000)................................. 43

*MacVaugh v. County of Montgomery,* 301 F. Supp.3d 458 (E.D. Pa. 2018)............... 30

*Mengel v. Reading Eagle Co.*, No. CIV.A. 11-6151, 2013 WL 1285477 (E.D. Pa. Mar. 29, 2013) ................................................................................................................................. 26

*Pallatto v. Westmoreland Cty. Children's Bureau*, No. 2:11CV1206, 2014 WL 836123 (W.D. Pa. Mar. 4, 2014)................................................................................................................. 30

*Paroline v. Unisys Corp.*, 879 F.2d 100 (4th Cir. 1989), *vacated in part on other grounds*, 900 F.2d 27 (4th Cir. 1990) ............................................................................................... 33

*Quinn v. Consolidated Freightways Corp.*, 283 F.3d 572 (3d Cir. 2002) ..................... 37

*Rhoads v. FDIC*, 257 F.3d 373 (4th Cir. 2001) ........................................................... 35

*Smith v. First Union Nat'l Bank*, 202 F.3d 234 (4th Cir. 2000) .................................. 35

*Spriggs v. Diamond Auto Glass*, 242 F.3d 179 (4th Cir. 2001)................................... 35

*Staub v. Proctor Hosp.*, 562 U.S. 411 (2011) ............................................................. 41

*Strothers v. City of Laurel, Maryland*, --- F.3d ---, No. 17-1237, 2018 WL 3321317 (4th Cir. July 6, 2018) ................................................................................................................. 31, 32

*Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002)........................ 23

*United States v. Gregory*, 871 F.2d 1239 (4th Cir. 1989)............................................ 44

*West v. J.O. Stevenson, Inc.*, 164 F. Supp. 3d 751, 774 (E.D.N.C. 2016) ................... 21

*Williams v. Gen. Motors Corp.*, 187 F.3d 553 (6th Cir. 1999) .................................... 29

*Yates v. W. Contra Costa Unified Sch. Dist.*, No. 16-CV-01077-MEJ, 2017 WL 3335991 (N.D. Cal. Aug. 4, 2017), *aff'd*, 708 F. App'x 418 (9th Cir. 2017) ................................................ 26

*Zavec v. Collins*, No. 3:16-CV-00347, 2018 WL 1035777 (M.D. Pa. Feb. 23, 2018) ................ 26

**Statutes**

18 U.S.C. § 1001 ................................................................................................................ 40

42 U.S.C. § 12102 ........................................................................................................ passim

42 U.S.C. § 12117 .............................................................................................................. 44

42 U.S.C. § 2000e-5 ........................................................................................................... 44

ADA Amendments Act of 2008 (ADAAA), Pub. L. No. 110-325 (2008) ...................... 21, 23, 24

**Regulations**

29 C.F.R. § 1630.2 ........................................................................................................ 21, 24

## INTRODUCTION

Plaintiff U.S. Equal Employment Opportunity Commission hereby files its Response in Opposition to Defendant Big Lots Stores, Inc.'s Motion for Summary Judgment (ECF No. 56) in the above-styled and numbered action. Big Lots' Motion for Summary Judgment must fail for two principal reasons. First, Big Lots has failed to move for summary judgment on a number of claims and ADA coverage issues pleaded in EEOC's Complaint, such as the claim that Christena Johnson was subjected to a hostile work environment because she was regarded as disabled and that she was denied promotion for that reason as well as her actual disability. More significantly, Big Lots' Motion must fail because contrary to its assertion, a review of the evidence in this matter, much of which Big Lots has failed to present to the Court, demonstrates genuine issues of material fact concerning EEOC's claims that require resolution by a fact-finder. For the reasons set forth more fully below, Big Lots' Motion should be denied.

## RESPONSIVE STATEMENT OF FACTS

**1.      Christena Johnson's bilateral deafness and speech impairment.**

Christena Johnson has lived in Elkins for most of her life. Ex. A (Johnson Decl.) ¶ 3. She has bilateral deafness, i.e., hearing loss in both ears. She has been completely deaf in her right ear and partially deaf in her left ear since birth or shortly thereafter. *Id.* ¶ 6; Ex. B (Johnson Dep.) 68:7–21. Her hearing and speech impairments have imposed substantial limitations throughout her life. For example, she cannot hear whispers, easily engage in in-person conversation without facing a person to read his/her lips, or easily use a telephone without focusing all her attention on the call to the exclusion of her surroundings. Ex. A (Johnson Decl.) ¶¶ 7–8; Ex. B (Johnson Dep.) 82:3–9. She also has difficulty pronouncing *r* sounds, and people sometimes have difficulty understanding her speech, which requires her to repeat herself. Ex. A (Johnson Decl.) ¶ 9. When she was in

school, her interactions with others were limited by their perceptions and prejudice, and she even had to transfer high schools in the ninth grade to escape bullying. *Id.* ¶ 10. Later in high school, she had wanted to become a secretary but abandoned that aspiration because she thought she could not perform largely phone-based work. *Id.* ¶ 11.

Because of her speech impairment, most people (including her Big Lots coworkers and supervisors) immediately understand that she has impaired hearing. According to former Store Manager David Perry, "she did speak different." Ex. C (Perry Dep.) 51:10. Former District Manager Donovan Bond noticed that "her speech was a little off" and her hearing impairment was obvious. Ex. D (Bond Dep.) 59:2–19. Regional Associate Relations Leader Billie Jo Bishop knew that, "Her communication would be consistent with someone who is hearing impaired but maybe not completely deaf." Ex. E (Bishop Dep.) 69:8–9. Former coworkers Shirlee Coffman and Pamela Heckler and current coworkers Sheila Bertelli and Fay Magner all knew that her hearing impairment is obvious. Ex. F (Heckler Dep.) 27:17; Ex. G (Bertelli Dep.) 52:10; Ex. H (Coffman Decl.) ¶ 5; Ex. I (Magner Decl.) ¶ 5. Former coworker Kellie Graham recalled, "[S]he talked funny, so you knew she couldn't—she would more or else [sic] tell you she couldn't hear well," "It was common knowledge," and, "[I]t's not like you didn't know." Ex. J (Graham Dep.) 50:12–14, 51:7, 52:20–21. And former coworker Barbara "Bobbi" Curtis testified, "[I]t's obviously the deaf voice." Ex. K (Curtis Dep.) 96:8–9.

## 2.     Christena Johnson's employment with Big Lots.

Since on or about August 3, 2011, Johnson has worked as a part-time cashier and stocker at Big Lots' retail store in Elkins. Ex. B (Johnson Dep.) 13:22–14:5, 15:19–16:21, 24:20–25:2, 59:13–15. She performs cashier, stocking, and recovery (i.e., returning merchandise to and tidying shelves) duties. *Id.* 17:4–10, 18:5–17. She also performs many duties in the store's furniture

2

department, including but not limited to unloading furniture trucks, setting "planograms" (i.e., erecting merchandise displays according to blueprints), executing price holds (which was a task that typically only managers and employees who regularly worked in the furniture department were trained to perform), stocking, and financing. *Id.* 16:22–18:3; Ex. C (Perry Dep.) 22:21–23:18, 25:12–27:7. Johnson had received extensive training in furniture department duties. Ex. B (Johnson Dep.) 156:10–16; Ex. C (Perry Dep.) 44:11–46:8.

Store Manager Perry described Johnson as a good employee who is eager to work, willing to learn, and performs her job duties as instructed. Ex. C (Perry Dep.) 22:6–16, 23:2–4. She met or exceeded expectations every year she worked for him. *Id.* 47:4–7. As a single mother with three children (one of whom is completely deaf), Johnson tried to work as many hours as possible and regularly volunteered to work additional shifts at other, struggling Big Lots stores to help with tasks such as putting out freight and setting planograms. *Id.* 22:12–14, 23:10–24:3; Ex. B (Johnson Dep.) 25:13–26:3, 196:6. Johnson was typically first to volunteer for such assignments, Ex. C (Perry Dep.) 23:19–23, and could perform myriad other duties. *Id.* 32:23–44:18. Johnson worked in the furniture department more frequently than other employees, even those who had received the same training in the department. *Id.* 68:13–21.

### 3.   Big Lots employees ridiculing Christena Johnson because of her disabilities.

During Johnson's employment with Big Lots, several coworkers—viz. Heckler, Bertelli, Curtis, and Graham—regularly harassed and otherwise mistreated her because of her hearing and speech impairments. Ex. A (Johnson Decl.) ¶¶ 12–16; Ex. B (Johnson Dep.) 72:9–17; Ex. L (Blackburn Dep.) 94:5–15; Ex. M (Blackburn Decl.) ¶¶ 7–13. From late 2012 or early 2013 until about January 2015, one or more of these coworkers made offensive comments about her based on her hearing and speech impairments approximately two to three times per week. Ex. A (Johnson

Decl.) ¶ 13. From about mid-2015 until about mid-2016, these coworkers made offensive comments about her approximately two to three times per month. *Id.*

Bertelli mocked and yelled at Johnson because she could not pronounce Bertelli's name correctly due to her speech impairment. Ex. B (Johnson Dep.) 72:18–24. Bertelli called Johnson *retard* and told her to go home. *Id.* 72:24. She regularly picked on her and called her names. *Id.* 77:5–6. Although Bertelli did not mock Johnson every time she saw her, she engaged in this kind of behavior frequently, exceeding 20 occasions. *Id.* 73:2–7. She frequently mocked Johnson when Graham was acting as a "third-key" (i.e., covering for an absent manager) because Graham would laugh with Bertelli and join the name-calling and mockery. *Id.* 73:5–24. Every or every other time Bertelli mocked her, Johnson reported the mistreatment to Store Manager Perry, and he responded, "I'll take care of it." *Id.* 75:13–76:6. Bertelli also erased Johnson's name from the work schedule so she did not know when she was supposed to work. *Id.* 77:8–20; Ex. M Blackburn Decl.) ¶ 11.

When mocking Johnson, Bertelli sometimes referred expressly to her disability, using the words *deaf*, *stupid*, and *retarded* in her taunts. Ex. B (Johnson Dep.) 81:7–15. When the phone rang while they were working together and Johnson asked Bertelli to take the call, Bertelli would retort, "Can't you answer it, you deaf person?" *Id.* 81:21–82:1. Johnson complied only to have Bertelli and Graham laugh at her and make noise, resulting in Johnson not being able to hear the person on the other end of the line. *Id.* 82:2–20. When Johnson would ask Graham and Bertelli to quiet down, Graham would join the mockery, calling her *deaf* and telling her to just get off the phone if she could not hear. *Id.* 82:3–21.

Bertelli also addressed Johnson as *retard* "[w]henever she had a chance," saying things like, "Go away, retard," when Johnson would try to interact with her for work reasons. *Id.* 82:22–83:2. Johnson never heard Bertelli call anyone else *retard*. *Id.* 83:16–17.

Curtis mocked Johnson for her hearing and speech impairments, calling her *stupid* and *retarded*. *Id.* 84:14–24, 86:1–3. Bertelli and Graham laughed at Johnson when Curtis called her names. *Id.* 86:1–3. Curtis also refused to help Johnson move heavy furniture when she asked for help, telling her it was not her problem, that Johnson should do it herself, and humiliating her in front of customers. *Id.* 84:22–85:14, 86:5–87:19.

In addition to her participation in Bertelli's and Curtis's ridicule of Johnson, Graham abused Johnson by calling her *retarded*, *stupid*, and *dumb* on 50–100 occasions. *Id.* 109:21–110:3. When Johnson was on the phone, Graham stood behind her and laughed as loudly as she could in an effort to distract Johnson. *Id.* 110:10–15. When Johnson asked her to be quiet, Graham moved close to her ear and said, "What's your problem, retard? Can't you do it yourself? If you don't know what you're doing, then get off the phone." *Id.* 110:15–21. Graham also called Johnson *retarded* or *stupid* when she would pass her in the store. *Id.* 111:7–9. She also said, "Oh, here comes the deaf person, better run. She don't know how to speak to us, so we better run from her." *Id.* 111:10–12. She also told Johnson just to go home, saying, "I don't need to be with a deaf person while I'm on duty tonight." *Id.* 111:15–16.

Heckler also admonished Johnson for her manner of speaking and told her she should try to speak more quietly and professionally when she was on the loudspeaker. Ex. F (Heckler Dep.) 33:1–13. Many times Johnson believed that Curtis, Bertelli, and Graham were mocking her because they were covering their mouths, pointing at her, and laughing, but she was unable to determine what they were saying due to her impairment and they were not situated so that she could easily read their lips. Ex. A (Johnson Decl.) ¶ 12.

Bertelli mocked Johnson at least 50–100 times and she reported it to Store Manager Perry every or every other time. Ex. B (Johnson Dep.) 75:10–15. Graham mocked her at least 50–100

times. *Id.* 109:21–110:3. From late 2012 or early 2013 until his termination in mid-2016, Johnson reported Heckler's, Bertelli's, Curtis', and Graham's offensive conduct toward her to Perry every time or nearly every time it happened. Ex. A (Johnson Decl.) ¶ 18. Before then-Store Manager Donna Long stopped working at the Elkins store, Johnson also reported Bertelli's offensive conduct toward her. *Id.* ¶ 17.

**4.      Other Big Lots employees witnessed the harassment Christena Johnson suffered.**

Sheria Blackburn worked at Big Lots' store in Elkins from 1993 until she was forced to resign in December 2014. Ex. M (Blackburn Decl.) ¶ 3; Ex. L (Blackburn Dep.) 22:15–17, 23:22–24:2. Her first position at Big Lots was associate manager, and in or about 2013, she expressed interest in and obtained the position of furniture manager because it was an area of the store in which she had not worked previously and the schedule was more compatible with that of her secondary job as a part-time mail carrier with the U.S. Postal Service ("USPS"). Ex. L (Blackburn Dep.) 22:15–17, 23:3–19. USPS hired Blackburn in 2005, and she maintained a full-time position at Big Lots and a part-time position with USPS from 2005 until she was forced to quit her job at Big Lots in December 2014. *Id.* 23:10–14; Ex. M (Blackburn Decl.) ¶ 4.

At some point prior to October 2014, Blackburn and others were at the Elkins store doing inventory. Also present were then-District Manager Donovan Bond, Bertelli, and Johnson. Bond approached her and related the following: (1) he had just admonished Bertelli for "picking on" Johnson; (2) he had informed Perry of the incident; (3) if Blackburn saw any other similar behavior, she should report it to Perry; (4) he (i.e., Bond) would not tolerate such behavior; and (5) he had issued Bertelli her "final warning." Ex. M (Blackburn Decl.) ¶ 8; Ex. L (Blackburn Dep.) 79:1–81:17. Blackburn understood from her conversation with Bond that Bond had witnessed Bertelli mocking Johnson because of her hearing and speech impairments. Ex. M

6

(Blackburn Decl.) ¶ 8. Johnson confirmed this incident. Ex. A ¶ 14.

Not long after this incident, Blackburn herself heard Curtis and Graham mocking Johnson by broadcasting themselves over the store's intercom; mimicking Johnson's loud and impaired manner of speech over the intercom for coworkers, customers, and anyone else in the store to hear; and then bursting into laughter. Ex. M (Blackburn Decl.) ¶ 9; Ex. L (Blackburn Dep.) 112:22–113:15, 114:7–16. Blackburn knew that they were using the phone in the stockroom because of the distinctive crackle she heard on the intercom. Ex. M (Blackburn Decl.) ¶ 9. Curtis and Graham paged Johnson, asking her to retrieve an item of merchandise whose name Johnson had difficulty pronouncing. *Id.* Curtis and Graham pronounced the item's name like Johnson did. *Id.* They started laughing before disconnecting the intercom, and Blackburn could discern their identities from their distinctive laughs. *Id.* Johnson confirmed that Heckler, Bertelli, Curtis, or Graham had done this many times. Ex. A (Johnson Decl.) ¶ 15.

Then, sometime in fall 2014, Blackburn and coworker Tisha Eddleman came upon Johnson crying in the women's restroom. *Id.* ¶ 16; Ex. M (Blackburn Decl.) ¶ 10. Johnson was upset because coworkers had been cruel to her and called her names because of her hearing and speech impairments. Ex. A (Johnson Decl.) ¶ 16; Ex. M (Blackburn Decl.) ¶ 10. Although neither Blackburn nor Eddleman could recall who the alleged name-callers were, Johnson had used the word *they* to convey that multiple people had participated. *Id.* Additionally, Blackburn did not ask Johnson who *they* referred to because she already knew that Heckler, Bertelli, Curtis, and Graham were the only employees at the store that made such offensive comments to Johnson. *Id.* Eddleman recalled Johnson saying the individual had called her *mumble-mouth*. Ex. L (Blackburn Dep.) 110:12–111:3; Ex. N (Eddleman Dep.) 33:6–34:7.

Johnson told Store Manager Perry about this incident the next day. Ex. A (Johnson Decl.)

¶ 16. Blackburn also told Perry what Johnson had told her and Eddleman in the women's restroom and that he needed to do something about it. Ex. L (Blackburn Dep.) 113:3–20; Ex. M (Blackburn Decl.) ¶ 10. Perry told Blackburn that they did not want Big Lots corporate management coming into their store and that they were better off if corporate did not know they existed. Ex. L (Blackburn Dep.) 113:5–20; Ex. M (Blackburn Decl.) ¶ 10. Perry never followed up with Blackburn, and he did not take any action to investigate the incident she reported. Ex. M (Blackburn Decl.) ¶ 10.

On another occasion, Big Lots coworker Carol Menear told Blackburn that she had seen Bertelli erasing Johnson's name from the work schedule. *Id.* ¶ 11. Blackburn advised Menear to report this to Perry, and she herself reported it to Perry the next day. *Id.*; Ex. L (Blackburn Dep.) 112:13–20. Perry asked no questions and made no promise to take action. Ex. M (Blackburn Decl.) ¶ 11. He simply put his hands on his head and shook his head in a way that suggested to Blackburn that he did not want to know about this incident. *Id.*

Blackburn and Eddleman were not the only employees to witness the disability harassment or its aftermath. Shirlee Coffman, a former cashier and customer-service employee at the Elkins store from 1999 until her retirement in 2015, regularly observed coworkers harassing Johnson, beginning as early as 2011. Ex. H (Coffman Decl.) ¶¶ 2–4. Specifically, Coffman observed Heckler, Graham, and Curtis make fun of Johnson on a regular basis because of her hearing impairment and the way she spoke. *Id.* ¶ 6. Coffman observed them, on multiple occasions, call Johnson names and stand behind her and laugh at her. *Id.* ¶¶ 5–6. In or around fall 2014, at the Elkins Big Lots' "Friends and Family" event, Coffman observed Curtis and Graham mock, point at, and laugh at Johnson as she struggled to move a heavy piece of furniture by herself. *Id.* ¶ 7. Coffman recalls that Curtis and Graham were very mean-spirited and that they were laughing at,

mocking, and making fun of Johnson because of her hearing and speech impairments. *Id.* Coffman also recalls that Curtis and Graham refused to help Johnson with the piece of furniture, and instead allowed her to struggle with it. *Id.*

Blackburn recalls Coffman coming to her in or about October 2014 and telling her about this incident and that Coffman was so upset about what Curtis and Graham had said about Johnson that she (Coffman) was crying. Ex. L (Blackburn Dep.) 111:21–112:3; Ex. M (Blackburn Decl.) ¶ 12. Blackburn recalls Coffman telling her it was "really, really bad stuff," and when Blackburn pressed Coffman to tell her what the harassers had said about Johnson, Coffman refused to repeat it. Ex. L (Blackburn Dep.) 112:1–7; Ex. M (Blackburn Decl.) ¶ 12. Blackburn recalls that Coffman was so upset by the episode that she said after witnessing it, she would have left her shift and gone home if her husband had been available to pick her up. Ex. L (Blackburn Dep.) 112:4–6. Blackburn advised Coffman to report the incident to Perry and recalls Coffman stating that she had told Perry, but that he would not do anything about it. *Id.* 112:8–12; Ex. M (Blackburn Decl.) ¶ 12. Blackburn herself reported the incident to Perry, but he simply repeated that they did not want corporate coming to the Elkins store. Ex. M (Blackburn Decl.) ¶ 12. Perry never followed up with Blackburn, and she is not aware that he took any action to investigate the incident she reported. *Id.*

In or about October 2014, Blackburn heard Graham call Johnson a "mumble-mouth bitch" in front of multiple coworkers and customers, because she was agitated that Johnson had failed to perform some task. *Id.* ¶ 13; Ex. L (Blackburn Dep.) 81:16–82:9, 84:1–20.

**5.      David Perry's refusal to confront the disability-based harassment against Johnson.**

As made clear above, during the months preceding October 2014, both Johnson and her coworkers persistently reported to Store Manager Perry the disability harassment to which she was being subjected. *See supra pp.* 4–9. What is undisputed is that Perry took no action whatsoever.

The evidence demonstrates that Perry took no corrective action of any kind concerning complaints of harassment against Johnson that he received prior to October 2014. Ex. C. (Perry Dep.) 82:16–24, 84:24–85:2, 94:2–21.

Johnson eventually confronted Perry about his inaction and insisted that they escalate the issue to a higher-level supervisor. Perry asked her for another chance, telling her that he would "take care of it, because we do not want anyone to come down here to our store." Ex. B (Johnson Dep.) 92:3–93:1. Johnson elaborated on his inaction, "And you go to your boss and you think that that boss is supposed to help you, [and] he doesn't. That's not right. He should have put a stop to it. You can't—when a person like me—I gave him chances after chances after chances." *Id.* 160:7–11. Still, Perry failed to take any action to end the harassment. Ex. L (Blackburn Dep.) 112:8–14, 124:16–20

In early October 2014, Blackburn reported to Perry that Graham, Curtis, and "I think maybe another one were supposedly making fun of" Johnson, that Blackburn had witnessed it, and that Perry believed her. Ex. C (Perry Dep.) 83:15–84:8, 94:2–20. Blackburn told him about the harassment on more than one occasion. *Id.* 98:18–99:9. He "believes he spoke to [Johnson] once" about the harassment, that it was "a five-minute type deal," that he thinks he spoke with Bertelli, Graham, Curtis, and Heckler. *Id.* 85:10–22, 86:23–87:20. Although he could not recall those conversations specifically, he recalled that they all denied the harassment. *Id.* 94:22–96:3. Perry admitted he "didn't go into any depth" during these conversations with the harassers. *Id.* 96:4–5. He also admitted that he *did not interview anyone other than the accused*, i.e., he did not attempt to obtain statements from potential witnesses and that he "didn't even ask them about the other people . . . [l]ike if I talked to Bobbi [Curtis], I only asked Bobbi if she did it, I didn't ask her if somebody did it." *Id.* 96:12–22.

Perry did not consult the Big Lots employee handbook or any other documents for guidance upon receiving complaints that Johnson was being harassed, nor did he reach out to human resources for assistance. *Id.* 96:23–97:5, 20–24. In fact, Perry admitted that he knew that Big Lots' employee handbook contained provisions on harassment and thus that the complaints "had to be handled," but also believed handling these complaints was "over [his] pay grade." *Id.* 98:1–16. He admitted that he never been trained on how to perform workplace investigations nor on how to conduct employee interviews after receiving complaints of workplace harassment. *Id.* 100:23–101:6. When he discussed the complaint with the alleged harassers and they denied the allegations, his "hands were kind of tied," and that he did not counsel or discipline Curtis, Graham, Bertelli, or Heckler, despite the multiple prior complaints he had received about their disability-based harassment of Johnson. *Id.* 99:17–100:22.

**6.    Sheria Blackburn's report of the harassment to District Manager Donovan Bond.**

On or about October 28, 2014, shortly after witnessing Graham call Johnson a "mumble-mouth bitch" and having become frustrated with Perry's failure to address the multiple, earlier complaints about coworkers making offensive comments about Johnson because of her hearing and speech impairments, Blackburn decided to escalate the matter and called then-District Manager Bond. Ex. L (Blackburn Dep.) 82:2–83:8, 89:6–9; Ex. M (Blackburn Decl.) ¶¶ 14–15. Bond was "not very happy" about the goings-on at the Elkins store and that after she told him about Graham calling Johnson a mumble-mouth bitch, he asked her to tell him about any other problems they were having at the Elkins store, which she did. Ex. L 83:5–8. Bond told her that she should expect a follow-up call from Big Lots Regional Human Resources Manager Claudia (Capell) Hooker. *Id.* 86:9–17. Thereafter, when Hooker called Blackburn, she first asked about an unrelated conflict between two other employees; then she asked about Johnson; and then she asked

11

about Carol Menear. *Id.* 87:18–88:3.

### 7.    Billie Jo Bishop's negligent, reckless harassment investigation.

Shortly after her call with Bond, Hooker called Blackburn, and then Big Lots assigned Regional Associate Relations Manager Billie Jo Bishop to conduct an investigation of the complaint.[1]

But Big Lots failed to prepare either Hooker, or her supervisor Billie Jo. Bishop, for their investigatory roles in this matter. Hooker could not recall ever receiving any training from Big Lots on investigating complaints of workplace harassment, interviewing techniques, or prohibited retaliation. Ex. O (Hooker Dep.) 53:1–6. She never provided Bishop with training on handling complaints of workplace harassment or interviewing alleged victims, perpetrators, or witnesses of workplace discrimination. *Id.* 53:7–18. The only training on harassment they received from Big Lots was an annual computerized training module required for all management employees. *Id.* 52:10–15; Ex. E (Bishop Dep.) 128:7–20. Prior to 2017, Bishop had received no training on retaliation. Ex. E (Bishop Dep.) 129:25–130:17. The only training she had received from Big Lots regarding interviewing potential witnesses of workplace discrimination consisted of "general do's and dont's." *Id.* 130:18–131:10.

Big Lots' failure to prepare Bishop for investigating allegations of workplace harassment tainted her "investigation" interviews with the employees at Elkins store. She interviewed Blackburn—whose call to Bond only days earlier had caused Bishop to visit the Elkins store—for

---

[1] Hooker assigned Bishop via an email purporting to memorialize Hooker's call with Blackburn. *Id.* 8:18–22; Ex. O (Hooker Dep.) 13:6–8, 14:23–15:11, 24:12–18, Ex. 2. Bishop was asked to investigate all of the complaints outlined in the email, which included the allegation that coworkers picked on Johnson and mocked her because of her hearing and speech impairments. Ex. O (Hooker Dep.) 25:19–24, 36:8–13. The email also outlines vague questions for Bishop to ask witnesses such as, "Have you ever observed any inappropriate behavior by any member's [sic] of management or fellow associates?" and, "Do you feel you are treated with dignity and respect?" *Id.* Ex. 2.

only five minutes. Ex. L (Blackburn Dep.) 110:7–9; Ex. M (Blackburn Decl.) ¶ 16. Bishop did not even ask Blackburn about whether Heckler, Bertelli, Curtis, and Graham had made offensive comments about Johnson's hearing and speech impairments; she only asked Blackburn about (1) a new couch that the Elkins store had recently set up for display and (2) a workplace dispute between Graham and Eddleman. Ex. L (Blackburn Dep.) 104:2–9, 110:7–8; Ex. M (Blackburn Decl.) ¶ 16.

Consistent with her lack of training, Bishop only asked Johnson generic questions about "what's going on" at the Elkins store. Ex. A (Johnson Decl.) ¶ 20; Ex. B (Johnson Dep.) 135:5. Similarly, when Bishop interviewed Coffman, she asked her only general questions about what things were like at the store and did not ask her any questions about Johnson specifically. Ex. H (Coffman Decl.) ¶¶ 8–9. Bishop did not interview Magner at all. Ex. I (Magner Decl.) ¶ 8. Nor did she interview Bond. *See* Ex. D (Bond Dep.) 80:4–8.

Bishop's questioning of Perry, who had received numerous reports of disability harassment in the past from Johnson and others, sought no specific detail about past allegations of harassment or incidents, though Perry volunteered he thought it was possible the harassment occurred. *See* Ex. C (Perry Dep.) 110:16-112:7.

Bishop's interviews with the alleged harassers were less-than probing. Bishop did not ask Heckler any questions about Johnson. Ex. F (Heckler Dep.) 42:9–12. Bertelli and Curtis did not remember Bishop querying them about their alleged harassment of Johnson. Ex. G (Bertelli Dep.) 78:15–79:1; Ex. K (Curtis Dep.) 115:24–117:7. And Bishop only asked Graham whether she had seen anyone at the store making fun of or being mean to Johnson; Bishop did not ask her any questions about whether she herself had made offensive comments about Johnson based on her hearing and speech impairments. Ex. J (Graham Dep.) 64:11–18.

13

8.      **Billie Jo Bishop's investigation produces no corrective action against the harassers.**

Based on her interviews at the Elkins store, Bishop reported to Big Lots that the complaint that Johnson was being subjected to disability harassment were "unsubstantiated." Ex. E (Bishop Dep.) 66:5–9. But Bishop's conclusion was contrary to the facts.

First, Johnson told Bishop about all the disability-based harassment to which she had been subjected. Bishop began Johnson's interview by asking her what was going on at the store. Ex. A (Johnson Decl.) ¶ 20; Ex. B (Johnson Dep.) 135:4–5. Johnson then told her about all the ways her coworkers picked on, made fun of, and otherwise mistreated her that she could remember at the time. Ex. A (Johnson Decl.) ¶ 20; Ex. B (Johnson Dep.) 135:5–6, 136:4–11. Specifically, she described Heckler, Bertelli, Curtis, and Graham sitting together and pointing and laughing at her; Graham laughing at her when she used the intercom; and on the occasions she reported Bertelli's and Curtis' mistreatment to Graham, Graham going to Bertelli and Curtis and telling them about her complaints, at which point they all laughed at her and called her names. *See* Ex. B (Johnson Dep.) 166:16–21, 172:10–13, 181:5–182:23. Indeed, though Bishop admits that she found Johnson's account of being "bullied" and "mocked" to be credible, Ex. E (Bishop Dep.) 98:1–20, she disregarded this, insisting that she needed corroboration.

But there *was* corroboration. Coffman told Bishop that she had seen Curtis and Graham mock, make fun of, and laugh at Johnson because of her hearing and speech impairments while Johnson attempted to move a heavy piece of furniture during the "Friends and Family Event" at the Elkins store in October 2014. Ex. H (Coffman Decl.) ¶¶ 7–10. Coffman also told Bishop that Heckler and Bertelli, along with Curtis and Graham, regularly made fun of Johnson because of her hearing and speech impairments. *Id.* ¶ 11.

In fact, Bishop's own cursory interview notes reflect corroboration: Johnson's report that

14

Heckler, Curtis, and Graham made fun of her when she used the intercom, Ex. E (Bishop Dep.) Ex. 5 at BLSI000641; Eddleman's account that Curtis, Graham, and Keith Shreve made fun of Johnson because she is deaf in one ear and speaks loudly, *id.* Ex. 5 at BLSI00064. Coffman having witnessed Heckler and Curtis mocking Johnson's hearing and speech impairments *Id.* Ex. 5 at BLSI000647. Her notes reflect that Perry told her that he had not heard the alleged harassers pick on Johnson "lately," but that nevertheless, Johnson did not want to work with them. *Id.* Ex. 5 at BLSI000607. Finally, Bishop's interview notes reflect that Blackburn told her that multiple employees (specifically Graham) make fun of Johnson because she is deaf. *Id.* Ex. 5 at BLSI000620. Blackburn told Bishop that "[e]veryone in the store has witnessed [the mockery]." *Id.* Despite these reports, Bishop considered none of this to be sufficient corroboration because, according to her, it lacked specificity. *Id.* 103:8–25.

Big Lots never reprimanded, disciplined, or even individually counseled the alleged harassers about harassing Johnson. Ex. F (Heckler Dep.) 44:10–19; Ex. G (Bertelli Dep.) 86:16–87:23; Ex. K (Curtis Dep.) 134:13–135:11; Ex. J (Graham Dep.) 76:24–77:17. Bishop asserts that her investigation failed to yield sufficiently specific results about the harassers to warrant disciplinary counseling against any person. Ex. E (Bishop Dep.) 68:21–25. And Big Lots has not adduced any evidence of corrective action specifically directed at the four perpetrators in this case.

Instead, Bishop and newly promoted District Manager Browning went to the Elkins store in January 2015 to conduct an informational review of a plethora of company policies with the employees there, policies that were already in place at the company at the time of the harassment and most of which had nothing to do with disability discrimination. *Id.* 119:18–120:2. They covered policies regarding attendance, discounts, the dress code, standards of conduct, harassment, and call-in procedures, all within approximately one hour. *Id.* 120:23–121:3, 122:20–22. The

review was conducted *en masse* with all store employees as a group, though not all Elkins employees were present. *Id.* 122:5–10; *see* Ex. I (Magner Decl.) ¶¶ 8–9. The retraining consisted of Bishop and Browning reading policies out loud, discussing some examples, and role playing. Ex. E (Bishop Dep.) 122:2–5. Big Lots claims that Perry later reviewed the policies with the employees who were not present. *Id.* 122:11–19, 123:14–25.

Thereafter, Big Lots failed to monitor the work environment at the Elkins store to determine if any disability harassment was occurring. Bishop failed to conduct such monitoring, and she gave no advice or instructions to either Store Manager Perry or District Manager Browning to monitor the work environment for harassment. Ex. C (Perry Dep.) 115:10–23; Ex. P (Browning Dep.) 99:10–18. Bishop did not even share the results of her investigation with Perry and Browning to inform them of what was happening in their own store. Ex. C (Perry Dep.) 116:19–117:4; Ex. P (Browning Dep.) 89:16–21.

Unsurprisingly, the disability harassment against Johnson resumed about two to three months later. Ex. B (Johnson Dep.) 137:17–138:1. Johnson reported it to Perry once it resumed, and as before, he assured her that he would take care of it. *Id.* 101:10–13. Perry repeatedly deterred Johnson from contacting corporate, telling her he did not want anyone from corporate in his store. *Id.* 138:2–138:22. At one point in 2015, Johnson even told Perry that they should speak with Bishop about the ongoing harassment, but he effectively prevented that complaint by falsely telling Johnson that Bishop no longer worked for Big Lots. *Id.* 210:20–211:12.

**9.    Big Lots subjects Sheria Blackburn to retaliation and associational discrimination.**

Perry had every reason to fear additional involvement by Big Lots HR, though not because Big Lots took the hostile work environment seriously. The aftermath of the Bishop visit to the Elkins store, precipitated by Blackburn and Johnson's complaints, was not kind to Perry's career.

16

As a result of her visits to the Elkins store, Bishop concluded that its employees were not following many corporate policies and that "there was a lack of accountability and professionalism in the building in general." Ex. E (Bishop Dep.) 71:24–72:3. She observed that associates failed to follow Big Lots' attendance policy and, more importantly, that managers were not living up to their job expectations. *Id.* 74:17–75:10. In a summary of her findings that she transmitted to her supervisor Hooker and Regional Team Leader William Boas, she wrote, "After a thorough investigation, I have come to the conclusion that most of the issues in this store result from lack of leadership. *Id.* Ex. 2 at BLSI000604. Bishop concluded that Perry was unwilling to deal with conflicts between his employees. *Id.* 100:23–101:9. Perry's performance evaluations suffered because of the policy infractions and lack of leadership at his store, and he was eventually fired in 2016. Ex. P (Browning Dep.) Ex. 2. But before his termination, Perry retaliated against Blackburn and Johnson.

Blackburn has worked for USPS since 2005. Ex. L (Blackburn Dep.) 9:14–16; Ex. M (Blackburn Decl.) ¶ 4. She was a part-time mail carrier until she obtained a full-time position in 2016. Ex. L (Blackburn Dep.) 54:18–55:10, 70:9–17; Ex. M (Blackburn Decl.) ¶ 4. Perry was always aware that Blackburn had a second job at USPS. Ex. C (Perry Dep.) 129:10–13. He had always accommodated her USPS work schedule and allowed her to start work at Big Lots when she finished her mail route. Ex. L (Blackburn Dep.) 73:18–74:10, 117:10–13, 118:15–17.

After Blackburn called Bond in October 2014 to report the harassment against Johnson, and after Bishop came to the Elkins store in November 2014 to investigate the various policy violations, Perry seemed different, "like he was upset because they were there." *Id.* 116:16–22. He had talked more freely before Bishop came to the Elkins store. *Id.* 116:19–22.

In December 2014, Perry told Blackburn that she could not continue to hold her job as a full-time furniture manager at Big Lots and her job as a mail carrier at USPS and that she needed

to quit Big Lots, quit USPS, or retire from Big Lots. *Id.* 117:14–18; Ex. M (Blackburn Decl.) ¶ 17. He told her that Bishop had instructed him to give her this choice. Ex. L (Blackburn Dep.) 117:16–18, 118:3–4; Ex. M (Blackburn Decl.) ¶ 17. Perry did not tell Blackburn that she had the option of stepping into a part-time position at Big Lots even though Bishop claims to have instructed him to give Blackburn that option. Ex. L (Blackburn Dep.) 119:16–24; Ex. M (Blackburn Decl.) ¶ 17; Ex. E (Bishop Dep.) 119:16–24. Perry claims that he did give Blackburn the option of stepping into a part-time position at Big Lots. Ex. C (Perry Dep.) 134:8–16.

Tellingly, when Blackburn asked Perry why she was being presented with this manufactured ultimatum forcing her to quit one of her jobs, he stated, "I told you we didn't want them down here." Ex. L (Blackburn Dep.) 118:4–5; Ex. M (Blackburn Decl.) ¶ 17. His statement was the culmination of his previous warnings to both Blackburn and Johnson about causing any involvement of corporate personnel at the Elkins store. Ex. B (Johnson Dep.) 138:5–9, 187:15–18; Ex. L (Blackburn Dep.) 111:14–16. Blackburn chose to continue working at USPS and resigned her job at Big Lots that day. Ex. M (Blackburn Decl.) ¶ 17.

**10.    Big Lots subjects Christena Johnson to unlawful denial of promotion.**

During her employment with Big Lots, Johnson was interested in being promoted to a position in the furniture department of the Elkins store, such as furniture manager, and prepared for such a position. Ex. B (Johnson Dep.) 20:13–21:21. For instance, throughout 2013 and 2014, Blackburn, who held the position of furniture manager at that time, worked closely with Johnson and trained her in the job tasks associated with that department. Ex. B (Johnson Dep.) 27:11–13. Then-District Manager Bond even sent Blackburn and Johnson to Big Lots' store in Morgantown in or around October 2014 to receive specialized training on Big Lots' furniture-leasing program. Ex. L (Blackburn Dep.) 27:17–28:18.

18

However, notwithstanding Johnson's interest in and experience with furniture-department operations, Store Manager Perry ruled out Johnson for such a role. Perry told Blackburn that if an associate furniture manager position was ever created at the Elkins store, he would select Bobbi Curtis, (one of the harassers) for the position because Curtis could "do the talking better" than Johnson. Ex. A (Johnson Decl.) ¶ 19; Ex. M (Blackburn Decl.) ¶ 6. Ex. K (Curtis Dep.) 95:21–24. That job never came to pass, but it was Johnson's understanding that if a full-time associate manager job were to become available in the furniture department, but for Perry's predisposition she would have been well-positioned to obtain it, given her longstanding desire for full-time work at Big Lots and extensive training and experience in that area of the store. Ex. A (Johnson Decl.) ¶ 19; Ex. B (Johnson Dep.) 25:4–26:3, 156:9–17.

After Blackburn was forced from her position as furniture manager in December 2014, the position became available. Because of her extensive experience in the furniture department at the Elkins store and her desire to obtain full-time employment, Johnson was interested in applying for the position and did so, as then-District Manager Browning testified. Ex. P (Browning Dep.) 35:19–36:2. Significantly, Perry did not want to consider Johnson for the furniture-manager position, but Browning insisted that they interview her. *Id.* 42:15–21. Thus, Johnson was considered a candidate for the position and was interviewed for it. *Id.* 35:19–36:11.

Browning, who had only recently started as district manager, relied heavily on Perry in choosing the new furniture manager. *Id.* 35:4–9, 41:17–21; *see also* Ex. D (Bond Dep.) 22:22–6, 23:18–24:1 (stating that district manager relied on store manager for recommendations on hires and promotions). While Perry now disclaims responsibility for hiring the furniture manager and alleges that he had no input in the decision, Ex. C (Perry Dep.) 59:3–4, Browning says otherwise, that he relied on Perry's input in selecting the new furniture manager and that he would not

19

normally select a candidate that the store manager did not recommend. Ex. P (Browning Dep.) 35:4–9, 41:17–21, 75:13–16. *See also* Ex. E (Bishop Dep.) 86:22–87:12. Perry told Browning about the internal candidates' levels of knowledge and productivity, *id.* 41:17–21, and Browning cited this information as his reason for selecting Curtis over Johnson, *id.* 44:6–15. Perry had recommended Curtis for the promotion, *id.* 41:22–42:2, 74:13–16, and she ultimately received the furniture-manager position, *id.* 44:6–7.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might affect the suit's outcome under the governing law. *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016). The Court must view all facts and justifiable inferences arising therefrom in the light most favorable to the nonmoving party and, in doing so, must not weigh evidence or make credibility determinations. *Id.*

## ARGUMENT

**I.     Big Lots is not entitled to summary judgment on the disability-harassment claim.**

Hostile work environment claims under the ADA require proof of the following: (1) the worker is a qualified individual with a disability; (2) was subjected to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability to the employer. *E.g., Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001). Big Lots has not shown the absence of a genuine factual dispute on these elements.

## A.   Big Lots has failed to challenge EEOC's claims that Johnson was "regarded as" disabled or that her speech impairment is a disability.

EEOC alleged that Johnson has a disability under the ADA because (1) she has hearing and speech impairments that substantially limit one or more major life activities and (2) Big Lots regarded her as having a disability, Compl. ¶ 16, ECF No. 1, but Big Lots moved for summary judgment only on the basis that Johnson's hearing impairment does not actually limit a major life activity, Def.'s Summ. J. Mem. (MSJ) at 12–13. Big Lots failed to move for summary judgment on the bases that it did not regard her as having a disability under 42 U.S.C. § 12102(1)(C) or that her speech impairment does not limit a major life activity, even though either basis, standing alone, is sufficient to show that Johnson has a disability under the ADA. *See* 42 U.S.C. § 12102(1)(A), (C). By failing to move for summary judgment on these bases, Big Lots has not shown the absence of a genuine issue of material fact regarding Johnson's disability status.

Even if Big Lots had moved for summary judgment on the basis that it did not regard Johnson as having a disability, evidence shows that her coworkers and supervisors regarded her as having a disability. Following the ADA Amendments Act of 2008 (ADAAA), Pub. L. No. 110-325 (2008), the ADA's definition of the "regarded as" prong of disability coverage expanded to include persons subjected to discrimination because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity. 42 U.S.C. § 12102(3)(A). Thus, to establish ADA protection as a person "regarded as" disabled, an employee need only show that her employer subjected her to an adverse action because of any non-minor or non-transitory[2] impairment, real or perceived. *See id.* § 12102(3)(A) & (B); 29 C.F.R. § 1630.2(g)(3), (j)(2); *West v. J.O. Stevenson, Inc.*, 164 F. Supp. 3d 751, 774 (E.D.N.C.

---

[2] The ADAAA defines a "transitory" impairment as having a duration or expected duration of six months or less. 42 U.S.C. § 12102(3)(B).

2016). The ADA does not require proof that the impairment actually limits, or is perceived to limit, any major life activity. 42 U.S.C. § 12102(3)(A).

Perry, Bond, Browning, Bishop, all the alleged harassers, and other coworkers knew Johnson has a hearing impairment. Ex. C (Perry Dep.) 50:4–51:4; Ex. D (Bond Dep.) 58:19–60:13; Ex. P (Browning Dep.) 75:18–76:4; Ex. E (Bishop Dep.) 68:20–69:14; Ex. F (Heckler Dep.) 26:22–27:10; Ex. G (Bertelli Dep.) 51:13–52:8; Ex. K (Curtis Dep.) 93:22–95:19; Ex. J (Graham Dep.) 50:4–53:12; Ex. N (Eddleman Dep.) 21:19–22:3; Ex. H (Coffman Decl.) ¶ 5; Ex. I (Magner Decl.) ¶ 5. According to Graham "[S]he talked funny, so you knew she couldn't—she would more or else [sic] tell you she couldn't hear well," "It was common knowledge," and, "[I]t's not like you didn't know." Ex. J (Graham Dep.) 50:12–14, 51:7, 52:20–21.

Further, most of these people knew Johnson has a speech impairment, which results from her hearing impairment. Ex. C (Perry Dep.) 51:7–13; Ex. D (Bond Dep.) 59:8–60:13; Ex. E (Bishop Dep.) 68:20–69:14; Ex. F (Heckler Dep.) 27:14–28:1; Ex. G (Bertelli Dep.) 53:6–54:19; Ex. K (Curtis Dep.) 96:2–24; Ex. J (Graham Dep.) 52:13–53:12; Ex. N (Eddleman Dep.) 20:9–13, 34:18–22; Ex. H (Coffman Decl.) ¶ 5; Ex. I (Magner Decl.) ¶ 5. Perry observed that "she did speak different." Ex. C (Perry Dep.) 51:10. Bond noticed immediately that "her speech was a little off." Ex. D (Bond Dep.) 59:15, 60:11–13. Bishop observed that "[h]er communication would be consistent with someone who is hearing impaired but maybe not completely deaf." Ex. E (Bishop Dep.) 69:8–9. Heckler knew that "you can tell just by the way she talks that she has . . . trouble hearing." Ex. F (Heckler Dep.) 27:20–21. And Curtis was aware, "[I]t's obviously the deaf voice." Ex. K (Curtis Dep.) 96:8–9. Blackburn overheard Graham call Johnson *mumble-mouth*. Ex. L (Blackburn Dep.) 84:1–10.

Thus, the four perpetrators of the disability harassment, the officials who refused to correct

the resulting hostile work environment, and the decision-making personnel concerning Johnson's denial of promotion all knew of Johnson's impairments, and given their nature and duration it cannot be seriously disputed that her impairments are non-minor and non-transitory. Given the genuine issues of material fact concerning the motivation for the harassment and denial of promotion, under 42 U.S.C. § 12102(3)(A) there is also a genuine issue of material fact concerning whether Johnson was regarded as disabled.

      **B.**      **Johnson has an actual disability because her significant deafness substantially limits her hearing, speaking, and communicating.**

     The evidence also demonstrates that Johnson has an actual disability under the current ADA definition of coverage. After the ADAAA, the standard for establishing disability was significantly relaxed to ensure broad coverage of workers. As amended, the ADA now sets forth rules of construction that must be used when construing and applying the statutory term *disability*. *See* 42 U.S.C. § 12102(4). The Act now directs the courts to construe "disability . . . in favor of *broad coverage* of individuals under this chapter, *to the maximum extent permitted* by the terms of this chapter." *Id.* § 12102(4)(A) (emphasis added). Moreover, when determining whether an individual is substantially limited in a major life activity, the courts are directed to assess the limitations that the worker would experience in the absence of mitigating measures and to disregard the ameliorative effects of those mitigating measures, such as "learned behavioral or adaptive neurological modifications." *Id.* § 12102(4)(E)(iv).

     In the ADAAA legislative findings, Congress stated its clear intent to provide expansive disability coverage and to specifically reject the "demanding standard" for establishing disability announced in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), which required that a worker's impairment "prevents" or "severely restricts" performance of a major life activity. Pub. L. No. 110-325, § 2(b)(4). Instead, Congress directed the courts and the

EEOC to focus their analysis on the employer's conduct, not disability coverage questions, as the "primary object of attention" in ADA cases, and that questions of whether an impairment is a disability "should not demand extensive analysis." *Id.* § 2(b)(5).

Applying ADAAA standards to this case, it is readily apparent that Johnson has an actual disability, or at least there is a genuine issue of fact for the jury on that question. Johnson is completely deaf in her right ear and partially deaf in her left ear and has been since birth or shortly thereafter. Ex. A (Johnson Decl.) ¶ 6. Her deafness substantially limits her major life activities, including but not limited to hearing, speaking, and communicating. 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(j)(3)(iii) ("[I]t should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: Deafness substantially limits hearing . . . .").

Although Johnson testified in her deposition that her deafness did not limit her activities inside or outside work, *see* MSJ 12–13, that is not the relevant question. Hearing, speech, and communication are each major life activities *in themselves*, and so the issue of whether Johnson experiences any *additional* limitations as a result of her substantial limitations in hearing, speech, and communicating is legally immaterial. *See* 42 U.S.C. § 12102(4)(C) ("An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability."). The issue is whether, without consideration of adaptive behaviors such as lip reading, Johnson's condition, manner or duration of hearing, speech or communication are substantially limited as compared to most people in the general population. *See, e.g.*, *id.* § 12102(4)(E)(iv); 29 C.F.R. § 1630.2(j)(1)(ii) & (j)(4).

In her deposition, Johnson was not specifically asked about the condition, manner, or duration of her hearing ability in itself or her speech. The evidence shows that she is substantially

limited particularly, but not exclusively, if the analysis applies the ADAAA requirement that her adaptive behavior of lip reading should be disregarded when assessing whether she is substantially limited in hearing. *E.g.*, Ex. B (Johnson Dep.) 63:15–16 ("It's hard for me to hear the intercoms and stuff."), 82:3–9 (describing her difficulty hearing customers over the phone); Ex. A (Johnson Decl.) ¶¶ 7–9 (describing limitations); Ex. J (Graham Dep.) 52:17–20 ("[Y]ou could talk to her sometimes and she would tell you, 'I can't hear you,' unless you are, like, right in front of her, talking, where she can—yeah."). Together with the excerpts Big Lots cites, MSJ 12–13, this collective testimony evinces a genuine factual dispute about whether Johnson's deafness substantially limits one or more major life activities.

Applying the post-ADAAA standard, the federal courts have held that plaintiffs with hearing loss similar to Johnson's had produced sufficient evidence of disabilities under 42 U.S.C. § 12102(1)(A). *See, e.g.*, *Brown v. CVS Pharmacy, Inc.*, No. 6:12-CV-1193-ORL-31, 2013 WL 3353323, at *2–3 (M.D. Fla. July 2, 2013) (holding that plaintiff produced sufficient evidence that deafness in her right ear and neuropathic pain in her left ear constituted an actual disability). In fact, even courts applying the more-stringent pre-ADAAA legal standard for disability reached this conclusion. *See, e.g.*, *Bosket v. Long Island R.R.*, No. CV 00-7352-RJDJMA, 2004 WL 1305746, at *3–5 (E.D.N.Y. June 4, 2004) (denying both parties' motions for summary judgment regarding disability status of plaintiff with unilateral hearing loss because "[f]act-intensive inquiries such as this often require resolution at trial"); *Connolly v. Bidermann Indus. U.S.A., Inc.*, No. 95 CIV. 1791 (RPP), 1998 WL 305643, at *5–6 (S.D.N.Y. June 9, 1998) (denying motions for summary judgment regarding disability of plaintiff with unilateral functional deafness and tinnitus because substantial limitation is issue of fact for trial).

Finally, courts have also held that plaintiffs with speech impairments similar to Johnson's

had produced sufficient evidence of disabilities under 42 U.S.C. § 12102(1)(A). *See, e.g.*, *Zavec v. Collins*, No. 3:16-CV-00347, 2018 WL 1035777, at *5 (M.D. Pa. Feb. 23, 2018) (denying in part defendants' motion to dismiss because plaintiff with speech impairment sufficiently alleged he had a disability under ADA when his attempts to communicate elicited mockery and ridicule from defendants); *Dorsey v. CHS, Inc.*, No. 15-CV-02735-RBJ, 2017 WL 1356093, at *6 (D. Colo. Apr. 13, 2017) (denying defendant's motion for summary judgment and holding plaintiff's dysarthria qualified as a disability under ADA).[3]

 "The extent of plaintiff's hearing loss is a factual question that must be resolved at trial." *Brodrick v. City of New York*, 942 F. Supp. 196, 200 (S.D.N.Y. 1996). And because the Court must resolve all factual ambiguities in EEOC's favor, Big Lots has failed to show the absence of a genuine dispute as to Johnson's disability status and that summary judgment is appropriate.

### C.  Johnson was harassed because of her hearing and speech impairments.

Big Lots argues that there is insufficient evidence that Johnson was subjected to harassment on the basis of disability, asserting that Johnson's own testimony fails to connect the harassment she complained of to any alleged disability. MSJ 15. Defendant's argument is meritless. There is ample evidence of disability motivation for the harassment.

First, Johnson testified that the alleged harassers regularly and expressly referred to her

---

[3] The cases on which Big Lots relies are inapposite. The plaintiff in each (1) suffered unilateral hearing loss (i.e., hearing loss in one ear with the other ear unaffected), rather than bilateral hearing loss (i.e., hearing loss in both ears), as Johnson suffers, *see Yates v. W. Contra Costa Unified Sch. Dist.*, No. 16-CV-01077-MEJ, 2017 WL 3335991, at *1 (N.D. Cal. Aug. 4, 2017), *aff'd*, 708 F. App'x 418 (9th Cir. 2017); *Mengel v. Reading Eagle Co.*, No. CIV.A. 11-6151, 2013 WL 1285477, at *3 (E.D. Pa. Mar. 29, 2013); *Fitzgerald v. Boone Cty. Pub. Safety Commc'ns Ctr.*, No. CIV.A. 04-149-DLB, 2006 WL 2714870, at *1 (E.D. Ky. Sept. 22, 2006); (2) disclaimed any limitations because of his or her hearing loss or failed to produce any evidence of limitations, *see Yates*, 2017 WL 3335991, at *5; *Mengel*, 2013 WL 1285477, at *3–4; *Fitzgerald*, 2006 WL 2714870, at *6; and/or (3) rely on the pre-ADAAA legal standard for disability, *see Fitzgerald*, 2006 WL 2714870, at *7–10; *Yates*, 2017 WL 3335991, at *5 (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999)).

deafness in derogatory ways while harassing her. Ex. A (Johnson Decl.) ¶¶ 12–13; Ex. B (Johnson Dep.) 81:7–82:2, 82:10–20, 111:10–16. This evidence directly connects their mockery to her hearing and speech impairments. *See Fox*, 247 F.3d at 179 (concluding that harassment was attributable to plaintiff's and other disabled employees' medical conditions because the terms *handicapped MF* and *hospital people* "expressly referenced their disabilities and resulting medical restrictions"). And Johnson perceived it as such. *E.g.*, Ex. B (Johnson Dep.) 160:4–6 ("If I don't say the words correctly or I don't do something correctly, you think it's right to have someone to be made fun of, called retard or stupid?").

Second, there is evidence of disability motivation contained in the testimony of other witnesses. Multiple witnesses testified that Johnson suffered harassment expressly because of her hearing and speech impairments. *E.g.*, Ex. L (Blackburn Dep.) 113:1–114:16 (describing harassers imitating "some word Christena couldn't pronounce correctly" over the intercom and "busting out laughing"); Ex. N (Eddleman Dep.) 20:7–14 (stating that Johnson spoke loudly over the intercom because of her partial deafness and that coworkers "would pick on her over that"); Ex. H (Coffman Decl.) ¶¶ 6–7 (describing Heckler, Curtis, and Graham regularly mocking Johnson and Curtis and Graham mocking Johnson at an October 2014 store event).

Furthermore, even assuming for the sake of argument that other direct and circumstantial evidence of disability motive were not present in this case, Big Lots presents no evidence that any of Johnson's nondisabled coworkers were subjected to the nature and quantum of abuse that Johnson was forced to endure at the hands of her tormenters and that Big Lots tolerated and condoned. That is because there is no such comparative evidence. The record reflects that the four perpetrators singled Johnson out for a persistent, wholly unique level of degradation.

Big Lots' argument regarding the epithets *retard* and *stupid*, to which Johnson was

regularly subjected, is particularly meritless. Contrary to Big Lots' representation that Bertelli's and Curtis' use of those terms was unconnected to Johnson's hearing and speech impairments, MSJ 14–15, the same perpetrators who abused Johnson by calling her *retard* and similar epithets also harassed her with overt references to her disability, Ex. A (Johnson Decl.) ¶ 12; Ex. B (Johnson Dep.) 81:7–82:2, or mocked her manner of speech and hearing, Ex. L (Blackburn Dep.) 113:1–114:16; Ex. B (Johnson Dep.) 62–63, 72–73, 74–75, 106, 108, giving rise to an inference that any harassment not overtly referencing hearing or speech was nevertheless motivated by that disability. As the evidence reflects, and as the jury will observe at trial, Johnson has a speech impairment and difficulty hearing that some biased, uninformed persons may view as a reflection of diminished intellect. It is an unfortunate disability stereotype that is common knowledge in our society. Under the circumstances of this case (or simply in light of common experience) a reasonable juror could (and will) infer that the use of epithets such as *retard* and similar comments and abuse directed at Johnson were motivated by her speech and hearing impairments. In fact, the federal courts have held that the epithet *retard* is evidence of disability-based animus regarding hearing or speech impairments. *See, e.g.*, *Long v. Hoffman Enclosures, Inc.*, No. CIV.A. 5:08-100-KKC, 2008 WL 2548640, at *3–4 (E.D. Ky. June 23, 2008) (crediting plaintiff's allegations that supervisor called him a *retard*, *reject*, and *one-armed bandit* because of his speech impairment and impaired arm).

The fact that one or two of the four alleged perpetrators may have occasionally mistreated other nondisabled employees does not show that the treatment of Johnson was unmotivated by disability-based animus. It is beyond cavil that the ADA does not insulate employers from liability for a disability-motivated hostile work environment simply because the perpetrators of the hostile work environment are occasionally mean to someone other than the disabled worker for other

reasons. The evidence of disability-based motivation for the harassment directed at Johnson is overt and permits a reasonable inference of disability motivation. At its core, Big Lots' argument is simply an attempt to induce this Court into committing error by drawing all inferences in the moving party's favor, not the non-movant

> **D.      The harassment Johnson suffered was not merely unpleasant; it was severe and pervasive because it was targeted, persistent, and humiliating.**

To demonstrate actionable workplace harassment, a plaintiff must show that she/he subjectively perceived the work environment to be hostile or abusive and that the harassment was sufficiently severe or pervasive that a reasonable person would perceive it as such, i.e., that it was objectively hostile or abusive. *E.g.*, *Fox*, 247 F.3d at 178. In assessing whether the workplace was objectively hostile, factors to be considered include the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating or merely an offensive utterance, and whether it unreasonably interfered with work performance. *Id.* Even if individual acts of harassment do not create an actionable hostile work environment on their own, their accumulated effects may create one. *E.g., Williams v. General Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999). A holistic analysis that considers the aggregate effect of all categories of unlawfully motivated harassment, whether it overtly referenced a protected trait (e.g., disability) or not, is required. *E.g., id.* at 562–64.

Big Lots does not dispute that Johnson subjectively perceived her workplace as hostile (as the evidence presented by both parties in their briefing allows a reasonable inference that she did regard it as abusive). Instead, Big Lots focuses on whether the harassment was sufficiently severe or pervasive, arguing the harassment was inadequate to establish an objectively hostile work environment. MSJ 21–22. Big Lots' argument is meritless and, in light of the evidence and previous discussion of the disability motive issue, *supra*, warrants only limited discussion.

Big Lots' assertion is based entirely on a flawed legal assumption, i.e., that only incidents that involved overt reference to hearing impairment or deafness are relevant to the hostile work environment, and all other offensive, pervasive, severe, and humiliating harassment to which Johnson was subjected by her four abusers should be ignored because those acts did not expressly reference her hearing/speech impairment. *See id.*

But as reflected in the factual discussion in this brief and as discussed in the preceding section, the evidence of the four perpetrators' disability motivation for their long-term campaign of frequent, humiliating workplace abuse against. Johnson is both overt and creates an inference that their course of conduct was because Johnson's actual or perceived disability. The harassers' express insults regarding and references to Johnson's disability, their participation in harassing acts in which others referred to Johnson's disability, and their mockery of her hearing or speech limitations exposed their disability-based motivation for all of their offensive conduct directed at Johnson. In its totality, the frequency, severity, and humiliating nature of that course of disability harassment is more than sufficient to establish an objectively hostile work environment. The federal courts have repeatedly found that far less significant harassment established an objectively hostile work environment. *See, e.g.*, *MacVaugh v. County of Montgomery,* 301 F. Supp.3d 458, 46667 (E.D. Pa. 2018) (holding plaintiff's allegations of being chastised in meetings, criticized and warned about various aspects of employment and told his breaks would be monitored, and being falsely accused of sleeping on the job and fired in response to request for leave sufficient to state hostile work environment claim); *Pallatto v. Westmoreland Cty. Children's Bureau*, No. 2:11CV1206, 2014 WL 836123, at *17 (W.D. Pa. Mar. 4, 2014) (holding pattern of second-guessing of legitimacy of plaintiff's impairment, denial of co-worker assistance, scheduling changes and unreasonable work deadlines, and reprimands sufficient to establish disability-based

hostile work environment); *Garcia v. Potter*, Civil Action No. SA–09–CV–973–XR, 2010 WL 2025068, at *5 (W.D. Tex. May 18, 2010) (holding postal worker allegations of unwarranted observations/monitoring of work, daily criticism, directive to lift outside of medical restrictions, and placement of undelivered mail in locker stated claim of hostile work environment). The nearly daily harassment Johnson and others described—which targeted Johnson's hearing and speech impairments and caused her to want to avoid work—demonstrates a genuine issue of material fact regarding whether the work environment was objectively hostile on the basis of disability, thereby precluding summary judgment.

### E.   Big Lots is liable for the harassment Johnson suffered.

An employer is liable for coworker harassment if it was negligent in controlling working conditions, i.e., if it knew *or should have known* about the harassment and failed to take prompt and effective remedial action reasonably calculated to ending the harassment and preventing its recurrence. *E.g.*, *Strothers v. City of Laurel, Maryland*, --- F.3d ---, No. 17-1237, 2018 WL 3321317, at *9 (4th Cir. July 6, 2018); *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008). Knowledge can be imputed to the employer if a reasonable person intent on complying with the ADA would have known of the harassment. *See Sunbelt Rentals, Inc.*, 521 F.3d at 319. Reporting harassment to an onsite manager whose knowledge is imputed to the corporation constitutes sufficient notice to the employer. *See, e.g.*, *id.* at 320; *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 982 (4th Cir. 1997) (holding complaints to warehouse manager who supervised harasser gave notice to employer).

Big Lots argues that EEOC cannot show it is liable for the severe and pervasive coworker harassment Johnson suffered, purportedly because Big Lots conducted an "investigation" in November-December 2014 in response to Blackburn's October 2014 complaint to District

Manager Bond, and then held an all-hands mass meeting in the Elkins store three months after the complaint, where management read all of Big Lots' existing employment policies to the workforce. Big Lots' argument is fatally flawed for at least three reasons:

First, Big Lots' liability for the disability-based harassment attached long before Billie Jo Bishop ever visited the Elkins store. As Big Lots' store manager, Perry was an agent responsible for receiving complaints of disability harassment and enforcing compliance with Big Lots' harassment policy. *See* Ex. E (Bishop Dep.) 19:3–20, 104-105; Ex. P (Browning Dep.) 22:9–15; Ex. J (Graham Dep.) 75:18–20; *see also* MSJ 2–3 ("The store manager is also responsible for compliance with the Company's policies, standards, and initiatives.") (citing Perry Dep. at pp. 21, 160; ECF No. 57-5 at 1). Accordingly, his knowledge is imputed to the corporation for purposes of liability. *See, e.g.*, *Haugerud v. Amery School Dist.*, 259 F.3d 678 (7th Cir. 2001) (notice imputed to employer when employee follows employer's complaint procedure).

As discussed *supra*, Johnson, Blackburn, and Eddleman, all reported the harassment to Perry prior to Blackburn's complaint to Bond and Bishop's investigation in late 2014. In fact, Johnson's repeated complaints to Perry were contemporaneous with the harassment throughout 2012–14. Moreover, the evidence discussed *supra* demonstrates that a reasonable jury could conclude that Perry took no action in response to those complaints that was reasonably calculated to end the harassment, and Big Lots have offered no contrary evidence. Big Lots thus became liable for the disability-based coworker harassment Johnson suffered when Perry learned about it and chose to do nothing. *See Strothers*, 2018 WL 3321317, at *11; *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 177–78 (4th Cir. 2009). Liability is also imputed to Big Lots for all disability harassment that occurred *after* Perry failed to act. *See, e.g.*, *Alexander v. Alcatel NA Cable Sys., Inc.*, No. 01-2077, 2002 WL 31302227, at *7 (4th Cir. Oct. 15, 2002) ("In certain circumstances,

an employer, whose tepid response to valid complaints emboldens would-be offenders, may be liable if a vigorous response would have prevented the abuse."); *Paroline v. Unisys Corp.*, 879 F.2d 100, 107 (4th Cir. 1989), *vacated in part on other grounds*, 900 F.2d 27 (4th Cir. 1990).

Second, even if Big Lots were not liable when Perry received the harassment reports and failed to act, a rational jury could conclude that it became liable when Bishop conducted an "investigation" and "retraining" that were not reasonably calculated to end the harassment. As the evidence cited by EEOC, *supra*, amply reflects, Big Lots' response to the October 2014 complaint by Blackburn was negligent and, indeed, reckless.

The evidence allows a rational finding that Big Lots had actual notice of the hostile work environment. It appears Bishop demanded corroboration as a precondition for taking any action against the harassers despite deeming Johnson to be credible, a negligent approach to harassment prevention that would, if adopted by industry generally, virtually guarantee that most discriminatory hostile work environments would go uncorrected given the often covert nature of workplace harassment. But in this case there *was corroboration* from witnesses such as Blackburn, Coffman, Eddleman, and even Perry himself. Unfortunately, when Bishop received that corroboration she dismissed it, inexplicably deeming the harassment complaint to be "unsubstantiated" despite multiple accounts of disability harassment. This was no doubt due in part to Big Lots' negligent decision to place Bishop in the position of conducting harassment investigations but failing to provide her with adequate training on conducting investigations, investigative interview techniques, credibility assessments, and evaluating evidence.

There was also constructive notice of the hostile work environment. Bishop's questioning of witnesses was incomplete and perfunctory. Bishop failed to ask a number of the harassers whether they engaged in the harassing conduct. Her interview of Blackburn lasted approximately

33

five minutes and she made no attempt to exhaust Blackburn's knowledge of the harassment or witnesses. She did not ask Coffman any questions about Johnson. She failed to interview some coworkers, like Magner, or former manager Bond. Her questioning of others such as Perry was apparently vague and perfunctory. Thus, to the extent Big Lots claims ignorance of the nature and extent of the disability-based hostile work environment at the Elkins store, that ignorance was a product of Big Lots' own negligence. A reasonable employer exercising due diligence in the performance of its legal duty to investigate allegations of disability harassment would have known of the hostile work environment. As a result of the aforementioned errors, Big Lots took no disciplinary or other targeted corrective action of any kind against the individual perpetrators. In light of the severity and pervasiveness of the disability harassment of which Big Lots knew or reasonably should have known, its response was grossly inadequate. Holding a one hour all-hands meeting to just read over a plethora of existing company policies to workers, most of which have no relevance to workplace harassment and discrimination, in response to the disability-biased work environment at issue in this case is, to say the least, a negligent company response.

Finally, there was a third juncture at which Big Lots incurred liability. The disability harassment directed at Johnson resumed in 2015, a mere two or three months after the all-hands meeting at the Elkins store, which demonstrates the weak, ineffectual and negligent nature of Big Lots' response to the harassment. (In fact, Big Lots did not even give instructions to Perry or his supervisor Browning to actively monitor the work environment.) In 2015, Johnson reported the continuing harassment to Perry, who again failed to act and instead actively discouraged complaints to corporate officials by making false statements about Bishop's employment status and statements designed to chill any attempt to bring outside personnel into the store.

Fourth Circuit case law, as well as the case law of every other Circuit, has authorized

findings of employer harassment liability in cases where the action taken in response to complaints was more substantial than in this case. *See, e.g.*, *Sunbelt Rentals, Inc.*, 521 F.3d at 319–21 (investigation of specific incidents and warnings to harassers to not engage in the alleged harassing acts insufficient); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 187–88 (4th Cir. 2001) (manager downplaying complaint and giving weak warning to harasser insufficient); *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 244–46 (4th Cir. 2000).

## II. Big Lots is not entitled to summary judgment on EEOC's retaliation claims.

To state a claim of retaliation under the ADA, EEOC must offer direct evidence of retaliatory motivation for an adverse employment action or proceed under the familiar *McDonnell Douglas/Burdine/Hicks* burden-shifting framework as adapted to retaliation cases. *Rhoads v. FDIC*, 257 F.3d 373, 391–92 (4th Cir. 2001). An adverse employment action is any employer conduct that may deter a reasonable person from opposing unlawful employment practices under the ADA (opposition) or participating in ADA proceedings (participation). *E.g.*, *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 67–68 (2006). Regardless of whether the evidence of motive is characterized as direct or circumstantial, for purposes of Big Lots' Motion the basic question is whether there is evidence sufficient for a rational jury to infer that Blackburn and Johnson were subjected to adverse action because of opposition to employment practices believed to be discriminatory. There is such evidence.

### A. There are genuine issues of material fact concerning Big Lots' retaliatory motive for the Blackburn ultimatum and resulting constructive discharge.

In its Complaint, EEOC pleaded claims that in October 2014 Blackburn made a discrimination complained to Store Manager Perry and District Manager Bond about the disability harassment leveled against Johnson and that she was thereafter subjected to retaliation in the form of an adverse change to her work scheduling (not permitting her to work in a second job at USPS

while retaining her job at Big Lots) and to constructive discharge (demanding that she resign her employment at USPS in order to maintain her employment at Big Lots). In its Motion, Big Lots does not dispute that Blackburn's complaint was ADA-protected opposition. Rather, Big Lots appears to challenge the discriminatory motive element of EEOC's retaliation claim.[4] But Big Lots' argument fails to cite or discuss most of the evidence relevant to this issue. The full evidence of retaliatory motive in this case is compelling.

The timing and sequence of events after Blackburn's complaint and the conduct of Big Lots' officials during those events raises a strong inference of retaliatory motive. Blackburn complained about the hostile work environment at the Elkins store to District Manager Donovan Bond on or about October 28, 2014, and shortly thereafter spoke with Big Lots human resource official Claudia Hooker about the complaint. Thereafter, human resources official Billie Jo Bishop spoke with Store Manager Perry about the complaint, and on or about November 5–6, 2014, she was dispatched to the Elkins store to investigate the complaint. Bishop then re-interviewed Perry about the investigation on November 19, 2014, also questioning him about other issues involving his management of the store. These facts are undisputed.

At that time, a disability-based hostile work environment existed at the Elkins store, and as previously discussed, Perry had a long history of failing to correct that environment. By December 5, 2014, Bishop similarly concluded that the reports of disability harassment at the Elkins store were unsubstantiated despite receiving evidence from multiple witnesses to the contrary, evidence that she inexplicably disregarded. Rather than taking any reasonable corrective action in response to Blackburn's harassment complaint and strong evidence of a hostile work

---

[4] While Big Lots also denies that there was adverse employment action against Blackburn, that argument is predicated entirely on its claim that it had a legitimate non-discriminatory reason for changing her work schedule to require open availability. Accordingly, for purposes of the present Motion the issues of adverse employment action and retaliatory motive merge analytically.

environment, like Perry, Bishop also condoned the harassment and instead turned her attention to Blackburn's schedule, directing Perry to forbid Blackburn from working at the USPS while holding her position at Big Lots. Bishop's and Perry's refusal to take corrective action is itself probative of retaliation against those who complained. The federal courts have long-recognized that an environment where unlawful harassment is condoned increases the likelihood of retaliation and is probative of retaliatory motivation. *See, e.g.*, *Quinn v. Consolidated Freightways Corp.*, 283 F.3d 572, 577–79 (3d Cir. 2002); *Hawkins v. Hennepin Technical Ctr.*, 900 F.2d 153, 155–56 (8th Cir. 1990). "[A]n employer's past discriminatory policy and practice may well illustrate that [its] asserted reasons for disparate treatment are pretext . . . . [A]n atmosphere of condoned [disability] harassment in a workplace increases the likelihood of retaliation for complaints in individual cases." *Hawkins*, 900 F.2d at 155–56.

Also on December 5, 2014, as a result of her investigation of the Blackburn complaint, Bishop reported to Big Lots corporate a very negative critique of Perry's management of the Elkins store, noting his lack of leadership at the store and purported failure to adhere to Big Lots' policies. The negative critique led to a planned visit to the store in January 2015 by both Bishop and District Manager Browning with Perry's knowledge in order to reinforce all company policies, thus occasioning more corporate involvement and oversight. As reflected in the preceding factual discussion, Perry had long feared such repercussions from corporate personnel involvement and knowledge of his store, at various times warning Blackburn and Johnson not to complain to corporate and get corporate officials involved in the store's operations.[5]

Blackburn observed that Perry seemed different after she called Bond. Ex. L (Blackburn Dep.) 116:16–18. "[H]e was upset because they were there." *Id.* 116:22. The evidence reflects that

---

[5] Corporate involvement in the Elkins store eventually led to Perry's discharge in May 2016.

after Blackburn's complaint Perry began to treat her differently, distancing himself from her by not speaking with her as he had done before.

Then within just a few weeks of this series of events, on December 16, 2014, Perry visited upon Blackburn the consequences of her decision to complain to corporate about the disability harassment. He presented Blackburn with an ultimatum concerning her known, long-term second job at USPS: leave her job at USPS or leave her job at Big Lots. Bishop has testified that she told Perry he was to offer Blackburn *three* options regarding her second job at USPS, not two: (1) open her availability fully by resigning from USPS and remain a full-time Big Lots furniture manager; (2) resign from Big Lots; or (3) step into another position at Big Lots not requiring open availability, such as a part-time hourly position. However, Bishop never confirmed with Perry that he had told Blackburn that she could have stepped into a part-time position. Ex. E (Bishop Dep.) 127:11–16. Nor did she reach out to Blackburn directly, despite her own conclusion that Perry was an ineffective manager, to ensure that he had delivered the message appropriately. *See* Ex. L (Blackburn Dep.) 114:23–115:6. While Perry claims he made that offer, Blackburn has testified that Perry *never offered the third option of stepping into a part-time position*, giving rise to a reasonable inference that either (a) Bishop has lied about providing the part-time option or (b) Perry made a material misrepresentation to Blackburn about Big Lots' intentions and has now lied about communicating the part-time option to Blackburn. Either inference supports a conclusion by a reasonable juror that the Big Lots officials in question have offered a false, pretextual explanation for their actions concerning Blackburn.

Most tellingly, there was an admission of retaliatory motive by Perry. When Blackburn asked Perry to explain why she was being presented with an ultimatum to leave Big Lots or USPS, one or the other, he stated the following: "I told you we didn't want them [corporate] down here."

38

In that context, a reasonable juror can infer direct evidence of retaliatory motivation, clearly presenting a fact question for trial concerning the reasons for Big Lots' actions.

Faced with a choice of losing her federal employment or her position at Big Lots, Blackburn was forced to choose the latter. The evidence reflects that if she had been presented with the third option to continue working at Big Lots, she would have stepped into a part-time position to do so. The evidence regarding Big Lots' treatment of Blackburn after she complained, taken in conjunction with the evidence of retaliation against Johnson, discussed below, demonstrates that Big Lots is not entitled to summary judgment.

**B.      Summary judgment is inappropriate regarding EEOC's claims that Johnson was denied promotion because of disability and retaliation.**

As a threshold matter, EEOC notes that in its Complaint it has asserted both disability-discrimination and retaliation claims concerning Big Lots' failure to promote Johnson. With regard to the disability-discrimination claim, Perry's statement to Johnson and Blackburn that he would select Curtis for any full-time furniture-manager position over Johnson because she could "do the talking better," particularly in view of his long-standing tolerance of a disability-biased hostile work environment created in part by Curtis herself, exposed his discriminatory animus based on her hearing and speech impairments. Regardless, Big Lots' Motion does not challenge the sufficiency of EEOC's disability-discrimination claim regarding Johnson's non-promotion, so that claim must proceed to trial regardless of the disposition of the instant Motion.

Regarding EEOC's retaliation claim for Johnson, Big Lots asserts there is insufficient evidence to permit a rational fact-finder to conclude there was retaliatory motivation. Big Lots is incorrect. There are genuine issues of material fact for trial on the question of retaliatory motive.

After Big Lots constructively discharged Blackburn from her furniture department manager position, the company sought to replace her with another worker and posted the position.

Johnson applied and was interviewed for the position in January 2015 by District Manager Browning. Johnson had extensive experience in the furniture department and had been groomed for such a position by Big Lots management, receiving training in furniture operations. Instead, on February 1, 2015, about a month after Big Lots concluded its investigation of Johnson's disability harassment, Big Lots promoted one of her harassers, Bobbi Curtis, and now claims that Curtis was chosen because she had management experience that Johnson lacked.

As an initial matter, the less than two-month period between the investigation, during which Johnson reported harassment, and the denial of promotion is suspect timing. *See Lauer v. Schewel Furniture Co.*, 84 F. App'x 323, 329 (4th Cir. 2004); *King v. Rumsfeld*, 328 F.3d 145, 151 & n.5 (4th Cir. 2003). But there is even more probative evidence of retaliatory motivation.

First, Big Lots' explanation is vague and unsupported. Big Lots has offered no evidence that prior management experience was requisite for selection into the furniture department manager position or that any such requirement is consistently applied, no specification of the type or quantum of such experience that is required, and no explanation as to how Curtis satisfied that purported criterion. Such generalized assertions of better "experience" without supporting explanation or evidence are classic indicia of pretext.

Moreover, Big Lots and Perry have shifted their explanations for the decision over time. In its Position Statement presented to EEOC during the investigation of this matter (which was subject to criminal penalties for knowingly false statements under 18 U.S.C. § 1001), Big Lots explained that Johnson did not receive the position because she never even applied, stating, "Most importantly, Complainant never applied for [the] position." Ex. E (Bishop Dep.) Ex. 4 at BLSI000066–67. This information was supplied to Big Lots corporate by Perry himself during Big Lots' efforts to respond to. Johnson's EEOC charge of discrimination. At that time, Perry

40

claimed that Johnson was not promoted "because she did not apply and did not interview with the hiring manager, Douglas Browning." *Id.* Ex. 3 at BLSI000617; 80:12–81:5. But the evidence discussed *supra* demonstrates that Johnson applied and Browning confirms she was considered a candidate and was interviewed for the position. Perry's explanation to his own employer was false, and he knew it. As previously detailed in this brief, Perry knew because Browning told him that he (Browning) intended to interview Johnson for the job and Perry opposed it, adamant that Johnson should not be interviewed for the job. Perry later consulted with Browning on the selection, including telling Browning about Johnson's and Curtis's employment.

Thus, Perry, who had already forced Blackburn out of her employment at Big Lots in retaliation for her complaint on Johnson's behalf, also opposed Johnson being considered for the promotion into Blackburn's former position, even attempting to prevent her interview. Perry's involvement caused the decision to reject Johnson and select one of her harassers.

While Big Lots claims that Browning was the final decision-maker concerning to not promote Johnson to the furniture manager position, Browning admitted that he relied heavily on Perry's recommendation to select Curtis and not promote Johnson and that it was his practice to defer to the wishes of Big Lots store managers concerning selection of personnel for promotions within their stores.[6] It is well-established that when a supervisor who is not the ultimate decision-maker regarding an adverse employment action engages in a discriminatorily motivated act with the intent to cause the adverse employment action, the employer will be liable for discrimination if the supervisor's act is the proximate cause of the adverse employment action taken by the ultimate decision-maker, even if the ultimate decision-maker harbored no discriminatory animus.

---

[6] Indeed, Big Lots also admitted in its Position Statement submitted to EEOC in response to Johnson's charge that when "Curtis was promoted to Furniture Sales Lead on February 1, 2015" she was "selected by Perry[.]" Ex. 4 at BLSI00067.

*E.g.*, *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011). This is often referred to as "cat's paw" liability.[7]

Thus, the evidence gives rise to a reasonable inference that Perry's opposition to promoting Johnson and input caused her non-promotion. Given that there is a genuine issue of material fact concerning Perry's retaliation against Blackburn for complaining of disability harassment on Johnson's behalf, that same motive evidence and inference also gives rise to a reasonable inference that Perry retaliated against Johnson. The inference has added force in light of the evidence that Perry has also repeatedly discouraged and warned *Johnson* not to get Big Lots corporate involved in the hostile work environment issues at the Elkins store. In light of the totality of the evidence discussed above, a reasonable jury could conclude that Perry punished Johnson by preventing her promotion in retaliation for her series of complaints about disability harassment culminating in Blackburn's complaint to corporate on her behalf, Johnson's reporting to Bishop in November 2014, and the investigation that uncovered his mismanagement.

## III.   Summary judgment on EEOC's punitive-damages claim is unwarranted.

Big Lots asserts that it is entitled to judgment as a matter of law regarding its good-faith-efforts affirmative defense under *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). It is not. Contrary to Big Lots' misrepresentation, Fourth Circuit case law does not automatically bar an award of punitive damages where an employer maintains and communicates an antiharassment policy. To the contrary, "the mere existence of an ADA compliance policy will not alone insulate an employer from punitive damages liability." *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 374 (4th Cir. 2008). Instead, "an employer maintaining such a compliance policy must also take

---

[7] While Perry himself has disclaimed responsibility for hiring the furniture manager and testified that he had no input in the decision, Ex. C (Perry Dep.) 59:3–4, the evidence from Browning shows the contrary, and the conflicting accounts on that point are further evidence of pretext.

affirmative steps to ensure its implementation." *Id.* The employer's state of mind remains the central question under 42 U.S.C. § 1981a(b)(1), and evidence that it promulgated but failed to implement an ADA-compliance policy in good faith will not establish the affirmative defense. "The good-faith defense rests on the notion that the existence *and enforcement* of an anti-discrimination policy shows that the employer itself 'never acted in reckless disregard of federally protected rights.'" *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 443 (4th Cir. 2000) (*quoting Kolstad*, 119 S. Ct. at 2129) (emphasis added).

Thus, to establish its entitlement to judgment as a matter of law on this affirmative defense, Big Lots must show the absence of any genuine factual dispute about its good-faith efforts to implement its anti-harassment policy. But there are genuine issues of material fact on that question. As reflected elsewhere in this brief, Perry was not trained to effectively implement the anti-harassment policy, and he willfully refused to do so despite the fact that the scope of his agency with Big Lots included anti-harassment-policy implementation. Bishop also was not trained adequately to implement the policy; inexplicably declined to ask even the most basic questions of witnesses during her "investigation," including refusing to squarely ask the four perpetrators whether they themselves actually harassed. Johnson in the ways reported; and, perhaps most significantly, she refused to take reasonable corrective action against the perpetrators of the harassment, characterizing the harassment reports as "unsubstantiated" notwithstanding her knowledge and her belief that Johnson's account of harassment was credible, her possession of corroborative evidence supplied by other witnesses, and a lack of contrary evidence from the perpetrators, who apparently were never asked if they did it. This evidence raises genuine issues of material fact on Big Lots' good-faith-efforts and forecloses Big Lots' ability to meet its summary-judgment burden to prove that no reasonable juror could reach any conclusion other than

the employer established its good-faith-efforts defense. The question of a party's "good faith," like other state of mind issues, is a quintessential jury question and should be resolved on a full trial record, not by summary disposition.

## IV.     Summary judgment on EEOC's injunctive-relief claim is unwarranted.

Title VII (and by extension the ADA) authorizes injunctive relief if the Court finds that Big Lots intentionally engaged in an unlawful employment practice. 42 U.S.C. § 2000e-5(g)(1); *see also* 42 U.S.C. § 12117(a) (incorporating Title VII's enforcement provisions into the ADA). The proven discrimination need not be ongoing to warrant an injunction. *United States v. Gregory*, 871 F.2d 1239, 1246 (4th Cir. 1989). Although an injunction's scope is committed to its discretion, the Fourth Circuit has held that district courts lack discretion to deny injunctive relief completely once discriminatory employment practices have been proven. *See id.* Upon a finding of liability, the burden shifts to the employer to demonstrate no reasonable probability of future violations in order to avoid injunctive relief. *See, e.g., EEOC v. Serv. Temps Inc.*, 679 F.3d 323, 338 & n.51 (5th Cir. 2012); *EEOC v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1253–54 (11th Cir. 1997); *EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1544–45 (9th Cir. 1987); *EEOC v. CONSOL Energy, Inc.*, 151 F. Supp.3d 699, 711 (N.D.W. Va. 2015), *aff'd*, 860 F.3d 131 (4th Cir. 2017).

Big Lots has not carried its burden to show no reasonable probability of future ADA violations. Johnson remains employed at Big Lots, as does Bertelli, one of the alleged harassers. Ex. B (Johnson Dep) 9:8–9; Ex. G (Bertelli Dep.) 14:2–3. Johnson and Bertelli often work the same shift. Ex. B (Johnson Dep.) 104:4–10. Bertelli's harassment has ceased and resumed on multiple occasions in the past, such as after the January 2015 store meeting. It is undisputed that Bishop, who conducted the negligent and reckless investigation in this matter, also remains

44

employed by Big Lots in a human-resources position responsible for conducting disability and other harassment investigations. These facts distinguish this case from *Spencer*, which concerned only a single incident of harassment where the employer terminated the lone harasser. Moreover, as discussed, Big Lots has never taken effective action reasonably calculated to ending the harassment at the Elkins store and deterring its recurrence. Thus, the risk of future disability harassment remains. Disposition of EEOC's claim for injunctive relief would be premature at this stage of the proceedings when there has been no fact-finding on a complete trial record.

## CONCLUSION

For the reasons set forth above, EEOC respectfully requests that this Court deny Defendant's Motion for Summary Judgment in its entirety.

Respectfully submitted,

/s/ Gregory A. Murray_____
Gregory A. Murray
Trial Attorney
Pa. I.D. No. 316144
EEOC – Pittsburgh Area Office
William S. Moorhead Federal Building
1000 Liberty Avenue, Suite 1112
Pittsburgh, PA 15222
Phone: (412) 395-5844
Fax: (412) 395-5949
gregory.murray@eeoc.gov

/s/ Ronald L. Phillips_____
Ronald L. Phillips
Supervisory Trial Attorney
Ohio I.D. No. 0070263
EEOC – Baltimore Field Office
City Crescent Building, 3d Floor
10 South Howard Street
Baltimore, MD 21201
Phone: 410-209-2737
Fax: 410-962-4270
ronald.phillips@eeoc.gov

William J. Powell
United States Attorney

/s/ Helen Campbell Altmeyer
Helen Campbell Altmeyer
Assistant United States Attorney
Civil Division Chief
WV Bar #117
United States Attorney's Office
U.S. Courthouse & Federal Building
1125 Chapline St., Suite 3000
Wheeling, WV 26003
Telephone: (304) 234-0100
helen.altmeyer@usdoj.gov

45

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS DIVISION

**U.S. EQUAL EMPLOYMENT**
**OPPORTUNITY COMMISSION**,

        Plaintiff,

    v.

**BIG LOTS STORES, INC.**,

        Defendant.

Civil Action No. 2:17-cv-00073

Hon. John Preston Bailey

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on this 27th day of July 2018, the foregoing

Plaintiff EEOC's Response in Opposition to Defendant Big Lots Stores, Inc.'s Motion for

Summary Judgment was served via the Court's ECF filing system to the following:

Mark A. Knueve, Esquire
Daniel J. Clark, Esquire
Cory D. Catignani, Esquire
Vorys, Sater, Seymour and Pease, LLP
52 East Gay Street
Columbus, OH 43215

*Attorneys for Defendant*

Respectfully Submitted,

/s/ Helen Campbell Altmeyer
Helen Campbell Altmeyer
Assistant United States Attorney
Civil Division Chief
WV Bar #117
United States Attorney's Office
U.S. Courthouse & Federal Building
1125 Chapline St., Suite 3000
Wheeling, WV 26003
Telephone: (304) 234-0100
helen.altmeyer@usdoj.gov