## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### Elkins

**U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,**

Plaintiff,

v.

**Civil Action No. 2:17-CV-73**
Judge Bailey

**BIG LOTS STORES, INC.,**

Defendant.

## ORDER DENYING MOTION FOR
## SUMMARY JUDGMENT AND MOTION TO STRIKE

Pending before this Court are Defendant Big Lots Stores, Inc.'s Motion for Summary Judgment [Doc. 56] and Big Lots Stores, Inc.'s Motion to Strike Declarations of Christena Johnson [Doc. 72]. Both motions have been fully briefed and are ripe for decision.

In its motion for summary judgment, Big Lots advances a number of arguments:

1.  That Christena Johnson is not disabled under the ADA;

2.  That Christena Johnson was not harassed because of a disability;

3.  That any harassment was not severe or pervasive;

4.  That Big Lots is not liable for the harassment;

5.  That Sheria Blackburn's retaliation claim fails;

6.  That Christena Johnson's retaliation claim fails;

7.  That there is no availability of punitive damages; and

8.  That any claim for punitive damages fails as a matter of law.

This case was filed on June 6, 2017, by the Equal Employment Opportunity Commission ("EEOC") on behalf of two charging parties, Christena Johnson and Sheria Blackburn. With respect to Ms. Johnson, the EEOC alleges that Big Lots Stores, Inc. ("Big Lots") has since May, 2014, subjected her to harassment that has created a hostile work environment on the basis of her disability. In addition the EEOC alleges that both Johnson and Blackburn were the subject of adverse treatment in retaliation for reporting the harassment of Johnson.

Hostile work environment claims under the ADA require proof of the following: (1) the worker is a qualified individual with a disability; (2) was subjected to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability to the employer. *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001).

## I.    Christena Johnson has a disability

Christena Johnson has lived in Elkins for most of her life. She has bilateral deafness, i.e., hearing loss in both ears. She has been completely deaf in her right ear and partially deaf in her left ear since birth or shortly thereafter. Her hearing and speech impairments have imposed substantial limitations throughout her life. For example, she cannot hear whispers, easily engage in in-person conversation without facing a person to read his/her lips, or easily use a telephone without focusing all her attention on the call to the exclusion of her surroundings.

She also has difficulty pronouncing r sounds, and people sometimes have difficulty

2

understanding her speech, which requires her to repeat herself. When she was in school, her interactions with others were limited by their perceptions and prejudice, and she even had to transfer high schools in the ninth grade to escape bullying. Later in high school, she had wanted to become a secretary but abandoned that aspiration because she thought she could not perform largely phone-based work.

Because of her speech impairment, most people (including her Big Lots coworkers and supervisors) immediately understood that she had impaired hearing. According to former Store Manager David Perry, "she did speak different." Former District Manager Donovan Bond noticed that "her speech was a little off" and her hearing impairment was obvious. Regional Associate Relations Leader Billie Jo Bishop knew that "Her communication would be consistent with someone who is hearing impaired but maybe not completely deaf." Former coworkers Shirlee Coffman and Pamela Heckler and current coworkers Sheila Bertelli and Fay Magner all knew that her hearing impairment is obvious. Former coworker Kellie Graham recalled, "[S]he talked funny, so you knew she couldn't—she would more or else [sic] tell you she couldn't hear well," "It was common knowledge," and, "[I]t's not like you didn't know." And former coworker Barbara "Bobbi" Curtis testified, "[I]t's obviously the deaf voice."

Since on or about August 3, 2011, Johnson has worked as a part-time cashier and stocker at Big Lots' retail store in Elkins. She performs cashier, stocking, and recovery (i.e., returning merchandise to and tidying shelves) duties. She also performs many duties in the store's furniture department, including but not limited to unloading furniture trucks, setting "planograms" (i.e., erecting merchandise displays according to blueprints), executing price holds (which was a task that typically only managers and employees who

3

regularly worked in the furniture department were trained to perform), stocking, and financing. Johnson had received extensive training in furniture department duties.

Store Manager Perry described Johnson as a good employee who is eager to work, willing to learn, and performs her job duties as instructed. She met or exceeded expectations every year she worked for him. As a single mother with three children (one of whom is completely deaf), Johnson tried to work as many hours as possible and regularly volunteered to work additional shifts at other Big Lots stores to help with tasks such as putting out freight and setting planograms. Johnson was typically first to volunteer for such assignments and could perform myriad other duties. Johnson worked in the furniture department more frequently than other employees, even those who had received the same training in the department.

This evidence demonstrates that Johnson has an actual disability under the current ADA definition of coverage. Following the adoption of the ADA Amendments Act of 2008 (ADAAA), the standard for establishing disability was significantly relaxed to ensure broad coverage of workers. As amended, the ADA now sets forth rules of construction that must be used when construing and applying the statutory term disability. See 42 U.S.C. § 12102(4). The Act now directs the courts to construe "disability . . . in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter. Moreover, when determining whether an individual is substantially limited in a major life activity, the courts are directed to assess the limitations that the worker would experience in the absence of mitigating measures and to disregard the ameliorative effects of those mitigating measures, such as "learned behavioral or adaptive neurological modifications." § 12102(4)(E)(iv).

4

In the ADAAA legislative findings, Congress stated its clear intent to provide expansive disability coverage and to specifically reject the "demanding standard" for establishing disability announced in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), which required that a worker's impairment "prevents" or "severely restricts" performance of a major life activity. Pub. L. No. 110-325, § 2(b)(4). Instead, Congress directed the courts and the EEOC to focus their analysis on the employer's conduct, not disability coverage questions, as the "primary object of attention" in ADA cases, and that questions of whether an impairment is a disability "should not demand extensive analysis." Id. § 2(b)(5).

Applying ADAAA standards to this case, it is readily apparent that Johnson has an actual disability, or at least there is a genuine issue of fact for the jury on that question. Johnson is completely deaf in her right ear and partially deaf in her left ear and has been since birth or shortly thereafter. Her deafness substantially limits her major life activities, including but not limited to hearing, speaking, and communicating.

42 U.S.C. § 12102(2)(A) provides that "major life activities include, but are not limited to . . . hearing . . . speaking [and] communicating. In addition, 29 C.F.R. § 1630.2(j)(3)(iii) states "[I]t should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: Deafness substantially

limits hearing . . . ."

Although Johnson testified in her deposition that her deafness did not limit her activities inside or outside work, that is not the relevant question. Hearing, speech, and communication are each major life activities in themselves, and so the issue of whether

5

Johnson experiences any additional limitations as a result of her substantial limitations in hearing, speech, and communicating is legally immaterial. See 42 U.S.C. § 12102(4)(C) ("An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability."). The issue is whether, without consideration of adaptive behaviors such as lip reading, Johnson's condition, manner or duration of hearing, speech or communication are substantially limited as compared to most people in the general population. See, e.g., id. § 12102(4)(E)(iv); 29 C.F.R. § 1630.2(j)(1)(ii) & (j)(4).

In her deposition, Johnson was not specifically asked about the condition, manner, or duration of her hearing ability in itself or her speech. The evidence shows that she is substantially limited particularly, but not exclusively, if the analysis applies the ADAAA requirement that her adaptive behavior of lip reading should be disregarded when assessing whether she is substantially limited in hearing. ("It's hard for me to hear the intercoms and stuff."), (describing her difficulty hearing customers over the phone); ("[Y]ou could talk to her sometimes and she would tell you, 'I can't hear you,' unless you are, like, right in front of her, talking, where she can—yeah.").

Applying the post-ADAAA standard, the federal courts have held that plaintiffs with hearing loss similar to Johnson's had produced sufficient evidence of disabilities under 42 U.S.C. § 12102(1)(A). *See Brown v. CVS Pharmacy, Inc.*, 2013 WL 3353323, at *2–3 (M.D. Fla. July 2, 2013) (holding that plaintiff produced sufficient evidence that deafness in her right ear and neuropathic pain in her left ear constituted an actual disability). In fact, even courts applying the more-stringent pre-ADAAA legal standard for disability have reached this conclusion. *See Bosket v. Long Island R.R.*, 2004 WL 1305746, at *3–5

6

(E.D. N.Y. June 4, 2004) (denying both parties' motions for summary judgment regarding disability status of plaintiff with unilateral hearing loss because "[f]act-intensive inquiries such as this often require resolution at trial"); *Connolly v. Bidermann Indus. U.S.A., Inc.*, 1998 WL 305643, at *5–6 (S.D. N.Y. June 9, 1998) (denying motions for summary judgment regarding disability of plaintiff with unilateral functional deafness and tinnitus because substantial limitation is issue of fact for trial).

Big Lots relies on some responses that Johnson made during her deposition to support its Motion. During her deposition, the following exchanges occurred:

Q.  Are you disabled?

A.  Yes.

Q.  How so?

A.  I'm deaf in my right ear?

Q.  Do you have any other impairments that you believe constitute a disability other than your right ear?

A.  No.

* * *

Q.  During your employment with Big Lots did you have any work restrictions or limitations as a result of your hearing impairment?

A.  No.

Q.  Has your hearing impairment impacted your performance in any other jobs that you've held?

A.  No.

Q.  Okay. Does your hearing impairment impact you or impose any limitations

7

on your life outside of work?

A.    No.

[Doc. 57-1, pp. 18-19].

As noted above, Johnson's hearing and speech impairments are sufficient to constitute a disability. There need not be any more. Furthermore, the ADA does not require that a claimant be unable to work to support a claim.

In relation to its argument, Big Lots has moved to strike the declaration of Christena Johnson, alleging that her declaration is in direct conflict with her deposition testimony and therefore constitutes a "sham affidavit." This Court finds that there is no direct contradiction between the declaration and Ms. Johnson's deposition testimony taken as a whole. The Motion to Strike will be denied.

## II.    There is evidence that Ms. Johnson was harassed and that her harassment was because of her disability.

Based upon the evidence presented in connection with the motions, it is clear that a jury could find that Ms. Johnson was harassed and that the harassment was because of and based upon her hearing and speech impairments.

First, Johnson testified that the alleged harassers regularly and expressly referred to her deafness in derogatory ways while harassing her. This evidence directly connects their mockery to her hearing and speech impairments. *Fox*, 247 F.3d at 179 (concluding that harassment was attributable to plaintiff's and other disabled employees' medical conditions because the terms handicapped MF and hospital people "expressly referenced their disabilities and resulting medical restrictions"). And Johnson perceived it as such. ("If I don't say the words correctly or I don't do something correctly, you think it's right to

8

have someone to be made fun of, called retard or stupid?").

Second, there is evidence of disability motivation contained in the testimony of other witnesses. Multiple witnesses testified that Johnson suffered harassment expressly because of her hearing and speech impairments. E.g., [Doc. 63-15 (Blackburn Dep.) 113:1–114:16] (describing harassers imitating "some word Christena couldn't pronounce correctly" over the intercom and "busting out laughing"); [Doc. 63-16 (Eddleman Dep.)] 20:7–14 (stating that Johnson spoke loudly over the intercom because of her partial deafness and that coworkers "would pick on her over that"); [Doc. 63-10 (Coffman Decl.) ¶¶ 6–7] (describing Heckler, Curtis, and Graham regularly mocking Johnson and Curtis and Graham mocking Johnson at an October 2014 store event).

Furthermore, even assuming for the sake of argument that other direct and circumstantial evidence of disability motive were not present in this case, Big Lots presents no evidence that any of Johnson's nondisabled coworkers were subjected to the nature and quantum of abuse that Johnson was forced to endure at the hands of her tormenters and that Big Lots tolerated and condoned.

Big Lots' argument regarding the epithets retard and stupid, to which Johnson was regularly subjected, is particularly meritless. Contrary to Big Lots' representation that Bertelli's and Curtis' use of those terms was unconnected to Johnson's hearing and speech impairments, the same perpetrators who abused Johnson by calling her retard and similar epithets also harassed her with overt references to her disability or mocked her manner of speech and hearing, giving rise to an inference that any harassment not overtly referencing hearing or speech was nevertheless motivated by that disability. As the evidence reflects, and as the jury will observe at trial, Johnson has a speech impairment and difficulty hearing

9

that some biased, uninformed persons may view as a reflection of diminished intellect. It is an unfortunate disability stereotype that is common knowledge in our society. Under the circumstances of this case (or simply in light of common experience) a reasonable juror could (and probably will) infer that the use of epithets such as retard and similar comments and abuse directed at Johnson were motivated by her speech and hearing impairments.

In fact, courts have held that the epithet retard is evidence of disability-based animus regarding hearing or speech impairments. *See Long v. Hoffman Enclosures, Inc.*, 2008 WL 2548640, at *3–4 (E.D. Ky. June 23, 2008) (crediting plaintiff's allegations that supervisor called him a retard, reject, and one-armed bandit because of his speech impairment and impaired arm).

The fact that one or two of the four alleged perpetrators may have occasionally mistreated other nondisabled employees does not show that the treatment of Johnson was unmotivated by disability-based animus. The ADA does not insulate employers from liability for a disability-motivated hostile work environment simply because the perpetrators of the hostile work environment are occasionally mean to someone other than the disabled worker for other reasons. The evidence of disability-based motivation for the harassment directed at Johnson is overt and permits a reasonable inference of disability motivation.

## III. The harassment was severe and pervasive

To demonstrate actionable workplace harassment, a plaintiff must show that she/he subjectively perceived the work environment to be hostile or abusive and that the harassment was sufficiently severe or pervasive that a reasonable person would perceive it as such, i.e., that it was objectively hostile or abusive. *Fox v. General Motors Corp.*,

247 F.3d 169, 178 (4th Cir. 2001). In assessing whether the workplace was objectively hostile, factors to be considered include the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating or merely an offensive utterance, and whether it unreasonably interfered with work performance. *Id.* Even if individual acts of harassment do not create an actionable hostile work environment on their own, their accumulated effects may create one. *Williams v. General Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999). A holistic analysis that considers the aggregate effect of all categories of unlawfully motivated harassment, whether it overtly referenced a protected trait (e.g., disability) or not, is required. *Id.* at 562-64.

Big Lots does not dispute that Johnson subjectively perceived her workplace as hostile (as the evidence presented by both parties in their briefing allows a reasonable inference that she did regard it as abusive). Instead, Big Lots focuses on whether the harassment was sufficiently severe or pervasive, arguing the harassment was inadequate to establish an objectively hostile work environment.

Big Lots' assertion is based entirely on the assumption, i.e., that only incidents that involved overt reference to hearing impairment or deafness are relevant to the hostile work environment, and all other offensive, pervasive, severe, and humiliating harassment to which Johnson was subjected by her four abusers should be ignored because those acts did not expressly reference her hearing/speech impairment.

But the evidence of the four perpetrators' disability motivation for their long-term campaign of frequent, humiliating workplace abuse against Johnson is both overt and creates an inference that their course of conduct was because Johnson's actual or

11

perceived disability. The harassers' express insults regarding and references to Johnson's disability, their participation in harassing acts in which others referred to Johnson's disability, and their mockery of her hearing or speech limitations exposed their disability-based motivation for all of their offensive conduct directed at Johnson. In its totality, the frequency, severity, and humiliating nature of that course of disability harassment is more than sufficient to establish an objectively hostile work environment. Courts have found that far less significant harassment established an objectively hostile work environment. *See MacVaugh v. County of Montgomery*, 301 F.Supp.3d 458, 466-67 (E.D. Pa. 2018) (holding plaintiff's allegations of being chastised in meetings, criticized and warned about various aspects of employment and told his breaks would be monitored, and being falsely accused of sleeping on the job and fired in response to request for leave sufficient to state hostile work environment claim); *Pallatto v. Westmoreland Cty. Children's Bureau*, 2014 WL 836123, at *17 (W.D. Pa. Mar. 4, 2014) (holding pattern of second-guessing of legitimacy of plaintiff's impairment, denial of co-worker assistance, scheduling changes and unreasonable work deadlines, and reprimands sufficient to establish disability-based hostile work environment); *Garcia v. Potter*, 2010 WL 2025068, at *5 (W.D. Tex. May 18, 2010) (holding postal worker allegations of unwarranted observations/monitoring of work, daily criticism, directive to lift outside of medical restrictions, and placement of undelivered mail in locker stated claim of hostile work environment). The nearly daily harassment Johnson and others described—which targeted Johnson's hearing and speech impairments and caused her to want to avoid work—demonstrates a genuine issue of material fact regarding whether the work

environment was objectively hostile on the basis of disability, thereby precluding summary judgment.

## IV.  Big Lots could be found liable for the harassment

An employer is liable for coworker harassment if it was negligent in controlling working conditions, i.e., if it knew or should have known about the harassment and failed to take prompt and effective remedial action reasonably calculated to ending the harassment and preventing its recurrence. *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 332 (4th Cir. July 6, 2018); *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008).  Knowledge can be imputed to the employer if a reasonable person intent on complying with the ADA would have known of the harassment. *See Sunbelt Rentals, Inc.*, 521 F.3d at 319.  Reporting harassment to an onsite manager whose knowledge is imputed to the corporation constitutes sufficient notice to the employer. *id.* at 320; *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 982 (4th Cir. 1997) (holding complaints to warehouse manager who supervised harasser gave notice to employer).

Big Lots argues that it cannot be found liable for the coworker harassment Johnson suffered, purportedly because Big Lots conducted an "investigation" in November-December 2014 in response to Blackburn's October 2014 complaint to District Manager Bond, and then held an all-hands mass meeting in the Elkins store three months after the complaint, where management read all of Big Lots' existing employment policies to the workforce.  Big Lots' argument is flawed for at least three reasons:

First, Big Lots' liability for the disability-based harassment attached long before Billie Jo Bishop ever visited the Elkins store.  As Big Lots' store manager, Perry was an agent

responsible for receiving complaints of disability harassment and enforcing compliance with Big Lots' harassment policy. ("The store manager is also responsible for compliance with the Company's policies, standards, and initiatives." [Doc. 57-5 at 1]). Accordingly, his knowledge is imputed to the corporation for purposes of liability. *Haugerud v. Amery School Dist.*, 259 F.3d 678 (7th Cir. 2001) (notice imputed to employer when employee follows employer's complaint procedure).

As discussed above, Johnson, Blackburn, and Eddleman, all reported the harassment to Perry prior to Blackburn's complaint to Bond and Bishop's investigation in late 2014. In fact, Johnson's repeated complaints to Perry were contemporaneous with the harassment throughout 2012–14. Moreover, the evidence demonstrates that a reasonable jury could conclude that Perry took no action in response to those complaints that was reasonably calculated to end the harassment. Big Lots thus became liable for the disability-based coworker harassment Johnson suffered when Perry learned about it and chose to do nothing. *Strothers*, 895 F.3d at 334; *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 177–78 (4th Cir. 2009). Liability is also imputed to Big Lots for all disability harassment that occurred after Perry failed to act. *Alexander v. Alcatel NA Cable Sys., Inc.*, 50 Fed.Appx. 594, 602 (4th Cir. 2002) ("In certain circumstances, an employer, whose tepid response to valid complaints emboldens would-be offenders, may be liable if a vigorous response would have prevented the abuse."); *Paroline v. Unisys Corp.*, 879 F.2d 100, 107 (4th Cir. 1989), *vacated in part on other grounds*, 900 F.2d 27 (4th Cir. 1990).

Second, even if Big Lots were not liable when Perry received the harassment

reports and failed to act, a rational jury could conclude that it became liable when Bishop conducted an "investigation" and "retraining" that were not reasonably calculated to end the harassment. The evidence allows a rational finding that Big Lots had actual notice of the hostile work environment. It appears Bishop demanded corroboration as a precondition for taking any action against the harassers despite deeming Johnson to be credible, a negligent approach to harassment prevention that would, if adopted by industry generally, virtually guarantee that most discriminatory hostile work environments would go uncorrected given the often covert nature of workplace harassment. Viewing the evidence most favorably to plaintiff there was corroboration from witnesses such as Blackburn, Coffman, Eddleman, and even Perry himself. Unfortunately, when Bishop received that corroboration she dismissed it, inexplicably deeming the harassment complaint to be "unsubstantiated" despite multiple accounts of disability harassment. This was no doubt due in part to Big Lots' decision to place Bishop in the position of conducting harassment investigations but failing to provide her with adequate training on conducting investigations, investigative interview techniques, credibility assessments, and evaluating evidence.

There was also constructive notice of the hostile work environment. Bishop's questioning of witnesses was incomplete and perfunctory. Bishop failed to ask a number of the harassers whether they engaged in the harassing conduct. Her interview of Blackburn lasted approximately five minutes and she made no attempt to exhaust Blackburn's knowledge of the harassment or witnesses. She did not ask Coffman any questions about Johnson. She failed to interview some coworkers, like Magner, or former manager Bond. Her questioning of others such as Perry was apparently vague and perfunctory. Thus, to the extent Big Lots claims ignorance of the nature and extent of the

15

disability-based hostile work environment at the Elkins store, that ignorance was a product of Big Lots' own negligence. A reasonable employer exercising due diligence in the performance of its legal duty to investigate allegations of disability harassment would have known of the hostile work environment. As a result of the aforementioned errors, Big Lots took no disciplinary or other targeted corrective action of any kind against the individual perpetrators. In light of the severity and pervasiveness of the disability harassment of which Big Lots knew or reasonably should have known, its response was grossly inadequate. Holding a one hour all-hands meeting to just read over a plethora of existing company policies to workers, most of which have no relevance to workplace harassment and discrimination, in response to the disability-biased work environment at issue in this case is wholly inadequate to evade liability.

Finally, there was a third juncture at which Big Lots incurred liability. The disability harassment directed at Johnson resumed in 2015, a mere two or three months after the all-hands meeting at the Elkins store, which demonstrates the weak, ineffectual and negligent nature of Big Lots' response to the harassment. (In fact, Big Lots did not even give instructions to Perry or his supervisor Browning to actively monitor the work environment.). In 2015, Johnson reported the continuing harassment to Perry, who again failed to act and instead actively discouraged complaints to corporate officials by making false statements about Bishop's employment status and statements designed to chill any attempt to bring outside personnel into the store.

Fourth Circuit case law has authorized findings of employer harassment liability in cases where the action taken in response to complaints was more substantial than in this case. *See Sunbelt Rentals, Inc.*, 521 F.3d at 319–21 (investigation of specific incidents

16

and warnings to harassers to not engage in the alleged harassing acts insufficient); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 187–88 (4th Cir. 2001) (manager downplaying complaint and giving weak warning to harasser insufficient); *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 244-46 (4th Cir. 2000).

## V.   Big Lots is not entitled to summary judgment on the retaliation claims.

To state a claim of retaliation under the ADA, a plaintiff must offer direct evidence of retaliatory motivation for an adverse employment action or proceed under the familiar *McDonnell Douglas/Burdine/Hicks* burden-shifting framework as adapted to retaliation cases. *Rhoads v. FDIC*, 257 F.3d 373, 391–92 (4th Cir. 2001). An adverse employment action is any employer conduct that may deter a reasonable person from opposing unlawful employment practices under the ADA (opposition) or participating in ADA proceedings (participation). *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006). Regardless of whether the evidence of motive is characterized as direct or circumstantial, the basic question is whether there is evidence sufficient for a rational jury to infer that Blackburn and Johnson were subjected to adverse action because of opposition to employment practices believed to be discriminatory.

The plaintiff contends that in October 2014, Blackburn made a discrimination complaint to Store Manager Perry and District Manager Bond about the disability harassment leveled against Johnson and that she was thereafter subjected to retaliation in the form of an adverse change to her work scheduling (not permitting her to work in a second job at USPS while retaining her job at Big Lots) and to constructive discharge (demanding that she resign her employment at USPS in order to maintain her employment

17

at Big Lots). In its Motion, Big Lots does not dispute that Blackburn's complaint was ADA-protected opposition. Rather, Big Lots challenges the discriminatory motive element of EEOC's retaliation claim.

The timing and sequence of events after Blackburn's complaint and the conduct of Big Lots' officials during those events does raise an inference of retaliatory motive. Blackburn complained about the hostile work environment at the Elkins store to District Manager Donovan Bond on or about October 28, 2014, and shortly thereafter spoke with Big Lots human resource official Claudia Hooker about the complaint. Thereafter, human resources official Billie Jo Bishop spoke with Store Manager Perry about the complaint, and on or about November 5–6, 2014, she was dispatched to the Elkins store to investigate the complaint. Bishop then re-interviewed Perry about the investigation on November 19, 2014, also questioning him about other issues involving his management of the store. These facts are undisputed.

On December 5, 2014, as a result of her investigation of the Blackburn complaint, Bishop reported to Big Lots corporate a very negative critique of Perry's management of the Elkins store, noting his lack of leadership at the store and purported failure to adhere to Big Lots' policies. The negative critique led to a planned visit to the store in January 2015, by both Bishop and District Manager Browning with Perry's knowledge in order to reinforce all company policies, thus occasioning more corporate involvement and oversight. Perry had long feared such repercussions from corporate personnel involvement and knowledge of his store, at various times warning Blackburn and Johnson not to complain to corporate and get corporate officials involved in the store's operations.

Blackburn observed that Perry seemed different after she called Bond. "[H]e was

upset because they were there." The evidence reflects that after Blackburn's complaint Perry began to treat her differently, distancing himself from her by not speaking with her as he had done before.

Then within just a few weeks of this series of events, on December 16, 2014, Perry visited upon Blackburn the consequences of her decision to complain to corporate about the disability harassment. He presented Blackburn with an ultimatum concerning her known, long-term second job at USPS: leave her job at USPS or leave her job at Big Lots. Bishop has testified that she told Perry he was to offer Blackburn three options regarding her second job at USPS, not two: (1) open her availability fully by resigning from USPS and remain a full-time Big Lots furniture manager; (2) resign from Big Lots; or (3) step into another position at Big Lots not requiring open availability, such as a part-time hourly position. However, Bishop never confirmed with Perry that he had told Blackburn that she could have stepped into a part-time position.

The plaintiff contends that there was an admission of retaliatory motive by Perry. When Blackburn asked Perry to explain why she was being presented with an ultimatum to leave Big Lots or USPS, one or the other, he stated the following: "I told you we didn't want them [corporate] down here." In that context, a reasonable juror could infer direct evidence of retaliatory motivation. On the other hand, the statement could be interpreted as indicating that Perry did not want corporate down there because her managerial position made it against corporate policy forbidding other employment preventing open availability, and that the corporate people would insist upon compliance with that policy. This is a actual issue for trial concerning the reasons for Big Lots' actions.

Faced with a choice of losing her federal employment or her position at Big Lots,

19

Blackburn was forced to choose the latter.

The plaintiff has alleged both disability discrimination and retaliation claims concerning Big Lots' failure to promote Johnson. With regard to the disability-discrimination claim, Perry's statement to Johnson and Blackburn that he would select Curtis for any full-time furniture-manager position over Johnson because she could "do the talking better," particularly in view of his long-standing tolerance of a disability-biased hostile work environment created in part by Curtis herself, is evidence of a discriminatory animus based on her hearing and speech impairments.

Regarding EEOC's retaliation claim for Johnson, Big Lots asserts there is insufficient evidence to permit a rational fact-finder to conclude there was retaliatory motivation. Big Lots is incorrect. There are genuine issues of material fact for trial on the question of retaliatory motive.

After Big Lots constructively discharged Blackburn from her furniture department manager position, the company sought to replace her with another worker and posted the position. Johnson applied and was interviewed for the position in January 2015 by District Manager Browning. Johnson had extensive experience in the furniture department and had been groomed for such a position by Big Lots management, receiving training in furniture operations. Instead, on February 1, 2015, about a month after Big Lots concluded its investigation of Johnson's disability harassment, Big Lots promoted one of her harassers, Bobbi Curtis, and now claims that Curtis was chosen because she had management experience that Johnson lacked.

As an initial matter, the less than two-month period between the investigation, during which Johnson reported harassment, and the denial of promotion is suspect timing. *See*

*Lauer v. Schewel Furniture Co.*, 84 F. App'x 323, 329 (4th Cir. 2004); *King v. Rumsfeld*, 328 F.3d 145, 151 & n.5 (4th Cir. 2003). There is additional probative evidence of retaliatory motivation.

First, Big Lots has offered no evidence that prior management experience was requisite for selection into the furniture department manager position or that any such requirement is consistently applied, no specification of the type or quantum of such experience that is required, and no explanation as to how Curtis satisfied that purported criterion. Such generalized assertions of better "experience" without supporting explanation or evidence can be viewed as pretext.

Moreover, Big Lots and Perry have shifted their explanations for the decision over time. In its Position Statement presented to EEOC during the investigation of this matter (which was subject to criminal penalties for knowingly false statements under 18 U.S.C. § 1001), Big Lots explained that Johnson did not receive the position because she never even applied, stating, "Most importantly, Complainant never applied for [the] position." This information was supplied to Big Lots corporate by Perry himself during Big Lots' efforts to respond to Johnson's EEOC charge of discrimination. At that time, Perry claimed that Johnson was not promoted "because she did not apply and did not interview with the hiring manager, Douglas Browning." But the evidence discussed above demonstrates that Johnson applied and Browning confirms she was considered a candidate and was interviewed for the position. Perry's explanation to his own employer was false, and he knew it. Perry knew because Browning told him that he (Browning) intended to interview Johnson for the job and Perry opposed it, adamant that Johnson should not be interviewed for the job. Perry later consulted with Browning on the selection, including telling Browning

21

about Johnson's and Curtis's employment.

Thus, Perry, who had already forced Blackburn out of her employment at Big Lots in, also opposed Johnson being considered for the promotion into Blackburn's former position, even attempting to prevent her interview. Perry's involvement caused the decision to reject Johnson and select one of her harassers.

While Big Lots claims that Browning was the final decision-maker concerning to not promote Johnson to the furniture manager position, Browning admitted that he relied heavily on Perry's recommendation to select Curtis and not promote Johnson and that it was his practice to defer to the wishes of Big Lots store managers concerning selection of personnel for promotions within their stores.[1] It is well-established that when a supervisor who is not the ultimate decision-maker regarding an adverse employment action engages in a discriminatorily motivated act with the intent to cause the adverse employment action, the employer will be liable for discrimination if the supervisor's act is the proximate cause of the adverse employment action taken by the ultimate decision-maker, even if the ultimate decision-maker harbored no discriminatory animus. *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011). While Perry himself has disclaimed responsibility for hiring the furniture manager and testified that he had no input in the decision, the evidence from Browning shows the contrary, and the conflicting accounts on that point may be evidence of pretext.

Thus, the evidence gives rise to a reasonable inference that Perry's opposition to

---

[1] Big Lots admitted in its Position Statement submitted to EEOC in response to Johnson's charge that when "Curtis was promoted to Furniture Sales Lead on February 1, 2015" she was "selected by Perry[.]"

22

promoting Johnson and input caused her non-promotion. Given that there is a genuine issue of material fact concerning Perry's retaliation against Blackburn for complaining of disability harassment on Johnson's behalf, that same motive evidence and inference also gives rise to a reasonable inference that Perry retaliated against Johnson. The inference has added force in light of the evidence that Perry has also repeatedly discouraged and warned Johnson not to get Big Lots corporate involved in the hostile work environment issues at the Elkins store. In light of the totality of the evidence, a reasonable jury could conclude that Perry punished Johnson by preventing her promotion in retaliation for her series of complaints about disability harassment culminating in Blackburn's complaint to corporate on her behalf, Johnson's reporting to Bishop in November 2014, and the investigation that uncovered his mismanagement.

## VI.    Summary Judgment on the punitive damages claim is not warranted.

Big Lots asserts that it is entitled to judgment as a matter of law regarding its good-faith efforts affirmative defense under *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). It is not. Contrary to Big Lots' misrepresentation, Fourth Circuit case law does not automatically bar an award of punitive damages where an employer maintains and communicates an anti-harassment policy. To the contrary, "the mere existence of an ADA compliance policy will not alone insulate an employer from punitive damages liability." *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 374 (4th Cir. 2008). Instead, "an employer maintaining such a compliance policy must also take affirmative steps to ensure its implementation." *Id.* The employer's state of mind remains the central question under 42 U.S.C. § 1981a(b)(1), and evidence that it promulgated but failed to implement an

23

ADA-compliance policy in good faith will not establish the affirmative defense. "The good-faith defense rests on the notion that the existence and enforcement of an anti-discrimination policy shows that the employer itself 'never acted in reckless disregard of federally protected rights.'" *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 443 (4th Cir. 2000) (quoting *Kolstad*, 527 U.S. at 544).

Thus, to establish its entitlement to judgment as a matter of law on this affirmative defense, Big Lots must show the absence of any genuine factual dispute about its good-faith efforts to implement its anti-harassment policy. But there are genuine issues of material fact on that question. As reflected elsewhere in this brief, Perry was not trained to effectively implement the anti-harassment policy, and he willfully refused to do so despite the fact that the scope of his agency with Big Lots included anti-harassment-policy implementation. Bishop also was not trained adequately to implement the policy; inexplicably declined to ask even the most basic questions of witnesses during her "investigation," including refusing to squarely ask the four perpetrators whether they themselves actually harassed Johnson in the ways reported; and, perhaps most significantly, she refused to take reasonable corrective action against the perpetrators of the harassment, characterizing the harassment reports as "unsubstantiated" notwithstanding her knowledge and her belief that Johnson's account of harassment was credible, her possession of corroborative evidence supplied by other witnesses, and a lack of contrary evidence from the perpetrators, who apparently were never asked if they did it. This evidence raises genuine issues of material fact on Big Lots' good-faith-efforts and forecloses Big Lots' ability to meet its summary-judgment burden to prove that no reasonable juror could reach any conclusion other than the employer established its

24

good-faith-efforts defense. The question of a party's "good faith," like other state of mind issues, is a quintessential jury question and should be resolved on a full trial record, not by summary disposition.

## VII. Summary Judgment on the injunctive relief claims is not warranted.

Title VII (and by extension the ADA) authorizes injunctive relief if the Court finds that Big Lots intentionally engaged in an unlawful employment practice. 42 U.S.C. § 2000e-5(g)(1); see also 42 U.S.C. § 12117(a) (incorporating Title VII's enforcement provisions into the ADA). The proven discrimination need not be ongoing to warrant an injunction. *United States v. Gregory*, 871 F.2d 1239, 1246 (4th Cir. 1989). Although an injunction's scope is committed to its discretion, the Fourth Circuit has held that district courts lack discretion to deny injunctive relief completely once discriminatory employment practices have been proven. *Id.* Upon a finding of liability, the burden shifts to the employer to demonstrate no reasonable probability of future violations in order to avoid injunctive relief. *EEOC v. Serv. Temps Inc.*, 679 F.3d 323, 338 & n.51 (5th Cir. 2012); *EEOC v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1253–54 (11th Cir. 1997); *EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1544–45 (9th Cir. 1987); *EEOC v. CONSOL Energy, Inc.*, 151 F.Supp.3d 699, 711 (N.D. W.Va. 2015), *aff'd*, 860 F.3d 131 (4th Cir. 2017).

Big Lots has not carried its burden to show no reasonable probability of future ADA violations. Johnson remains employed at Big Lots, as does Bertelli, one of the alleged harassers. Johnson and Bertelli often work the same shift. Bertelli's harassment has ceased and resumed on multiple occasions in the past, such as after the January 2015

25

store meeting. It is undisputed that Bishop, who conducted the negligent and reckless investigation in this matter, also remains employed by Big Lots in a human-resources position responsible for conducting disability and other harassment investigations. These facts distinguish this case from *Spencer*, which concerned only a single incident of harassment where the employer terminated the lone harasser. Moreover, as discussed, it is questionable whether Big Lots has taken effective action reasonably calculated to ending the harassment at the Elkins store and deterring its recurrence. Thus, the risk of future disability harassment remains. Disposition of EEOC's claim for injunctive relief would be premature at this stage of the proceedings when there has been no fact-finding on a complete trial record.

For the reasons stated above Defendant Big Lots Stores, Inc.'s Motion for Summary Judgment [**Doc. 56**] and Big Lots Stores, Inc.'s Motion to Strike Declarations of Christena Johnson [**Doc. 72**] are **DENIED**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED:** September 27, 2018.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE